1                  UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
2                        ORLANDO DIVISION


3

SECRETARY OF LABOR, UNITED   )
4   STATES DEPARTMENT OF LABOR, )
                                )
5           Plaintiff,          )            Case Number
                                )
6              v.               )     6:15-cv-1824-Orl-41GJK
                                )
7   CARING FIRST, INC., et al., )
                                )
8           Defendants.         )
    _____)

9

10

11          Transcript of an Order to Show Cause hearing

12            before Magistrate Judge Gregory J. Kelly

13                  March 4, 2016; 10:03 a.m.

14                      Orlando, Florida

15

16
    Appearances:
17
    Counsel for Plaintiff:   Lydia Jones Chastain
18                           Wildali DeJesus

19
    Counsel for Defendants:  Craig A. Brand (by telephone)
20

21
        Proceedings recorded by FTR Gold digital recording,
22   transcript produced by computer.

23
                      Diane Peede, RMR, CRR
24             Federal Official Court Reporter
            401 West Central Boulevard, Suite 4600
25                 Orlando, Florida  32801

**P R O C E E D I N G S**

1

2          THE COURTROOM DEPUTY:  Case number 6:15-cv-1824-

3    Orl-41GJK, Secretary of Labor, United States -- Secretary of

4    Labor and United States Department of Labor versus Caring

5    First, Inc., et al.

6          Counsel, please state your appearances for the

7    record.

8          MS. CHASTAIN:  Good morning, Your Honor.  This is

9    Lydia Chastain, attorney for the Secretary of Labor.

10          With me this morning is Wildali De Jesus,

11    representative for the Wage Hour Division.

12          THE COURT:  Good morning.

13          And who's here in court on behalf of the

14    defendants?

15          MR. TIMOTHY THOMPSON:  Good morning, Your Honor.

16    My name is Timothy Thompson.  I'm one of the named

17    defendants.

18          THE COURT:  Good morning, sir.

19          And on the phone we have?

20          MR. BRAND:  Good morning, Your Honor.  And thank

21    you very much for allowing us to appear by telephone.  This

22    is Craig Brand.  I represent both Dr. Ivanah Thomas as well

23    as Timothy Thompson.

24          Dr. Thomas is also on the line with me, calling in

25    from Jamaica.

1          THE COURT:   Good morning.

2          All right.   By way of background, this action was

3    initiated back in July of last year.   The case was referred

4    to me for all case management issues up to trial by your

5    district court judge on November 20th of last year.

6          December 3rd I entered a scheduling order.   That is

7    a traditional scheduling order, lacking some of the

8    requirements.   But in -- let me just tell you that F.L.S.A.

9    cases are fully over ten percent of our docket here in the

10   Middle District.   And so there's a protocol that we use, a

11   specific scheduling order that requires an early exchange of

12   information between the parties, and the purpose behind that

13   is to expedite the resolution of the claims.

14         Many times the individual claims are not large in

15   terms of the monetary amount, and these cases have the

16   potential for the amount claimed in fees and costs to dwarf

17   the amount at issue in the case.

18         I don't know whether that's the case here.   I don't

19   know exactly how many employees are involved, but that's the

20   purpose behind the scheduling order, is to require an early

21   exchange of information.

22         We find that the issues in these cases are usually

23   not particularly complex, and once the factual information is

24   shared, although the parties rarely agree on everything,

25   there's some sort of common ground that they can reach, and

1    that's why we require an early settlement conference.

2            This case did not have that type of order issued

3    initially, but once it was referred to me, I went ahead and

4    entered that type of an order.  We'll talk a little bit more

5    about that in a moment.

6            But what it required was a mutual exchange of

7    information by January 15th of this year.  And so basically

8    the parties had all of December and part of January to gather

9    the information.

10           And the type of information to be exchanged is not

11   complex.  It's time records, payroll records, et cetera.  And

12   the order clearly states that anything in the parties'

13   possession, custody or control, which would of course include

14   anything in the possession of professionals providing

15   services for the parties, needs to be exchanged.

16           And there was a February 26th deadline for a

17   settlement conference; and then if that was unsuccessful,

18   there was a date of March 16th to go ahead and provide a Case

19   Management Order that would track the case moving forward.

20           What had happened in this case is the Department of

21   Labor, the plaintiff in this action, went ahead and filed a

22   motion for relief from the scheduling order stating that they

23   didn't have the information that this Court had ordered to be

24   disclosed, and also the Department of Labor requested an

25   Order to Show Cause.

1          I went ahead and issued that Order to Show Cause.

2    I've received a response from the defendants in this matter.

3          I would like to hear from the defendants and their

4    counsel in regard to why sanctions should not be imposed as

5    to the defendants and as to counsel in this matter.

6          I've read what was submitted, and it includes a

7    myriad of missteps, misunderstandings, intervening events.

8          And let me just say for the record, Mr. Brand,

9    that, you know, it's unfortunate that you suffered the -- the

10   injury that you did, but this is about discharging duties,

11   duties that you owe and that your clients owe to this Court.

12         And I know that you're here in Orlando.  So you

13   should be familiar with the fact that this Court very much

14   views the schedule as its own and is not receptive to delays

15   based on problems encountered by counsel.

16         So I have questions about whether you -- I want to

17   hear from you in terms of why you think sanctions should not

18   be imposed, but I also have serious reservations about

19   allowing you to continue to represent the defendants in this

20   case, given what's transpired thus far.

21         So I'd like to hear from you in regard to that.

22         MR. BRAND:  No -- no problem.  And thank you, Your

23   Honor.

24         And if this was just something that was simple or

25   just -- or something that could have been foreseen and

planned, then I assure you that these missteps, as Your Honor

pointed out, would not have occurred.

What had happened was it was just a domino effect

of a -- of, I guess, a lot of things just falling down at one

particular period of time.

You -- the scheduling order came out on December

3rd.  We filed a response -- my clients and I met.  We filed

a response to the scheduling order on, I believe it was -- I

have it right now.  It was January 22nd, as well as started

getting together all of the documentation that was required

pursuant to the Court's December 3rd order.

At that particular period of time, Your Honor, we

were already facing the holidays.  My clients had holiday

plans, travel plans.  Myself had holiday travel plans.  And

I'm not using the holiday travel plans as an excuse, because

if it makes -- if it meant holding up my own, I would have

stayed back or done whatever I could to just -- to get

everything out.

What happened was this is not the only employment

case that is going on on Caring First at the same time.

The Secretary of Labor, when they filed their case,

there is 103 named individuals on their Schedule A.  That

compounds with the other employment cases going on with

Caring First, which I believe there's an E.E.O.C. case and

there's some other (indiscernible) court cases going on,

1  everybody propounding discovery requests.

2          So by the time the holidays came around, my office

3  was -- already boxes from Caring First and everything had to

4  get put in order.

5          Now, this is -- this is something that I guess

6  needs to be said and it's something that as I started

7  representing the client, I started learning more and more.

8  Caring First is an institution that sends nurses out to

9  various clients --

10          THE COURT:  Right.

11          MR. BRAND:  -- to take care of complex child --

12  chronic child care problems.  Their -- their workers are not

13  -- or the people that work for Caring First are not, quote,

14  their employees.  And therefore all the records -- and I did

15  not know this until I started getting knee deep into the

16  boxes of the Caring First production.

17          But -- so while there may be a -- if you take the

18  Schedule A and you just look at any one of those individuals,

19  while there may be a folder, a file folder, an employee

20  folder for any of those individuals, which I have separate

21  boxes for -- I mean, when I tell Your Honor that during the

22  month of December and January, tens and tens of thousands of

23  documents were brought to my office, I'm not kidding.  And

24  it's only by starting to go through that did I understand

25  what my clients were talking about.

 1    But if you look at the employee's file folder, it

 2  does not have the time sheets and payroll records in it.  So

 3  where I may have been under a misunderstanding that I would

 4  be able to take file folders of individual employees and

 5  start making copies and start producing them to all of the

 6  plaintiffs' counsel, including the Secretary in the case

 7  before us as well as the other ones, that was not the case.

 8  But then it --

 9    THE COURT:  You know, let me -- let me just stop

10  you right now.  I want to hear what else you have to say.

11  But I think it's appropriate, given the fact you're giving a

12  lengthy narrative, I'm glad to hear you're not using the

13  holidays, okay?  Because the holidays cannot be used, your

14  work load cannot be used, the responsibilities of your client

15  and their day-to-day duties cannot be used as an excuse for

16  failure to comply with an order of this Court.  Other

17  lawsuits cannot be used as a basis.

18    Frankly, having been involved in practice for over

19  20 years and having clients who have been sued by multiple

20  entities before, I know that what you need to do is marshal

21  your resources, get the data together, and assemble it as

22  quickly as possible to cost effectively and efficiently get

23  the information that you need in the hands of the other

24  parties.

25    And in regard to the fact that you were under the

1   misimpression that each individual would have a nice, neat

2   file containing that individual's payroll records and time

3   sheets, I don't know where that came from.  But it seems it

4   was sorely misguided in this case.

5           It sounds like time sheets and payroll records are

6   being kept in the ordinary fashion, which is they're --

7   they're maintained in another location, not in an

8   individualized personnel file.

9           So everything that you're saying to me -- and the

10  fact that these are claimed not to be employees, this is all

11  common, very, very common in this type of case.

12          Let me just ask you, Mr. Brand, do you have any

13  experience in dealing with these F.L.S.A. cases?

14          MR. BRAND:  Yes, I do, Your Honor.

15          THE COURT:  How long have you been practicing law,

16  sir?

17          MR. BRAND:  Since 1991.

18          THE COURT:  Okay.  And how long have you went doing

19  F.L.S.A. litigation?

20          MR. BRAND:  I've been doing this probably going on

21  two years.

22          THE COURT:  Okay.  You and I are virtually

23  contemporaries, okay?  I started practicing in '88.  So I

24  imagine that -- you know, you're giving me a lot of detail

25  and minutia.

1          What I'm telling you is when this Court or any

2  other Court enters an order that says you're to produce time

3  sheets and payroll records, you have an obligation and your

4  client has a corresponding obligation to understand and

5  appreciate that.  And you have an obligation to communicate

6  with your client, not to just surmise that there's going to

7  be individual files.  You have a duty of inquiry, a duty of

8  diligence in order to tell your client, look, this is what

9  needs to be produced.

10          I'm not making any assumptions whatsoever.  This

11  may be hard.  It may be easy.  But here's the deadline and

12  here's what we need to do in order to comply.

13          And furthermore, if you can't -- if you think

14  there's some reason, really good reason, like it's going to

15  cost hundreds of thousands of dollars and take additional

16  time, then I need affidavits with facts supporting it to move

17  for an enlargement of time.  Otherwise, we have no option but

18  to comply.  And that's -- that's how it works.

19          I'm hearing your explanation and I'm just telling

20  you none of it is -- is good cause, from what I've heard.

21  Good cause is all about the diligence that you've exercised

22  from the inception to comply with a deadline established by

23  this Court.

24          And so that's -- that's what I've heard so far from

25  you.  That's my assessment of it, and -- and I want to be

1   candid with you about that.

2          So all right.  So you've talked to me about the

3   fact that you have 103 individuals, the holidays were there,

4   but that was not really a reason.  There were other lawsuits.

5   You thought that these were not employees.  You thought there

6   might be nice, neat individualized files and there weren't.

7          What else do you have in terms of why the Court

8   should not sanction you and your clients?

9          MR. BRAND:  Your Honor, once -- once I learned that

10  the information, the time sheets and payroll records came

11  from other sources, my clients then immediately started to

12  reach out to those other sources and bring them to my office.

13          So the first --

14          THE COURT:  When did that happen?  When did you

15  first come to the realization that the information -- even

16  though the Court's order says anything in your possession,

17  custody or control, which clearly indicates if there's

18  information in the possession of others, you're going to be

19  required to produce it.  When did you come to the realization

20  that there might be information in the possession of third

21  parties?

22          MR. BRAND:  Not -- not third parties.  Of my

23  clients but in different -- different locations, and that

24  would have come, Your Honor, the end of December, early

25  January.

1          THE COURT:  And you had a January 15th deadline to

2    exchange.

3          MR. BRAND:  Yeah, but I -- the -- I did, Your

4    Honor, but that would -- that deadline in and of itself, I

5    would have been able to meet with no problem.  I had --

6    actually, because of this case -- there's a little bit more

7    involved, and I found out as I was putting together the

8    production on the other cases as well, the medical records of

9    these particular patients are all mixed in with the time

10   sheets for these individual care providers.

11         THE COURT:  So you've got HIPAA issues?

12         MR. BRAND:  I had -- I had HIPAA -- HIPAA issues.

13         THE COURT:  Okay.  You don't have a --

14         MR. BRAND:  And in order --

15         THE COURT:  Do you have a stipulation with opposing

16   counsel about HIPAA?  Did you -- did you fashion some form of

17   confidentiality agreement and provide it to them?

18         MR. BRAND:  I -- I -- I wound up getting a software

19   program that allows me to do several things all at one time.

20   It allows me to go through the documents.  I can scan in the

21   documents.  It allows me to electronically redact the

22   documents, the -- the patient information, and then it allows

23   me to save the redacted documents into a file.

24         THE COURT:  Stop -- stop for a moment, Mr. Brand,

25   because I'm -- this is -- this case is going to move forward,

1    I think, a lot more quickly than -- than you're appreciating

2    in regard to discovery, and I'm going to make certain of it.

3            So let me just ask Ms. Chastain, is -- I mean, the

4    most efficient way to deal with this, okay -- I mean, do you

5    want them to redact or do you want some -- some sort of

6    confidentiality agreement where you get unredacted documents?

7    Do you see redaction as posing a problem?  Because I'm not

8    going to have ongoing issues that continue to delay the

9    progress of this case.

10            MS. CHASTAIN:  Your Honor, Mr. Brand did produce

11   certain of the time sheets and he did already redact the

12   patient information.  We can still glean the necessary

13   information from the time sheets with the redactions.

14            But I have no objection and often do consent to a

15   confidentiality agreement.  We have no problem protecting the

16   HIPAA information as long as the documents are marked

17   confidential.

18            THE COURT:  All right.

19            So why -- I mean, in light of that, Mr. Brand, why

20   would you want to go ahead -- if the parties are agreeable to

21   it and want to propose a confidentiality order, which usually

22   we allow parties to agree to confidentiality by stipulation,

23   but in light of the fact that HIPAA is at issue here, you

24   could file a joint motion with this Court that the

25   information will be -- will not be redacted.

1          That would lighten the burden on Mr. Brand and his

2   clients and the information could be exchanged, but the

3   D.O.L. would be under an obligation not to disclose any of

4   that information and the parties could redact, if they need

5   to, at a later point in time.

6          Why -- I mean, if HIPAA is an issue -- it shouldn't

7   be an issue.

8          MR. BRAND:  I'll -- I'll -- I'll tell -- I'll

9   tell -- if I could answer that for Your Honor?

10          THE COURT:  Right.

11          MR. BRAND:  The program -- the program that I got

12   was -- is so good that once I started feeding the information

13   in through the scanner, it did not take me very long, anyway.

14   I think I got -- once I realized where the error was with the

15   production to Ms. Chastain, that was, like, on the 19th, then

16   I had my surgery.  I had -- I wrenched my son to go pick up

17   the boxes and bring them to the house post-surgery.

18          I think it only took me -- to get her the 3,000

19   documents with the redactions, it only took me the better

20   part of a day and a half before I set up a Dropbox and sent

21   them all to her, and this way, they were electronically

22   maintained now as part of my file and as part of her file.

23          THE COURT:  So HIPAA is no longer an issue?  It's

24   totally taken care of?

25          MR. BRAND:  So -- so HIPAA is no longer an issue.

1    I can still work out -- and I have them predone.  I have

2    confidentiality agreements that I could send to Ms. Chastain,

3    you know, at the push of a button and get those over to her.

4            But no matter what, I would still want to scan in

5    the documents, anyway, so that I have an electronic file of

6    my production.

7            THE COURT:  Let me just ask you this.  Have you --

8    have you made a full production?

9            MR. BRAND:  Of everything I have, Your Honor.

10           THE COURT:  Every -- not only --

11           MR. BRAND:  Every --

12           THE COURT:  Not only in your clients' possession

13   but in their care or custody.  So you've gone to accountants,

14   you've gone to lawyers, you've gathered all that information

15   that's in their care, custody or control?  In other words,

16   any third party that owes a duty to go ahead and make it

17   available to your client upon request, have you and your

18   client done that?

19           MR. BRAND:  Okay.  As -- as to myself, Your Honor,

20   I have.  I'm going to answer -- I'm going to answer fully

21   your question.

22           As to whatever I have in my office and has been

23   brought to me, I have nothing left that I haven't provided to

24   Ms. Chastain.

25           THE COURT:  That's not my question.  My question

1  to --

2       MR. BRAND:  My client -- my client -- my client has

3  not.  My client -- my client has a -- has informed me of a

4  problem that she has in being able to get some of the older

5  records, and is telling me solutions -- she's now telling me

6  solutions to the problem or what is the problem.  But the

7  answer is -- the answer is from that perspective, no.

8       And if I could inform the Court what the problem

9  is, I could also -- I could also inform the Court what my

10  client and I have talked about as to how we're going to

11  create the solution to this particular problem.

12       And if Your Honor doesn't mind, may I -- may I

13  inform the Court what the problem is?

14       THE COURT:  Yes.

15       MR. BRAND:  Okay.  The problem is out of the 103

16  listed caregivers --

17       THE COURT:  Yes.

18       MR. BRAND:  -- as I told the Court before, there is

19  no file that says Person A and you open up the file and

20  there's time sheets and payroll records.  Those records are

21  found in the actual ultimate client -- the patient files

22  themselves.

23       Caring First does not have a way -- it's not on any

24  computer system, it's not on any note, it's not in any file

25  -- and I did not know this until recently.  Caring First does

1    not have a way to be able to track which caregivers are

2    associated with what patients at what time.  And therefore in

3    order to fully, fully comply, every box in storage from every

4    ultimate patient needs to be pulled down and the files

5    copied.  And not only files copied, but someone needs to go

6    through the files to make sure that any of the caregivers

7    listed on Schedule A are associated with that particular

8    patient.

9            So -- and as my clients tell the Court, from what

10   my understanding is, we're talking about hundreds and

11   hundreds of boxes of ultimate patient files that need to be

12   dragged out of storage.

13           THE COURT:  Did I -- did I misunderstand what you

14   said?  I thought what you said in the first case was that the

15   problem that your client faces is that the information

16   regarding the care provided by their claimed independent

17   contractors is contained in the individual patient's medical

18   file.  However, you're not able to determine which individual

19   actually provided the care to that particular patient.  Is

20   that what you said?

21           MR. BRAND:  That -- that is my understanding.

22           THE COURT:  Okay.  But then you went on to say,

23   which seems contradictory to me, that each one of those files

24   needs to be pulled down and a review needs to be conducted to

25   verify that one of the individuals on Schedule A actually was

1    the provider of the care to the individual patient.

2            Those things seem completely contradictory and I

3    can't connect them, given what you've explained to me.

4            So what is it that I'm missing?  Do you follow the

5    gap that I'm seeing?

6            MR. BRAND:  I -- I -- I am.  And maybe Dr. Thomas

7    would -- would -- would like to explain.

8            But in a -- in a summary -- hello?  Dr. Thomas,

9    would you like to explain?

10           DR. THOMAS:  Yes.  If I may speak, I would like to.

11           THE COURT:  Yes, but you're going to have to draw

12   closer to the microphone and apparently yell, because you're

13   very, very low volume here in the courtroom.

14           DR. THOMAS:  Okay.  Sir, is that better?

15           THE COURT:  It's a little better, yes.  Keep that

16   up, please.

17           DR. THOMAS:  Okay, sir.  Good morning.

18           THE COURT:  Good morning, Doctor.

19           DR. THOMAS:  Good morning.  Okay.  What he -- what

20   Mr. Brand has explained is the way how we've done it.  The

21   caregiver provides the services, and we have a time sheet

22   plus service lot that Medicaid dictate the information that

23   needs to be on there, i.e., the client name, their Medicaid

24   number.  The time sheets have to be signed by the caregiver

25   and also by the family member.

1    That time sheet is then -- we bill from that time

2    sheet.  That's how we pay them.  And then it is placed in the

3    individual client's file.

4    When Medicaid comes in to do their review, they

5    have their computer system with what we've billed for, and

6    then they then go to the individual client's file to verify

7    that, yes, indeed these are the services that were provided,

8    and make sure (inaudible).

9    As a matter of fact, we just had a service from the

10   Medicaid Attorney's General Integrity Office a couple of

11   weeks ago where they came in and went through a number of

12   files from 2014, client files to verify that the services

13   were indeed provided and what we billed for was absolutely

14   correct, and that was so we did not get one citation.

15   So what I'm saying is that the individuals that are

16   listed on Appendix A from 2012, '13, most of them no longer

17   are working with us and we no longer have those clients with

18   us in our care.  So those files, those client files are

19   imported.

20   We have the caregivers that work with multiple

21   clients.  So literally -- it's not like one caregiver works

22   with one person.  One caregiver may decide, one nurse may

23   decide, okay, I only want to work this day with this person

24   and I want to work the next day with the other person, the

25   next day with somebody else.  They pick and choose who they

1    want to work with, their schedule, according to whatever.

2            So literally we have to go through the individual

3    client files that we have in storage to go through all the

4    time sheets plus service log and to pull out all the

5    individuals that are listed on Appendix A that would have

6    worked with the multiple clients, because we don't have where

7    it's just one nurse working with one client.  They pick their

8    schedule, when they want to work and with whom they want to

9    work, and that is the issue.

10           So we literally have to go through each client file

11   and pull out the individuals that have worked with them.

12   That is what Mr. Brand was trying to explain.

13           It is a very daunting task.  We're trying our best

14   to get it done.  We're working on a very, very slim staff in

15   the office because of the severe Medicaid cuts that we've

16   experienced.  It is extremely, extremely difficult.  I've

17   been a nurse for 30 years and I've never seen anything like

18   this.

19           I sometimes provide free services to these Medicaid

20   recipients sometimes because, for whatever reason, some of

21   the services that Medicaid will not pay for it, even after

22   the client have gotten it.

23           We ran into an issue where we went to a Medicaid

24   H.M.O. that up and went out of business last summer with a

25   couple hundred thousand dollars worth of services that we

1    never got paid for, have no recourse how we're going to get

2    paid for it.  In the meantime, the clients have gotten the

3    services, the nurses have been paid, and we're left holding

4    the bag.

5         So we have several issues.  We had to cut staff,

6    put a hold on accepting patients.  So our patient load right

7    now --

8         THE COURT:  All right, Doctor.  I'm going to stop

9    you because your -- your overall administrative issues are

10   not a concern.  You -- you've got to make the information

11   available and you've got to do it timely.

12        So I understand what you're saying.  You have to go

13   back and look at the individual files, and in there you'll

14   find the time sheets from the individual employee.  So you --

15   well, independent contractors.

16        DR. THOMAS:  Yes, sir.

17        THE COURT:  You'll be able to identify who

18   performed the work.

19        I'm assuming that these files are dated, so that if

20   you wanted to go ahead and get the files for 2012 or 2013,

21   you could do that, right?

22        DR. THOMAS:  Yes.  We just have to dig through to

23   find them.  Yes.

24        THE COURT:  All right.  So, I mean, I'm not

25   understanding --

1    DR. THOMAS:  Well, we're working on it, sir.  We're

2  working on it.

3    THE COURT:  Well, what I'm telling you is you're

4  not -- you're not complying.  Okay?  Clearly, unequivocally,

5  you, your lawyer and -- and Mr. -- Mr. Thompson have not

6  complied with the Court's order.

7    And I'm not -- if -- if these files are in storage

8  -- there's two questions I have for you.  If these files are

9  in storage, why is it that you wouldn't be able to just

10  produce all of the 2012 and 2013 files and make them

11  available?

12    And then the other question I have -- subject to a

13  confidentiality order, so that the information cannot be --

14  so that the information cannot be used for any purpose other

15  than this litigation.

16    The other question I have about it is this.  Are

17  you going about -- both sides going about this the right way?

18  In other words, it sounds like -- are all your clients

19  Medicaid clients?

20    DR. THOMAS:  Yes, sir.

21    THE COURT:  Okay.  So I'm assuming that for all of

22  the work done in 2012, '13 and beyond, that you have billed

23  Medicaid.  In that billing, have you identified the

24  individual independent contractors that performed the

25  services?

1          DR. THOMAS:  I am -- I am sorry, Your Honor.

2  They're all Medicaid right now.  They were not on Medicaid

3  then.  We had some that were H.M.O.s and some that were

4  private insurance I'm alluding to right now.

5          THE COURT:  Okay.  Well, let me just ask you --

6          DR. THOMAS:  (Inaudible) private pay.

7          THE COURT:  Doctor, let me --

8          MR. BRAND:  Your Honor -- Your Honor, if I may?

9          THE COURT:  Let me ask you about your billing

10  system.  Does your billing system identify the individual who

11  provided the services?  When you bill it to --

12          DR. THOMAS:  No, because we have to bill --

13          THE COURT:  When you bill it to Medicaid, an

14  H.M.O., whoever, does it indicate the individual that

15  provided the services or does it only --

16          DR. THOMAS:  No, Your Honor.

17          THE COURT:  No, it doesn't.  It just codes it?

18          DR. THOMAS:  Right.  We have to go on, like, the

19  Medicaid system that they have provided for us, the Florida

20  Medicaid system, and you're putting in the clients'

21  information and then the services provided, hours worked and

22  that kind of thing.  So, no, the individual is not on there.

23          MR. BRAND:  Your Honor, we -- we even approached --

24  I can say I even approached Medicaid to try to ask if they

25  could do a -- something through their patient portal system

1    where they could provide us with all our past billings,

2    because that would be a regurgitation of all the information

3    requested.  And Medicaid flat out told me they would do no

4    such thing.

5            THE COURT:  All right.  Let me talk to you about

6    this, okay?

7            As I see it, based on what I've heard, I do think

8    that sanctions are warranted against counsel and against the

9    clients for failure to comply with the Court's order.  I

10   think that there has been a failure to appreciate fully the

11   duty that is owed to the Court and to opposing counsel in

12   order to abide by the orders of the Court in a timely manner.

13   I don't think diligence was exercised from the beginning, and

14   therefore I find that there is cause to impose sanctions on

15   the -- on the defendants and on their counsel.

16           In light of that, I'm going to go ahead and -- I'm

17   going to withhold the imposition of sanctions, subject -- and

18   provide defendants and their counsel an opportunity to purge

19   any sanction that would be imposed by this Court in the

20   following manner:  I'm going to go ahead and give the

21   defendants until March 11th to go ahead and produce all of

22   these files at issue.  Okay?

23           I -- I realize that that is only a week from today.

24   I'm telling you that what you need to do is produce the

25   files.  I don't care whether you conduct a review of the

files or not, but these files need to be produced.  They need

to be copied.  They need to be produced.

Is there any reason why, with extreme diligence and

an all-out effort, including working on the weekend, that

defendants and their counsel would be unable to produce them?

And I'm not -- I'm telling you don't redact

anything.  You need to -- I will enter an order that says

that all HIPAA information is protected.

I will enter an order that says that the documents

can only be used for purposes of this -- of this action, and

it will basically require that if there is a situation where

the parties want to publicly disclose the documents, they

need to redact the documents.

Mr. Brand, tell me why it is, if for any reason,

you and your clients cannot get these boxes of documents in

the hands of a qualified photocopying operation, get them

copied and get them delivered to opposing counsel in the next

week.

MR. BRAND:  Your Honor, I have -- I have no problem

being able to do that.  Obviously, it won't be done by scan,

then.  It'll just be done by document dump and Federal

Express.

But I've -- I use the services of copy centers

for -- at both Staples and Office Depot.  And for large

orders, such as what Your Honor is requesting, if my client

1   was to bring that many boxes over to them, they would tell us

2   that they need a week alone just for that kind of copying of

3   that many documents.  So it -- it wouldn't --

4            THE COURT:  Now, I -- I disagree.  I literally have

5   had warehouses copied in a -- in a week.

6            MR. BRAND:  The -- the 3,000 pages that I just had

7   done for -- for the plaintiff in this case, they gave me --

8   it took them three days to copy -- to copy those.

9            THE COURT:  I don't know who you're using.  Have

10  you -- what about Iron Mountain?

11           MR. BRAND:  I -- I -- I don't have an account with

12  Iron Mountain anymore.  They're -- they're very expensive

13  compared to the new Staples copy center.

14           THE COURT:  I think you need to go look for

15  somebody who can comply with the Court's order.

16           MR. BRAND:  All right.  The -- the -- the -- the

17  only -- I mean, again, thank you, Your Honor.  And -- and we

18  do want the opportunity to purge and we do want the

19  opportunity to make -- to make it all happen.

20           Logistically, though -- and I can't even offer my

21  services.  I -- as I pointed out in my response, I have just

22  come off of one knee surgery and I'm waiting for the second

23  one.

24           But I -- logistically, I'm not sure -- well,

25  Dr. Thomas, can you make sure that everything is brought over

1   to a copy center within the next few days or the next day,

2   really, in order to get this all done?

3           DR. THOMAS:  Well, we are going to be doing

4   everything in our power to get the help that we can to get

5   all this stuff and going through them and get some help to

6   cover them.  We will do our absolute best.

7           THE COURT:  How many boxes, banker's boxes are we

8   talking about?  A thousand?

9           DR. THOMAS:  Probably a few hundred.

10          THE COURT:  Okay.  I -- if your counsel is -- is

11  correct in that the vendors that you're attempting to use

12  cannot turn that around, you need to look for different

13  vendors or to break it up and -- and to initiate a different

14  Bates numbering system, if you're using Bates numbers on your

15  documents, so that you can discern what was -- what was being

16  copied at each facility.

17          But, you know, if a couple hundred boxes, you know

18  -- I'll -- I'll tell you what.  I'll give you until the --

19  I'll give you until the 18th.  That's two weeks.  I can't see

20  any way that this would not be accomplished in two weeks'

21  time.

22          And, frankly, it's outrageous, that this should

23  have occurred back in mid-January and nobody apparently had

24  an informed discussion about what would be involved.  It's,

25  you know -- Mr. Brand, I want to talk to you about your

1    medical situation.  Are you a sole practitioner?

2              MR. BRAND:  Yes, I am, Your Honor.

3              THE COURT:  All right.  Look, I have serious

4    reservations about your ability to manage this case solo

5    going forward.

6              Being a sole practitioner is challenging, but I'm

7    just -- I'm telling you that's -- you're not going to be able

8    to use that as a basis for an enlargement of time.

9              You're also not going to be able to use a medical

10   condition as a basis.  You know, we have lawyers that appear

11   here in court in wheelchairs.  We have deaf lawyers.  We have

12   blind lawyers.  They abide by the deadlines established by

13   this court.

14             I don't know anybody at our age -- and I'm

15   including you because we're roughly contemporaries.  I don't

16   know anyone hardly that hasn't had surgery of some kind.

17   Most of the judges here have had some kind or another,

18   whether it's a hip, a knee or whatever.  They get around.

19   They -- they -- they continue to function.

20             If you're unable to do that because of your medical

21   condition, it's not going to be a basis to delay the business

22   of this Court and this case.  And you might want to seriously

23   consider getting co-counsel involved in this matter that can

24   assist you.

25             MR. BRAND:  I -- I -- I appreciate that, Your

1   Honor.  And if -- if we're talking about the copy service

2   coming and picking up the boxes and then Federal Express

3   delivering them to -- to the plaintiff's office, that -- that

4   shouldn't stall me, whether I'm medically unfit or not.

5           The company is working right now on a negative cash

6   flow.  It's on borrowed money in order to keep afloat.  So

7   the difficulty of bringing in other counsel is -- there's no

8   money to pay other counsel.

9           I have a friendship with the defendants.  I

10  represented the defendants in their healthcare matters and

11  concerns.  As a matter of fact, at one point I probably had

12  one of the largest healthcare law firms in the country.  So

13  I've represented them for all kinds of past medical --

14  healthcare issues.

15          So there is -- there's favors at play here as well

16  that keep me on the case where opposed to if they had to

17  actually pay an attorney to come in, I'm not sure if -- if

18  the money or the finances would be there.

19          And actually, while Your Honor is talking about

20  photocopying hundreds and hundreds of boxes, I know my heart

21  kind of sunk and so did Dr. Thomas's at the same time,

22  because the first thing I thought in my mind was, is there a

23  credit card left for her to max out even the photocopying

24  charges?

25          But I understand that's not the Court's problem and

1  we'll find a way to make that happen.

2         But, Your Honor, we -- we will do -- we'll do

3  everything possible, and as soon as I hang up the phone with

4  you, I will be calling Staples.  I will be calling Office

5  Depot.  I will be finding out how quickly a truck can get

6  over to Dr. Thomas's warehouse.

7         And -- and Tim Thompson, her son, is present before

8  Your Honor.  I'm sure he'll help get those boxes loaded.  And

9  if we could start the loading process, then I think in two

10 weeks we should have -- have everything done.

11        THE COURT:  All right.  Well, that's fine.  Look,

12 it sounds like you've got very tough sledding with a client

13 that, you know, you're trying to help out, but the reality

14 is, as you said and have acknowledged, if your -- if your

15 client can't comply financially with the orders of this

16 Court, then you might as well file something with the Court

17 advising the Court of that and we'll proceed accordingly.

18        Obviously, sanctions would be imposed.  It would

19 include a variety of things if plaintiff's counsel were to

20 file a motion and request sanctions.  It could even include a

21 default against your client if they can't -- can't -- or your

22 clients if they can't continue to defend themselves in this

23 particular matter.

24        But, you know, the fact that you're just doing this

25 as a favor, while I appreciate that and have done a lot of

1    favors for clients over the years, including representing

2    them in matters without compensation, it doesn't change one

3    bit the obligations that you owe to opposing counsel, to this

4    Court and to your clients.

5            MR. BRAND:  And I understand.  And again, Your

6    Honor, thank you for the opportunity to allow us to cure.

7    And I will -- you know, it's my account at Staples and it's

8    my account at Office Depot.  So these will fall onto --

9    ultimately, I guess, they're going to fall onto my account

10   and I'll work it out with my client.  But we will get -- we

11   will get everything copied.

12           THE COURT:  All right.  So the 18th --

13           MR. BRAND:  I mean, we believe we have defenses and

14   we do not want to jeopardize our defense.

15           THE COURT:  All right.

16           Now, let me -- let me just ask plaintiff's counsel,

17   have you seen some of the records that we're talking about

18   here today and do the records provide you a basis from which

19   to extract and/or extrapolate the amounts claimed by these

20   103 individuals?

21           MS. CHASTAIN:  Your Honor, we've received copies of

22   check registers and also about 2,600 pages of these time

23   sheets, and, no, these documents alone are not sufficient for

24   us to make a determination as to whether these employees were

25   properly paid.

1          THE COURT:  Are they helpful?

2          MS. CHASTAIN:  The time sheets absolutely are very

3   helpful and part of what we need.

4          The check registers don't --

5          THE COURT:  Because I have no -- I mean, I want to

6   make sure that this is advancing.

7          MS. CHASTAIN:  I agree.

8          THE COURT:  I don't want to just impose on

9   defendants some unreasonable burden without -- without reason

10  behind it.  And I need to make sure that this is moving the

11  case forward in the most effective manner.

12          I mean, I basically am interjecting myself in your

13  discovery dispute and ordering that this -- that this take

14  place so that we can achieve the goal of having an informed

15  discussion between everyone about the claims and the merits

16  and, you know, regardless of your respective positions on the

17  merits, quantification of the individual claims.

18          So how do we get there?

19          MS. CHASTAIN:  Well, Your Honor, I don't know what

20  else is in those boxes.  I would imagine that there's some

21  sort of payroll register in existence that lists the rates of

22  pay as well as any withholdings that have been held from

23  these employees' or contractors' checks.

24          We have not seen any of those documents as of yet,

25  and I can't say where they would be exactly.

1          THE COURT:  Well, one option is production in the

2   ordinary course of business.  Here are the boxes.  Here they

3   are.

4          I mean, that's what I'm trying to get at.  I'm --

5   I'm -- you know, I'm obviously frustrated because this is not

6   good for anyone when we have this type of scenario.

7          On the other hand, I want to cut to the chase as

8   quickly as possible.  And one of the alternative -- they're

9   incurring huge costs and I'm imposing a large burden on them

10  to go ahead and produce this.

11         I'm wondering if -- what I'm just getting to is, is

12  that the best way if the vast majority of what they're

13  anticipating copying and producing is not going to really

14  advance the case?  But, rather, it would be better for you to

15  go on site and review all these files and, you know, have a

16  discussion about what's involved and kind of learn more so

17  that you could get to a point where you say, you know, really

18  all we need is from each one of these patient files, we need

19  these four pages and we need it from 2012 to 2013.

20         I mean, look, come on.  Let's get this together.

21         MS. CHASTAIN:  I -- I agree, Your Honor.  And I

22  don't know what are in these boxes, but I do imagine the

23  majority of it is irrelevant to this litigation.

24         You know, I feel like we've been very clear with

25  Mr. Brand about what particular documents we do need to do

1    our analysis, but I -- I certainly don't know at this point

2    where those documents are located.

3           I find it incredible that an employer with this

4    many employees would not have records of paychecks issued

5    with the information that we're seeking, and it's very, very

6    basic information.

7           But what we've gotten so far, Your Honor, is copies

8    of lists of checks issued to employees each week and time

9    sheets indicating how many hours they've worked each week.

10          So far, I haven't been able to match up the time

11   sheets to the lists of employee payments entirely.  So I

12   don't know that they're complete productions that I've

13   received.

14          But in addition, from these documents, we don't

15   have a -- we don't know the rate of pay.  We don't know if

16   overtime is being paid appropriately, and we can't tell what

17   withholdings have been withheld from these checks.

18          MR. BRAND:  Your Honor, if I -- if I may answer

19   that, we provided -- we have a managed payroll web portal

20   that handles all the company's pay records, and we've

21   produced the payroll register printouts for everything going

22   back to when the company started with this -- with this

23   electronic payroll system, which goes back to the beginning

24   of 2013, which shows the name of each of the contractors, the

25   date of payment, the amount of each payment, any and all

1 reimbursements, the total amount paid, and the check number

2 of each payment.  So it shows quite -- quite a lot of

3 information.

4           Maybe it's best, Your Honor, if we provide to Ms.

5 Chastain a sample.  We -- we -- Mr. Thomas goes to the

6 warehouse today, gets five or six boxes copied, and we send

7 those over as a sampling.

8           THE COURT:  All right.  Wait.  You know what?

9 Here's the thing.  I don't -- given where you are in the

10 process and the fact that you're still discovering how best

11 to get to this information, which is really extraordinary,

12 because I have had a lot of cases where the parties are in

13 dispute about whether overtime hours -- whether people were

14 independent contractors or employees; whether overtime hours

15 were worked; how many overtime hours; if overtime was worked,

16 by whom; all of those issues.  So very similar to what you're

17 dealing with.

18           But I've never had a case where the parties dispute

19 what the best records are in the employer's possession in

20 order to identify who worked what hours.

21           Now, those records haven't been a model of clarity

22 in many of the cases, but they've always been able to agree

23 that this is the universe of records that encompasses the

24 information to the extent it was tracked.

25           And I'm concerned that if -- if you copy the entire

1    patient file -- let me -- let me ask the defendants, do you

2    think that copying the entire patient file is necessary in

3    order to get a picture of what your best evidence is

4    regarding hours worked and whether or not there were overtime

5    hours worked by the 103 individuals on Schedule A?

6              MR. BRAND:  Your Honor, that would be a

7    tremendously -- I find it would be a wasteful experience.

8              THE COURT:  All right.  Well, that's what I was

9    afraid of, because I have no interest in that.  I -- I -- I'm

10   frustrated by what's happened, but I really want to get

11   everyone just -- the information necessary.

12             So tell me, Mr. Thompson, what -- what is the best

13   source of the information, where is it found, and how do we

14   get that --

15             MR. THOMPSON:  Well, Your Honor, if I'm being --

16             THE COURT:  -- produced?

17             MR. THOMPSON:  -- honest with the Court -- and I

18   appreciate the fact that you kind of want to make things as

19   expeditious as possible in these proceedings -- I have not

20   worked with the company for close to a year and a half in any

21   serious capacity.  I'm now involved in this proceeding

22   because I was brought up in the lawsuit --

23             THE COURT:  Right.

24             MR. THOMPSON:  -- and named as a defendant.

25             As far as the intricate details of the inner

workings, I am -- I'm very ignorant at this point in the game

of exactly how it all works.

I will say this.  The files that exist in storage

and on site, the task of going through them to retrieve the

information, whether it be from time sheets or any kind of

records that do exist, is one that could not be undertaken

without cessation of business on the part of Caring First,

and that's just from me being on the outside looking in.

This is my mother's company, one that she founded

and incorporated, and one that when I came on board

initially, I thought I'd have a little more say in.

But the reality is when I was there, day-to-day

operations, I was quintessentially a yes-man in that I did

what I was told.  I didn't really have too much say.

And what I do know as far as my knowledge of what

records do exist, this, as I said, would be extremely

superfluous in its reach in that the information that the

Department of Labor is requesting, there would be no need to

go through every patient file and scan -- and give -- and

essentially do a document dump.

THE COURT:  What -- what is the best source of --

of the information?  What's the quickest path here to it?

Because if -- if no one can outline a better path, I am

definitely going to --

MR. THOMPSON:  The solution --

1          THE COURT:  -- revert to my position of saying all

2    these files need to be -- need to be copied.  And that's not

3    a threat; it's just a reality of the problem I'm dealing

4    with.

5          MR. THOMPSON:  The -- the quickest method --

6          DR. THOMAS:  If I may say, Your Honor. . .

7          THE COURT:  Yes, Doctor.

8          DR. THOMAS:  If I may speak?

9          THE COURT:  Yes, Dr. Thomas.

10          DR. THOMAS:  The only way to get them -- the only

11    way to get them the time sheets so they can see the

12    individuals that worked and the hours they work is from the

13    time sheets, which are in the individual files.  That's the

14    only way to get them.  We're just going to have to copy them,

15    go through each box meticulously and copy the time sheets.

16    There's no other way to do it.  There's just no other way.

17    That's it.  There's no other way to do it.

18          THE COURT:  Let me -- let me ask you --

19          MR. THOMPSON:  While that places --

20          THE COURT:  Let me --

21          DR. THOMAS:  The time sheets with the hours that

22    they worked.

23          THE COURT:  Dr. Thomas, let me ask you this.  Are

24    the time sheets -- please let this be the case -- pink or

25    yellow or blue or a different shape or are they something

1    that's readily --

2            MR. THOMPSON:  Identifiable?

3            THE COURT:  -- apparent?

4            DR. THOMAS:  No.  It's all black and white, sir.

5    It's all black and white.

6            And then may I ask a question, Your Honor?  This is

7    not my area of expertise, but I'm just wondering --

8            THE COURT:  You can't -- you can't ask me any

9    questions.  I'm not going to answer questions.

10           DR. THOMAS:  All right.

11           THE COURT:  If you have a question for me, you know

12   -- you see what I'm trying to do, and I'm trying to get to

13   the numb of the problem.

14           And by the way, just so you understand, this

15   original exchange was bilateral, okay?  It was a January 15th

16   date for both.

17           Now, I totally understand that with respect to

18   defendants, they have more information, but that's not the

19   end of it.

20           The next step is once all this information is made

21   available to the Department of Labor, they're going to be

22   tasked with the responsibility of going through it and

23   quantifying and doing a spreadsheet for every individual on

24   that list quantifying the amount that they're claiming so

25   that you can have an informed discussion about each

1    individual and get to the -- to the end game in this case.

2         So while it seems that this is all such a

3    tremendous burden with respect to the defendants, I assure

4    you it's not going to end there.  It's -- the plaintiff has

5    brought this action and is going to be required to quantify

6    their claims, but I can't require them to do that without

7    getting them the necessary information.

8         So, look, Mr. Brand, it sounds like you've seen

9    these files.  Correct?

10        MR. BRAND:  Correct, Your Honor.

11        THE COURT:  All right.  So in your -- the way that

12   you're looking at it, having seen the files, do you think

13   that -- it sounds like the better course of action would be

14   to just have the time sheets copied from every one of these

15   files, if that could be done.  Is there a way that that could

16   be done?

17        I mean, certainly there are copy companies that

18   when you give them the documents, you say this is the content

19   that we need copied from each one of these files.

20        MR. BRAND:  The -- the difficulty is the -- they're

21   not time sheets, quote, independent time sheets.  They're

22   time records filled out on the Medicaid claim forms and

23   patient forms.  So the reality is somebody has to go through

24   each and every one of these documents.

25        And the other thing I want to point out to the

1   Court is when I asked Dr. Thomas whether or not these boxes

2   say 2012, 2013, they're not labeled that way.  I think

3   Dr. Thomas was confused in how she answered.  The boxes are

4   labeled by client and they're put into storage.

5            So when she's grabbing at boxes, she's grabbing at

6   the client.  There's no way until you open the box and start

7   digging through the papers whether or not you're holding a

8   record from 2009 or 2013.  It's all in the same box or boxes

9   as it relates to that client.

10           So if we're on a time rush, then, unfortunately, I

11   don't see any other way but to just copy everything.

12           If we had a little bit more time, then I could

13   certainly sit down and I could go through all the boxes after

14   they're already copied and start pulling out what's not

15   necessary and needed and send to Ms. Chastain only -- only

16   what is really relevant to -- to the production.

17           But if Your Honor is looking at having this done

18   within two weeks, there will be no way to separate -- there

19   will be no way to go through that many boxes, separate

20   everything out and then bring to the copy service only what

21   is relevant, because from what I have seen, there's anywhere

22   between half the box to maybe two-thirds of the box that may

23   be relevant.

24           THE COURT:  Mr. Brand, who --

25           MR. BRAND:  I say "may be."

1        THE COURT:  Who are you dealing with other than

2   Dr. Thomas -- Dr. Thomas is out of the country, correct?

3        MR. BRAND:  Dr. Thomas -- well, for right now.

4        DR. THOMAS:  But I will be back.

5        THE COURT:  All right.

6        Who -- Mr. Brand, who are you dealing with in order

7   to get this information?  Who's -- who's the person that's

8   implementing your request?

9        MR. BRAND:  Right now, it's Dr. Thomas.  Her staff

10   -- at this point her staff has dwindled down to -- I think

11   there's only three or four people in the office right now --

12        THE COURT:  Are these documents --

13        MR. BRAND:  -- including her.

14        THE COURT:  These documents are all either in the

15   office or in storage?

16        MR. BRAND:  No.  Everything in the office, I've

17   already produced.

18        THE COURT:  Okay.  So --

19        MR. BRAND:  There's nothing in the office anymore.

20        THE COURT:  So that the category of documents that

21   remains is all in off-site storage.

22        MR. BRAND:  All in off-site storage.

23        THE COURT:  In a single location?

24        MR. BRAND:  In a -- my understanding, it's in a

25   single location.

```
 1                THE COURT:  Where?

 2                MR. BRAND:  Ivanah?

 3                DR. THOMAS:  In Apopka.

 4                THE COURT:  Where is it?

 5                MR. BRAND:  Apopka.

 6                THE COURT:  Apopka?  It's accessible during

 7   business hours?

 8                DR. THOMAS:  Yes, sir.

 9                THE COURT:  So they would be available

10   starting. . .

11                MR. BRAND:  Tonight.

12                THE COURT:  Tonight.

13                All right.  You know, here's what I'm going to do.

14   Mr. Brand, you can go to that location Monday, correct?

15                MR. BRAND:  Correct, Your Honor.

16                THE COURT:  Okay.

17                And, Ms. Chastain, you can go there Monday?

18                MS. CHASTAIN:  To Apopka, Your Honor?

19                THE COURT:  Yes.

20                MS. CHASTAIN:  I am in Atlanta normally, Your

21   Honor, but I could try to be there or I could send a

22   representative from the Wage Hour Division.

23                THE COURT:  Okay.

24                And what I want is I -- instead of ordering the

25   copying of the entire file, because it sounds like, based on
```

1   what I've heard, that a lot of unnecessary information would

2   be photocopied in that effort, I'm going to order the

3   defendants to make the records available for inspection

4   starting Monday at 8:00 a.m.

5           I'm also going to order Mr. Brand to be there

6   personally and I'm going to order Dr. Thomas to be available

7   by phone.  And I want you to have an actual conference call

8   about what you're looking at.  You can FaceTime or whatever

9   is appropriate.  But I want to get the parties looking at the

10  documents, agreeing on what the best records are, and then

11  arranging for copying those.

12          I'll allow the defendants to produce them as

13  they're maintained in the ordinary course of business.

14          Plaintiff can go ahead and arrange for copying and

15  Bates numbering and whatever else they want.

16          If defendants want to request a copy, they can

17  request a copy as well so that they have that for their

18  records.

19          Of course, this is something that may ultimately

20  come into play in regard if there's an application for costs.

21  But we've got to get through this.

22          And, Mr. Brand, I want all remaining payroll

23  records produced starting immediately.  So just --

24          MR. BRAND:  My -- my -- my understanding, Your

25  Honor, is if they do exist -- and my client did not tell me

1    for sure if there exists anything other than what we've

2    already produced, with the exception of Mr. Thomas (sic)

3    brought with him today to court copies of 1099s, and I

4    believe he's got a stack for Ms. Chastain.  With the

5    exception of that, if there is anything else, it would be

6    inside those boxes.

7           The -- it is my understanding that the bank does

8    not send copies of checks or anything else like that to the

9    business.  There are electronic bank accounts at this

10    particular point.  And given the fact that they had a

11    computer program that -- a managed cable computer program

12    that I produced the register printout, that gives more

13    information than a check would, anyway.  So a check would be

14    less than redundant.

15           THE COURT:  All right.  Okay.  And I want there to

16    be a dialogue between your client and the plaintiff here

17    about what they believe the best method is for determining

18    the hours.  Okay?

19           Your client is going to have to answer that,

20    anyway, in deposition or whatever.  There's no reason why

21    that shouldn't be put on the table, especially in light of

22    the fact that your client has operational concerns and

23    financial concerns.  They should want to get to the core of

24    this case as quickly as possible if they want to survive the

25    costs.

1          And that's -- that's the point.  These F.L.S.A.

2     cases can -- can strangle a defendant just by fees and costs.

3     If we all work together and get the data on the table, you

4     know, good, bad or indifferent, the story will be told and

5     there's a possibility for the parties to work something out.

6          Of course, nobody is required to do that, but at

7     least they should be afforded the opportunity to do that.

8          So I want the production to start Monday.  I want

9     your client to be available.

10          Doctor, I understand you're on vacation, but --

11          DR. THOMAS:  It's not vacation, Your Honor.

12          THE COURT:  Oh, it's not?  Okay.  I thought you --

13          DR. THOMAS:  No.  I'm here to take care of my mom,

14     who's having some health challenges, and I'm hoping over the

15     weekend we will have gotten somebody to take care of her and

16     I should be flying back on Monday.

17          THE COURT:  Oh, well, look, anything you can do to

18     help us, you know, just get clarity on exactly what needs to

19     be copied here by the plaintiff so that they can then extract

20     the data and calculate the claims that they're asserting, and

21     that's going to start Monday.

22          I want that to be wrapped up in a matter of, as I

23     said, no less than two weeks.  So that'll -- that'll start on

24     Monday.  Let me take a look.

25          Yeah, the 7th.  It should be completely done, I

1    would hope, by the 21st.

2           I'm going to go ahead and tell plaintiffs that

3    April 15th I want you to provide a spreadsheet providing your

4    best calculation.  This is just like any case.  It's a

5    preliminary calculation based on the data that you've

6    received, the amount of compensation that you believe each of

7    the plaintiffs is entitled to.

8           Following that, I want the parties to go ahead and

9    have their settlement conference by the end of the month,

10   April, that is, the end of April.  Okay?

11          I don't -- I don't care what date you pick, but

12   it's going to be before the end of April.  If you have any

13   difficulty agreeing on a date, I'm going to go ahead and set

14   it for you.

15          So if you do have difficulty, I will set a date for

16   you to have your -- your conference.

17          If you're unsuccessful, then file a Case Management

18   Report with the Court.  I'll enter an order on this, but file

19   a Case Management Report with the Court setting forth the

20   schedule for moving the case forward.

21          F.L.S.A. cases are over ten percent of our docket

22   here.  We move them very, very quickly and efficiently.

23          Mr. Brand, you, I'm sure, know that, as somebody

24   who practices in this area and before this court.

25          So that's what we're going to do in this case as

well.  It's been off to a rough start, but we're going to get

there.

Now, as I said, I'm going to go ahead and enter an

order that says that defendants are ordered to produce the

records, necessary time sheets, payroll records necessary to

determine the hours worked.  To the extent that any of those

records do contain protected HIPAA information, defendants

are prohibited from -- from using that for any purpose other

than this litigation.

And, furthermore, before filing any such records

with the Court, the parties should meet and confer and try

and agree on redaction to protect the privacy of the

individuals -- individual patients who were cared for in

this -- in this case.

All right.  I think that's the best I can do for

you.

And I just -- I think I'm -- I've made it clear to

the defendants and their counsel that you're -- you're going

to need to be a lot more diligent in complying with discovery

in this case.  And I don't -- I'm going to keep my eye on

this.  I don't want to see motions for enlargement of time on

every single discovery request or anything like that.  I -- I

-- it's not going to be tolerated.

So I want the parties to -- to take this -- their

obligations to each other and to the Court to efficiently and

1   cost effectively and timely resolve the issues in this case.

2          All right.  Let me just ask for the plaintiff, are

3   there any additional matters that you want the Court to

4   address at this time?

5          MS. CHASTAIN:  No, Your Honor.  Thank you.

6          THE COURT:  All right.

7          From defendants, all first starting with Mr. Brand,

8   any additional matters you do want the Court to address?

9          MR. BRAND:  No, Your Honor.  I can make

10  arrangements starting bright and early Monday morning to be

11  at the Apopka warehouse.

12         I do want to advise the Court on Monday I happen to

13  have two doctor appointments, including they're supposed to

14  take out my stitches.  But I could go back and forth, if need

15  be.  In the meantime, I could arrange for one or both of my

16  clients to be at the warehouse if I'm not there.

17         THE COURT:  All right.

18         I understand the parties are adversarial here, but

19  in terms of just identifying what the best records are, I

20  can't -- I can't see where that should be a problem unless

21  there's somebody trying to be obstreperous.

22         So where is -- where is the -- where is this

23  warehouse?  Does somebody have an address for it?

24         DR. THOMAS:  Your Honor, I don't know the address

25  off the top of my head, but what we could start doing over

1    today and the weekend is probably start moving some of those

2    to the offices in Winter Park, which is probably going to be

3    more accessible for the counsel.  So we can bring them there.

4            I mean, at the warehouse, there's nothing for them

5    to sit down.  There's nothing but to stand in a hot

6    warehouse.  So we can probably work and start getting some of

7    those files to the office where it would be more comfortable

8    for the counsel to, you know, sit down and look at the files.

9            THE COURT:  Well, I appreciate that, Doctor.  The

10   fact of the matter is lawyers do spend many, many hours in

11   warehouses, and actually the conditions right now are not

12   that bad.

13           But if you want to move them to Winter Park, that's

14   -- that's fine.  But I want a single location where all

15   records are being made available.  So if they're going to be

16   moved, they need to be moved all so that Monday morning

17   they're there for plaintiff's counsel to begin their review.

18           There's not -- we're not taking any additional

19   delays due to moving documents.

20           DR. THOMAS:  No problem, sir.

21           THE COURT:  So where do you want to produce them?

22           DR. THOMAS:  We'll just do -- we'll get some help

23   to move them and get them at the office at the 2425 Lee Road

24   location.

25           THE COURT:  Okay.

1              Ms. Chastain, do you know where that is?

2              MS. CHASTAIN:  Yes, Your Honor.

3              THE COURT:  Okay.

4              So all the records will be made available Monday at

5     that -- at that location.

6              And, you know, if you need to have a copy service

7     in, that's fine.  Just work with opposing counsel on it.

8              All right.  Let me -- Doctor, is there anything

9     further that you want to add?

10              DR. THOMAS:  No.  I'm just learning as I go, Your

11     Honor.

12              As far as I know, I -- I was under -- I thought it

13     was six staff members that filed this suit, and then the next

14     thing I know, the Department of Labor came in and got

15     everybody that was on staff and say we have to do this for

16     106 persons.

17              And I can tell you that they do not want to be a

18     part of this and they don't want to be involved, but they are

19     forced to be involved.  They don't want any part of this.

20              It's six nurses that worked with one particular

21     client, and not even all the clients from the nurses on that

22     client did not want to do this.  It's just six of them that

23     gathered together and did this.

24              And when the Department of Labor came in, they

25     wanted us to send them everybody that worked for us, and

1  that's all 103 persons are in the attending state.  And, I

2  mean, I can tell you most of them, as far as I know

3  personally, do not want to be involved.

4           THE COURT:  Okay.  Well --

5           DR. THOMAS:  But here we are going back and to be

6  doing this.

7           THE COURT:  Well, the Department of Labor has the

8  right to bring this action.  They have standing to do it.

9           So, all right, then.  Mr. Thompson, you have the

10 records, the 1099s.  You're going to make those available to

11 opposing counsel.  Thank you for bringing those here today.

12          Is there anything further that you want to add?

13          MR. THOMPSON:  No.  I turned 25 a couple of months

14 ago, and I'm learning so many things about life and the

15 things that occur in it as I go along.

16          So I have nothing further to add, Your Honor.

17 Thank you for your time.

18          THE COURT:  All right.  Thank you.

19          We're adjourned.  I'll enter an order.  Good luck.

20 If there's any problems, let me know.  I'll be happy to get

21 on it right away.

22          Thank you.  You're excused.

23          (Proceedings concluded at 11:19 a.m.)

24                  - - - - - - - -

25

1                    Reporter's Certification

2    I certify that the foregoing is a correct transcript from the

3    record of proceedings in the above-entitled matter.

4                              s/Diane Peede, RMR, CRR
                             Official Court Reporter
5                             United States District Court
     Date:   August 10, 2017   Middle District of Florida

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25