1                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
2                          ORLANDO DIVISION

3

SECRETARY OF LABOR, UNITED   )
4  STATES DEPARTMENT OF LABOR, )
                             )
5         Plaintiff,          )         Case Number
                             )
6             v.              )    6:15-cv-1824-Orl-41GJK
                             )
7  CARING FIRST, INC., et al., )
                             )
8         Defendants.         )
   _____)

9

10

       Transcript of a hearing on Motion for Sanctions,
11
         Spoliation, Violation of Court Orders, and
12
           Misconduct in Discovery (Doc. 86)
13
          before the Honorable Carlos E. Mendoza
14
             October 3, 2017; 9:30 a.m.
15
                  Orlando, Florida
16

17

Appearances:
18
Counsel for Plaintiff:   Lydia J. Chastain
19                         Melanie L. Paul

20

Counsel for Defendants:  Craig A. Brand
21

22      Proceedings recorded by mechanical stenography,
   transcript produced by computer.
23  _____

24              Diane Peede, RMR, CRR
                Federal Official Court Reporter
25        401 West Central Boulevard, Suite 4600
                 Orlando, Florida  32801

<pre>
1                        Index of transcript

2                                                Page

3
                            Karen Reyes
4    Direct by Ms. Paul                            13
     Cross by Mr. Brand                            31
5    Redirect by Ms. Paul                          47

6
                          Wildali DeJesus
7    Direct by Ms. Chastain                        50
     Cross by Mr. Brand                            69
8

9                       Elizabeth Podczaski
     Direct by Ms. Chastain                        75
10   Cross by Mr. Brand                           100

11
                           Ivia Rosado
12   Direct by Ms. Paul                           125
     Cross by Mr. Brand                           143
13

14                        Ivanah Thomas
     Direct by Ms. Paul                           156
15   Cross by Mr. Brand                           193
     Redirect by Ms. Paul                         199
16

17                       Timothy Thompson
     Direct by Mr. Brand                          219
18   Cross by Ms. Chastain                        225

19
     Counsel's argument
20   By Ms. Chastain                         230, 263
     By Mr. Brand                                 240
21

22

23

24

25
</pre>

**P R O C E E D I N G S**

1

2       THE COURTROOM DEPUTY:  This is the case of

3 Secretary of Labor, United States Department of Labor versus

4 Caring First, Inc., Ivanah Thomas and Timothy Thompson, case

5 number 6:15-cv-1824.

6       Will counsel please state their appearances for the

7 record.

8       MS. CHASTAIN:  Thank you.  Good morning, Your

9 Honor.  My name is Lydia Chastain.  I'm lead attorney for the

10 Secretary of Labor.

11       With me this morning is Melanie Paul, co-counsel.

12       Our agency representative is Wildali DeJesus from

13 the Wage and Hour Division.

14       THE COURT:  Good morning.

15       MS. CHASTAIN:  Good morning.

16       MR. BRAND:  Good morning, Your Honor.  Craig Brand

17 on behalf of the defendants.  With me is Dr. Ivanah Thomas

18 and to her left is her son, Timothy Thompson.

19       THE COURT:  All right.  Good morning.

20       Are the plaintiffs ready to proceed?

21       MS. CHASTAIN:  We are, Your Honor.

22       THE COURT:  All right.  I have an exhibit list

23 here.  What are your plans?  How many witnesses do you intend

24 on calling this morning, if any?

25       MS. CHASTAIN:  Your Honor, I was not sure what Your

1  Honor had in mind when you scheduled the hearing.  We're

2  prepared to put forward evidence to testify as to all the

3  exhibits attached to our motion and referenced in our motion

4  as well as some additional exhibits that have either come to

5  light since the filing of that motion or that are responsive

6  to defendants' arguments and their response.

7  THE COURT:  All right.  Are any of these exhibits

8  stipulated to or are we going to go through laying the

9  predicate and moving them into evidence individually?

10  MS. CHASTAIN:  We would be moving them into

11  evidence individually, Your Honor.  A number of them are

12  exhibits that we had disclosed to opposing counsel for

13  purposes of trial, but, obviously, some are only relevant for

14  purposes of this Motion for Sanctions hearing.

15  MR. BRAND:  Your Honor, I haven't seen what you

16  have.  So --

17  THE COURT:  Do you normally address the Court

18  sitting down?

19  MR. BRAND:  I'm sorry.

20  THE COURT:  That's twice.  The last time we were

21  here, you did that.  I would recommend you read the local

22  rules.  Let's not do that anymore.

23  MR. BRAND:  I'm sorry.

24  THE COURT:  All right.  Go on ahead.

25  MR. BRAND:  I haven't seen what has been presented

1    to Your Honor.

2            THE COURT:  Would you like an opportunity to review

3    it before we get started?

4            MR. BRAND:  I -- I would, Your Honor.

5            THE COURT:  All right.  Let's take ten minutes.

6    Let opposing counsel have a look.

7            And you may have seen them, just maybe not in this

8    compilation.  But in all fairness, you should get to see what

9    I have in my hand before we go.

10           So do you have an extra copy or does he need mine?

11           MS. CHASTAIN:  If you don't mind, Your Honor --

12           THE COURT:  Not at all.

13           All right.  Here's what we'll do.  Minutes is

14   loosely assigned.  If you need more, let Miss Darleen know.

15   But as soon as you're ready, we'll get started.

16           Court's in recess.

17           (Recess taken from 9:38 until 9:47 a.m.)

18           THE COURT:  All right.  Is the plaintiff ready to

19   proceed?

20           MS. CHASTAIN:  Yes, Your Honor, we are.

21           THE COURT:  The defendant?

22           MR. BRAND:  Yes, Your Honor.  (Now standing)  Yes,

23   Your Honor.

24           THE COURT:  Maybe you should take over.

25           MR. BRAND:  (Light laughter)

1          THE COURT:  Okay.  So let's cut to the chase here.

2    I'm going to help guide this because there's information I

3    need to make an informed decision here.

4          There are three prongs you have to meet in order to

5    obtain the relief that you're seeking with regard to the

6    allegation that they're destroying evidence.  Okay?

7          And it seems to me that before Judge Kelly, the

8    magistrate judge in this case, there was sort of a tacit

9    admission, at the very least, maybe a direct admission by the

10   defendants that evidence was destroyed.  And I say that in

11   the passive voice for a reason.

12          The question is:  Who and what and how?

13          It's your allegation that they destroyed the

14   evidence.  They should have known not to destroy the evidence

15   because the litigation was already moving forward.

16          Their position is there was a disgruntled employee

17   named Ms. Reyes who destroyed it.  You returned fire by

18   providing information indicating that she unequivocally

19   denies that she was destroying evidence.

20          So it seems to me that -- so in the default

21   judgment you're entering, my notes indicate you need to

22   establish a willful or bad-faith failure to obey the order,

23   prejudice to the moving party, and a showing that no lesser

24   sanctions would adequately punish the violation.

25          It seems to me that the most important thing here

1    is what happened to that evidence.

2            And I think if the Court makes a finding that she

3    was a disgruntled employee and she was inappropriately

4    destroying evidence unbeknownst to the defendant as a whole,

5    then the leap from that conclusion to the default is a longer

6    leap.

7            If the Court makes the finding that they were

8    destroying evidence and just blaming it on her, then I think

9    it's a much shorter leap.

10           So it seems to me that that should probably be the

11   primary focus this morning.

12           So are you planning on calling her?

13           MS. CHASTAIN:  Yes, Your Honor.

14           THE COURT:  All right.  I would invite you to call

15   your first, which I hope is Ms. Reyes.

16           MS. CHASTAIN:  Your Honor -- oh.

17           MR. BRAND:  Your Honor, I have a question regarding

18   Ms. Reyes.  I filed yesterday or the day before the copies --

19   I filed in this case copies of the Orange County Circuit

20   Court case that is styled Gloria Rodriguez and Karen Reyes

21   versus Caring First.  And I filed the pleadings that were in

22   there, including our counterclaim and our exhibits against

23   Ms. Reyes.

24           So it's an ongoing circuit court case that I would

25   not -- what I don't want to happen is I don't -- because I

1   have things in that case, since it's ongoing, that I really

2   don't want to disclose at this time and allow Ms. Reyes or

3   her attorneys to know that I have this information.

4           If she's calling -- if the plaintiff is calling Ms.

5   Reyes solely for the purpose of saying I didn't destroy any

6   records, we'll stipulate that that's what she's going to say.

7           THE COURT:  No, no, no.  I mean, this is very --

8   this is critical here.

9           I -- I need to weigh her credibility.  I don't need

10  you to stipulate to her credibility.

11          I would invite you to employ whatever strategy you

12  feel you need to employ to protect whatever case is happening

13  in state court.  But, bluntly, I'm not concerned with what's

14  going on in state court.  I have to make a decision as

15  informed as it can be based on what happens here, and I'm not

16  going to dictate to plaintiff how they're going to present

17  their case.

18          But I will tell you -- I'm telegraphing my pass

19  here -- her testimony, based on what the plaintiffs are

20  asking for in terms of a remedy, is, in my view, critical.

21          So I understand.  I'll leave it to you as to how

22  far you want to delve into that on cross-examination.  You'll

23  certainly have your opportunity to ask, I'm sure, what are

24  going to be challenging questions for this witness.

25          But I would invite the plaintiff to go on ahead and

1    proceed.  It's your motion.

2          MS. CHASTAIN:  Your Honor, if the Court will allow,

3    I wanted to hopefully correct a few facts that you stated

4    which are not entirely accurate.

5          THE COURT:  Sure.

6          MS. CHASTAIN:  At the Show Cause hearing in front

7    of Judge Kelly on March 4th, I believe, of 2016, the

8    Secretary was not aware at that time that defendants had

9    destroyed the payroll spreadsheets that it had relied upon in

10   its earlier Wage/Hour investigation.  We, in fact, were

11   befuddled as to why we were not receiving the records that

12   we'd received so easily two years before.

13         It was not until our investigator, Elizabeth

14   Podczaski, went to Caring First's office, as directed by

15   Judge Kelly, to collect documents, go through the boxes

16   herself and collect documents, that she confronted them with

17   a copy of the spreadsheet that we allege has been destroyed

18   by defendants, asked for it and learned that, according to

19   defendants, Karen Reyes had destroyed these items.

20         I think Judge Kelly's -- the hearing would have

21   gone differently if the defendants had admitted to Judge

22   Kelly the Friday before that these records had existed and in

23   fact were being destroyed.

24         In addition, it is not just important -- well, back

25   up.

1          To date, despite the fact that this is the Third

2   Motion for Sanctions filed by the Secretary, defendants have

3   presented no sworn statement or evidence showing that Karen

4   Reyes was in fact the person who destroyed the records.

5          Even in response to this last Motion for Sanctions,

6   Dr. Thomas has not actually claimed that Karen Reyes was the

7   reason that the records were destroyed.

8          The only reason that's even an allegation is

9   because it's what they represented to our investigator and

10   what Mr. Brand represented to me at the time we learned the

11   documents were destroyed.

12          I don't really know that that's going to be their

13   position today.  I assume it will be, but it has not been

14   something they've been willing to swear to before this Court

15   to date.

16          THE COURT:  I certainly appreciate you clarifying

17   on that, but let's get into the witnesses.  I'll let you

18   respond to it, but we're going to move into the witnesses.

19          We do have a limited amount of time today.  So we

20   need to get rolling.

21          First question for the plaintiff:  Will you be

22   invoking the rule of sequestration this morning?

23          MS. CHASTAIN:  Yes, Your Honor.

24          THE COURT:  Will the defense?

25          MR. BRAND:  (No response.)

1          THE COURT:  I mean, it only makes sense if your

2    witnesses have to leave, you probably want hers to leave,

3    too.

4          All right.  So I don't know who your witnesses are

5    by identifying them.  So if they're in the courtroom, I'll

6    leave it in your capable hands to inform them they're going

7    to need to wait in one of the jury rooms -- or one of the

8    witness rooms just outside those double doors.

9          So having said that, does the defendant want to

10   respond briefly to what the plaintiff just informed the Court

11   so we can get started?

12         MR. BRAND:  Yes, Your Honor.  The plaintiff keeps

13   bringing up the fact that I had some kind of obligation to

14   produce records of Ms. Karen Reyes.

15         Ms. Karen Reyes is not on Exhibit A.  Ms. Karen

16   Reyes was not relevant to their case.  They didn't, even in

17   their Amended Exhibit A, even -- what they tried to put

18   through on their summary judgment -- before their summary

19   judgment by amended -- trying to amend again, they still

20   didn't list Ms. Reyes.

21         Ms. Reyes -- Ms. Reyes and our claims against her

22   have been known to them since 2015.

23         Ms. Reyes had filed claims with the Florida

24   Commission on Human Relations.  Ms. Reyes filed a public

25   lawsuit in Orange County Circuit Court.  We filed our

1     response back.

2          It was never brought up, there was never an

3     evidentiary hearing that we had to actually address Ms. Reyes

4     in any kind of detail more than the affidavits that we

5     submitted for the purpose of contesting their motion here,

6     which Dr. Thomas did specifically point out that Ms. Reyes

7     committed criminal conduct by issuing checks that shouldn't

8     have been issued to people as well as deleting the files.

9          But we never had an obligation to turn over records

10    regarding Ms. Karen Rodriguez -- Ms. Karen Reyes.

11         THE COURT:  All right.  That's your argument.  I

12    certainly will consider that.

13         I would invite the plaintiff to call their first

14    witness.

15         MS. PAUL:  The plaintiff calls Ms. Karen Reyes,

16    Your Honor.

17         THE COURT:  Okay.

18         THE COURTROOM DEPUTY:  Please come forward and be

19    sworn.  Raise your right hand.

20         Do you solemnly swear or affirm under penalty of

21    perjury that the testimony you will give will be the truth,

22    the whole truth and nothing but the truth?

23         MS. KAREN REYES:  I do.

24         KAREN REYES, PLAINTIFF'S WITNESS, SWORN

25         THE COURTROOM DEPUTY:  Have a seat there, please.

1    THE COURT:  All right.  Good morning, Ms. Reyes.

2  Once seated in the chair, please make yourself comfortable

3  with the chair's proximity to the microphone, and then state

4  your full name into that microphone, spelling your last name.

5    THE WITNESS:  Good morning.  My name is Karen

6  Reyes, last name spelled R-e-y-e-s.

7    THE COURT:  All right.  Your witness.

8    MS. PAUL:  Thank you, Your Honor.

9                     DIRECT EXAMINATION

10  BY MS. PAUL:

11  Q    Good morning, Ms. Reyes.

12  A    Good morning.

13  Q    You worked at Caring First?

14  A    Yes.

15  Q    When did you start?

16  A    December 1st, 2014.

17  Q    How did you get hired?

18  A    I responded to an ad on Craigslist that Dr. Thomas had.

19  I went into an interview the day after Thanksgiving,

20  November -- whatever fell on that day.  And she hired me on

21  the spot.  She told me to go back -- to start on Monday.

22  Q    What position were you interviewing for?

23  A    Scheduler.

24  Q    And is that the position that you were hired into?

25  A    No.

1   Q     Okay.  What happened when you went into the office that

2   Monday?

3   A     When I went in that morning, I presented myself.  You

4   know, I said, good morning.  I will be the new scheduler.

5         There was a scheduler already in the office by the name

6   of Yolanda.  She was a little shocked that there was a new

7   scheduler while she was the scheduler, and she went and spoke

8   to Dr. Thomas.  I don't know what they spoke about in the

9   office.

10        But Dr. Thomas came out and told me, you will not be the

11  scheduler anymore.  You're going to be front desk.

12  Eventually I am going to fire Yolanda and you will be the

13  scheduler.  But for now, you'll be the front desk while she

14  can train you, and so on.  So I did start as front desk.

15  Q     So how long were you in that position at the front desk?

16  A     About a month and a half.

17  Q     And then what happened?

18  A     Then Yolanda got fired and I was doing front desk and

19  scheduling.  So I was doing both jobs.

20  Q     Okay.  What kind of business is Caring First?

21  A     It's a home health agency.

22  Q     And prior to working at Caring First, did you have

23  experience working in the home healthcare agency industry?

24  A     My whole life.  It's the only thing I've worked in since

25  I was 16 years old.

1   Q      How many years of experience do you have in the

2   industry?

3   A      I'm 32 now.  So more than 15.

4   Q      Okay.  Can you tell us a little bit about your previous

5   jobs and what jobs you've held in that industry?

6   A      Okay.  I started off at 16, like I said, at V.N.A. of

7   Miami-Dade.  It's one of the biggest agencies in almost the

8   whole state of Florida.  I started off as data entry.  Two

9   months later, I was doing Medicaid billing.

10          Four months later, my boss at that time, he actually

11   opened his own agency.  Out of 400 employees, he called me

12   only.  We started another agency, which was Golden Care.  We

13   started that from the bottom up.  It's still actually an

14   agency right now up and running, very successful in Miami.

15          I worked there for about three and a half years.  Then I

16   moved over here to Central Florida, and here I was the

17   district supervisor for the Mars Group and I was actually in

18   charge of the whole Medicaid department for the St. Cloud

19   Hospital, Palms of Pasadena, and Tampa General Hospital.

20          I worked there for about three and a half years, until,

21   you know, the company closed.  They closed their offices here

22   in Florida.  They're still in Texas.

23   Q      You said you worked in -- supervising Medicaid?

24   A      It was for the Medicaid department.  Anything that had

25   to do with eligibility, the patients applying for Medicaid,

1  billing Medicaid, anything that had to do with Medicaid and

2  the patients of those hospitals, it was our company that we

3  would be.

4        So I was the supervisor and we had -- at one point we

5  had seven employees, but for the rest of the time, it was

6  about four or five.

7  Q     Okay.  Where did -- where did you go to after that?

8  A     After that, I went to Nurse On Call, which is in

9  Orlando.  I started off as a scheduler.  And I worked there

10 only for about four or five months because at that time was

11 when I interviewed with Dr. Thomas and the pay rate was

12 higher.  So I decided to go with her.

13 Q     Okay.  Did there come a time in your employment with

14 Caring First where you changed positions from being the

15 scheduler and front desk person to something else?

16 A     Yes.

17 Q     And when was that?

18 A     I don't know exact dates, but probably about three

19 months that I was working there.

20 Q     Okay.  What new role did you step into?

21 A     I was doing the billing and the payroll.

22 Q     What were your responsibilities in doing billing and

23 payroll?

24 A     We had to bill every patient every week and we had to do

25 the payroll checks for every nurse, every employee as well.

Q      Who trained you to do the billing and the payroll?

A      Her son, Timothy Thompson.

Q      And what did he train you to do in terms of doing the billing and payroll?

A      He has his own Excel spreadsheet that he created with these formulas and things like that, and that's how we would actually come up with the calculations on the billing for the patients and as well as the payroll amount for the nurses.

Q      So did you utilize the spreadsheet in doing the payroll processing?

A      Yes.  That's the only way to do any billing process or anything.  She doesn't actually have, or at that time, a software that it would be easier to bill and do payroll.

Q      In your previous jobs in the home healthcare industry, had you -- had you done manual entry into Excel spreadsheets to do the billing and payroll?

A      Never.  They always have a billing software or payroll software, QuickBooks, things like that.

Q      What information was in the Excel spreadsheet?

A      Caregiver name; patient's name; the hours they worked; the rate that they're getting paid at; and at the end, it would be, like, a total of the calculation of what's actually going to be billed and what's actually going to be paid to the caregiver.

Q      And where did you get the information to enter into the

1    spreadsheet?

2    A    From the time sheets that the nurses would have to turn

3    in every week.

4    Q    Did you create any other documents in doing the payroll

5    processing?

6    A    Create, no.

7    Q    Did you use any other kind of documents in the payroll

8    processing?

9    A    (No response.)

10   Q    Well, walk me through the steps of how you would use the

11   information on the payroll spreadsheet to create the

12   paychecks.

13   A    Okay.  So once it was actually entered into the payroll

14   spreadsheet, we would then transfer that information to

15   managepayroll.com.  So it was just a regular website with the

16   list of the nurses, and you would put on the memo line

17   patient name, the caregiver's discipline, the hours they

18   worked, and then you would put in the amount of what they're

19   supposed to get paid.

20   Q    And all of that information was contained on the memo

21   line of the check?

22   A    Yes.

23   Q    Who trained you to do that?

24   A    Her son, Timothy Thompson.

25   Q    And why were you putting this information on the memo

1  line of the check?

2  A    So the nurses -- the caregivers could have some

3  information as to how many hours they worked and with what

4  patients.  Sometimes they're not always with the same

5  patient.  So sometimes it would change every week, and like

6  that, they would have some type of record.

7  Q    And approximately what months and what year were you

8  doing the payroll processing for Caring First?

9  A    I believe I started that around March of 2015 and then I

10  was fired in May of 2015.  So probably two months and a half

11  or so.

12  Q    Did you have authority to sign the payroll checks?

13  A    Never.

14  Q    Who did?

15  A    At one point, her son, Timothy Thompson, had, Dr. Thomas

16  and her sister, Petra, as well.

17  Q    Did anybody review the paychecks before they were

18  signed?

19  A    Yes.

20  Q    Who was that?

21  A    I would review them.  Then I would give them to the new

22  office manager, Blanca.  Then she would review them and then

23  she would give them to Dr. Thomas.

24  Q    Okay.  Did you give Dr. Thomas any other documentation

25  with the payroll checks?

1    A      Yeah.   The summary of each caregiver's name and each

2    employee's name that will have a check that week.

3              MS. PAUL:   Your Honor, may I approach the witness,

4    please?

5              THE COURT:   You may.

6    BY MS. PAUL:

7    Q    Ms. Reyes, I'm handing you what's been marked for

8    identification as Government's Exhibit 14.   Would you take a

9    look at that document, please.

10             MR. BRAND:   Your Honor.

11             THE COURT:   Yes.

12             MR. BRAND:   Before the witness sees the documents,

13   may I be handed --

14             MS. PAUL:   (Hands to Mr. Brand).

15             MR. BRAND:   Thank you.

16             THE COURT:   Is the issue resolved, then?

17             MR. BRAND:   I guess the issue is resolved.   Thank

18   you.

19             THE COURT:   All right.   Go on ahead.

20   BY MS. PAUL:

21   Q    Ms. Reyes, does this summary look familiar to you?

22   A      Yes.

23   Q    Okay.   I realize that the dates on here are not the time

24   that you were employed.   Is that right?

25   A      That is correct.

1   Q    But are these examples of the type of summaries that you

2   just previously described that you would provide to Ms. -- to

3   Dr. Thomas when giving her the payroll checks to review?

4   A    This is exactly the same summary, just different dates.

5   Q    Okay.

6        MS. PAUL:  Your Honor, we move to admit

7   Government's Exhibit 14 into evidence.

8        THE COURT:  Any objection?

9        MR. BRAND:  Yes, Your Honor.

10        THE COURT:  What's your objection?

11        MR. BRAND:  Your Honor, the witness just testified

12   that she was let go in, I believe, May of 2015.  And I'm

13   looking at -- at this document.  This document is for the pay

14   period of February 14th to February 20th, 2016, paid on March

15   4th, 2016.  Therefore, this document could not possibly have

16   anything to do with --

17        THE COURT:  All right.  So your objection is

18   relevance.  Any tendency to make a fact in dispute more or

19   less likely.

20        Response to the relevancy objection?

21        MS. PAUL:  It's relevant.  It's demonstrative of

22   the type of documents that she created when she was in that

23   role during her employment, and those records are now

24   allegedly destroyed.  So we don't have the ones from the time

25   period that she herself would have created.

1          THE COURT:  All right.  Just as an F.Y.I., if this

2    were the contested matter and I was the trier of fact at

3    trial, I wouldn't admit this; but for demonstrative purposes

4    only, seeing as how this is a motions hearing, I'm going to

5    overrule the objection.

6          What's been previously marked as Plaintiff's 14

7    will be admitted and marked as such.  You may proceed.

8          MS. PAUL:  Thank you, Your Honor.

9          Your Honor, may I approach again?

10          THE COURT:  Certainly.

11   BY MS. PAUL:

12   Q   Ms. Reyes, I'm handing you what's been marked for

13   identification as Government's Exhibit 1.  Can you please

14   take a look at that document.  Exhibit 3.  I apologize.

15        You can see from the date on this document that this is

16   from March 2014.  And you were not employed by Caring First

17   at that time period?

18   A   Correct.

19   Q   Are these -- is this document the type of document that

20   you created when you were doing the payroll processing, the

21   one that you previously described as a summary that you would

22   give to Dr. Thomas to review the payroll checks?

23   A   The same exact one, just different dates.

24          MS. PAUL:  Again, Your Honor, the government would

25   move to admit Exhibit 3 as demonstrative into evidence.

 1              THE COURT:  Any objection?

 2              MS. PAUL:  I'm so sorry.  (Hands to Mr. Brand.)

 3              MR. BRAND:  Two objections, Your Honor.

 4              THE COURT:  Go on ahead.

 5              MR. BRAND:  The first one would be relevance.  The

 6    same argument as before, only this is now for a period prior

 7    to Ms. Reyes.

 8              THE COURT:  Sure.

 9              MR. BRAND:  The second argument -- the second

10    objection is I believe Ms. Reyes testified that the data that

11    she inputted was then inputted into the Manage Payroll

12    system.  If that's the case, then the best evidence would be

13    the Manage Payroll system's records, not either one of these

14    documents --

15              THE COURT:  Aren't those printouts from that?

16              MR. BRAND:  No, they're not.

17              THE COURT:  Okay.  They're just compilations of the

18    information that would exist on that?

19              MR. BRAND:  That's correct.  So there is another

20    source of documents.

21              THE COURT:  I've got it.  I've got it.  Remember,

22    we're not at trial.  This is a motions hearing.

23              So objection number two, absolutely overruled.

24              On number one, you have a point.  It's of limited

25    use for the Court because -- but you see what they're trying

1    to do.  They want to establish the type of documents that

2    were produced.

3           I mean, it is what they purport it to be.  I agree

4    with you it's of limited relevance.  But for this particular

5    use, I'm going to overrule the objection and allow -- and,

6    of course, you're certainly welcome to argue its limited

7    usefulness when you do your cross and certainly when you

8    close out this hearing.

9           So Plaintiff's 3 will be admitted over objection

10   and marked as such.

11          Feel free to continue.

12          MS. PAUL:  And we have an additional exhibit that

13   wasn't on the list that we're about to add.

14          THE COURT:  All right.  I would invite you to keep

15   going, though.  Let's go.

16          MS. PAUL:  Okay.

17   BY MS. PAUL:

18   Q    The weekly payroll spreadsheets that were created in the

19   managepayroll.com -- or let me back up.

20        The spreadsheets that did the payroll and billing, were

21   those saved on the payroll.com website?

22   A    No.  On Manage Payroll?

23   Q    Correct.

24   A    No.  There's no way.

25   Q    Okay.  Were those spreadsheets that you referred to that

1  did the billing and the payroll or contained information for

2  billing and payroll, were they saved at all?

3  A    Yes, in the Excel folder.

4  Q    Okay.  And did you personally save those documents?

5  A    Yes.  The first thing, which is the correct way, that

6  Tim trained me in, before you even enter any information, you

7  change the date and you save the new week that you're going

8  to be working on.

9  Q    So you saved each work week spreadsheets for payroll and

10  billing as separate Excel files?

11  A    Whatever week you're working, yes.

12  Q    What about those summaries you created?

13  A    As well.  So whatever week you're working on, you would

14  go in first, save it as that week, and then continue working.

15  Q    Where were those Excel files located?

16  A    They were originally, like, in a folder kind of hidden.

17  So all I did when I started, I put it on the Desktop so I

18  could just have easy access to it.

19  Q    So it was on your personal computer at the office?

20  A    Yes.

21  Q    Did the company have a network where different people at

22  different computers could share work files?

23  A    No.

24  Q    So the Excel spreadsheets that you made in doing the

25  payroll and billing as well as the summary documents were

1   contained on your computer?

2   A    Yes.

3   Q    Were they on anybody else's computer?

4   A    I believe they were on hers, but it wasn't on a cloud.

5   It was a V.P.N. or something.  I don't know exactly how she

6   had it on hers as well, because it was not connecting through

7   all the computers, but she did have copies on hers as well.

8   Q    Who is "she"?

9   A    Dr. Thomas.

10  Q    And did anyone have access to your computer when you

11  were employed there?

12  A    No.

13  Q    Was there a password and log-in to get onto the computer

14  when you turned it on?

15  A    Every computer had a password and log-in, yes, to go in.

16  Q    Did anybody else know your password and log-on?

17  A    Dr. Thomas.

18  Q    Was there a password and log-on to -- a password to

19  access the Excel spreadsheets that you were saving?

20  A    Yes.  I did put a password on there just for privacy.

21  Q    So could anybody go onto your computer and open up an

22  Excel spreadsheet?

23  A    Not without the password.

24  Q    And let me just clarify, that was the spreadsheets that

25  you created for the billing and payroll?  They were password

1   protected?

2   A     They were, yes.

3   Q     Did you follow the process of saving the spreadsheets as

4   a separately named file each week?

5   A     Yes.

6   Q     You followed that process each time you did the payroll?

7   A     Yes.

8          MS. PAUL:  Your Honor, may I approach?

9          THE COURT:  You may.

10  BY MS. PAUL:

11  Q     I'm handing you what's been marked for identification as

12  Government's Exhibit 30.  Take a look at that document.  Do

13  you recognize it?

14  A     Yes.  It seems it's a caregiver's check.

15  Q     Okay.  And the date on the check is for April 20 --

16  A     April 3rd.

17  Q     I'm sorry?

18  A     April 3rd, 2015.

19  Q     Okay.  And that is when you were employed by Caring

20  First doing payroll?

21  A     Yes.

22  Q     So is this a check that you would have issued -- or

23  would have drafted?

24  A     Yes.

25          MS. PAUL:  Your Honor, we move to admit

1    Government's Exhibit 30 into evidence.

2              THE COURT:  All right.  So you're admitting this as

3    a check that she initiated and was executed by one of the

4    signatories, correct?

5              MS. PAUL:  Yes, Your Honor.

6              THE COURT:  All right.

7              Any objection?

8              MR. BRAND:  No objection, Your Honor.

9              THE COURT:  All right.  What's been previously

10   marked as Plaintiff's 30 would be admitted without objection

11   and marked as such.

12             Feel free to continue.

13   BY MS. PAUL:

14   Q    And on the check at the bottom, there's the memo line.

15   Do you see that?

16   A    Yes.

17   Q    Okay.  And what are the dates on that memo line?  What

18   do they indicate?

19   A    March 15, 2015, to March 21, 2015, which is the pay

20   period that's getting paid on April 3rd, 2015.

21   Q    Okay.  And what is the SN designation?

22   A    So this would be skilled nursing and 70 hours.

23   Q    Okay.  So this memo line, is this the type of

24   information that you previously testified you put on the

25   checks when you drafted them?

1    A     Yes.

2    Q     And did you put this information on the memo line of

3    every nurse's check while you were doing payroll processing?

4    A     Yes.

5    Q     And you previously indicated that Timothy Thompson had

6    trained you to do this?

7    A     Yes.

8    Q     When did your employment with Caring First end?

9    A     I believe it was May 8, 2015.

10   Q     And why did it end?

11   A     I don't know to this day.  I was in my office, like I

12   usually am.  She came into the office, said that some changes

13   were going to happen and that one of those changes was me;

14   that she had gone previously to her son's house and he was

15   without power.  He didn't have any money.  He didn't have any

16   food in his fridge, and she had to offer him back the job

17   that he had before, which was my job now, but that's what he

18   was doing before, because he was having a very tough time in

19   his life and he didn't have any money.  And that's -- and

20   that she had spoken to God and that God told her that was the

21   best thing to do and help her son.

22        At that time, I did start crying because it was just a

23   shock, you know, a shocking thing for one second to the other

24   she would tell me I'm not having a job.

25        So at that time she did tell me, come back on Monday.

1    I'll see where I can put you, what position I can put you on,

2    but it's not going to be billing and payroll because my son

3    will continue to do that.

4        I did not return on Monday.  You know, I gathered my

5    things and I left that Friday.

6    Q    Did you have any contact with Dr. Thomas after you were

7    let go?

8    A    Yes.  For, like, the following three weeks, I'm assuming

9    almost a month I did.

10   Q    Who initiated the contact?

11   A    She did.

12   Q    Okay.  Why was she reaching out to you?

13   A    So basically it was -- I'm assuming Tim did not start

14   that position, because if not, she would have known those

15   answers.  But basically it was, well, how do you do this and

16   how do you do that, and where do I have to go to do this and

17   where do I have to do this.  It was different things about

18   the billing and the payroll that she has no idea about and

19   she was asking me to let her know.

20       At one point she did ask what's the password to go into

21   the Excel spreadsheets, which are the ones that were

22   destroyed by me, supposedly.  So she asked for the password.

23   I gave her the password.

24   Q    Okay.  Did you destroy the payroll records before you

25   left your employment with Caring First?

```
 1   A     I did not, no.

 2             MS. PAUL:  That's all I have at this time, Your

 3   Honor.

 4             THE COURT:  Cross-examination?

 5             MR. BRAND:  Yes, Your Honor.  May it please the

 6   Court.

 7                      CROSS-EXAMINATION

 8   BY MR. BRAND:

 9   Q     Good morning, Ms. Reyes.  How are you?

10   A     Good.  How are you?  Good morning.

11   Q     Good.  I just want to clarify a few things.  You're the

12   same Karen Reyes that filed a -- back in 2015 filed a claim

13   with the Florida Commission on Human Relations against Caring

14   First, Inc., correct?

15   A     I am.

16   Q     Okay.  And you filed a complaint which alleged

17   discrimination against Caring First, correct?

18   A     Correct.

19   Q     And I responded to your complaint in front of the

20   Florida Commission on Human Relations, correct?

21   A     I am not aware of that.

22   Q     I sent you a copy.  Did you receive a copy from my

23   office that I had sent to the Florida Commission on Human

24   Relations?

25   A     You must have sent it to my attorney.  I don't have a
```

1   copy of that.

2   Q     Okay.  Did you ever receive my response?

3   A     I have not received anything.

4   Q     Did your -- who is your attorney at that time?

5   A     The same one right now, Richard Celler.

6   Q     And did he ever go over my response?

7   A     He did tell me some allegations that Dr. Thomas had

8   said, but I haven't received anything in physical is what I

9   mean.

10  Q     Okay.  Did he specifically tell you that in my response

11  dated October 29, 2015, to the Florida Commission on Human

12  Relations, I alleged and attached proof that you had written

13  checks improperly, made mistakes, and issued checks to other

14  people in amounts that were not approved?

15          MS. PAUL:  Objection, Your Honor; relevance and

16  this is improper impeachment under Rule 608 and Rule 609.

17          THE COURT:  All right.

18          Response?

19          MR. BRAND:  Your Honor, I'm going right to her

20  credibility.  I mean, the allegations --

21          THE COURT:  All right.  You're attacking the

22  credibility of the witness on cross.

23          And what specifically are your objections to it?

24          MS. PAUL:  Well, so she has a lawsuit against

25  Caring First and they've counter-claimed in that lawsuit.

1    They're all just allegations.   There's no proof of any

2    criminal wrongdoing, of any civil wrongdoing of any kind.

3    They're allegations.

4              THE COURT:   I understand.

5              I'll allow her to answer the question.   She can

6    answer the question.

7              MR. BRAND:   Thank you, Your Honor.

8    A    Yeah.   Of course.   So as far as the -- I believe he did

9    tell me about a check that was issued for two weeks at a time

10   and it was for $1,280.

11        You can go back to her records.   Everybody that was an

12   employee staff for that week and for the following two or

13   three weeks, I believe, got an extra paycheck on their check

14   because she was behind a week.   And she hires and fires

15   people so often, she doesn't want them coming back to her

16   office to collect the last check.   So she wanted everybody to

17   be up to date with their check.

18        So one week, it was myself and Blanca, I believe.   The

19   following week, it was Gloria and India; and the following

20   week, it was Catiana.

21        So everybody as an employee staff got an extra check for

22   that month.

23   Q    Okay.   Well, did your attorney tell you that I wrote a

24   letter and gave the attachments to your attorney, hence to

25   yourself, of not just one check but more than five checks?

1    A     For myself?

2    Q     Improperly written checks that you wrote out.

3    A     Improperly written checks for myself?

4    Q     To yourself and to -- and to -- and to Gloria.

5    A     I doubt that.

6    Q     Your attorney didn't tell you?

7    A     He did not tell me that.  But I doubt that you have

8    proof that I did five checks to myself that were improper.

9    Q     Okay.  And are you aware that the Florida Commission on

10   Human Relations issued a Notice of Dismissal of your case on

11   April 16th?  It's actually April 1st of 2016.

12              MS. PAUL:  Objection; relevance.

13   BY MR. BRAND:

14   Q     Are you aware?

15   A     No.

16              THE COURT:  All right.  The objection is relevance.

17   Why does that matter here?

18              MR. BRAND:  It goes to the believability of her

19   complaint.

20              THE COURT:  So am I bound by the decision of

21   whatever commission you just cited?

22              MR. BRAND:  No, but for --

23              THE COURT:  Okay.  I'll consider it, but it's like

24   a drop in a giant bucket.  F.Y.I.

25              Go on ahead.  The objection is overruled.  You can

1   continue.

2   BY MR. BRAND:

3   Q     And, Ms. Rodriguez (sic), are you aware that --

4   A     Reyes.

5   Q     Ms. Reyes, are you aware that on September 28, 2015, you

6   filed -- you and Gloria Rodriguez filed a lawsuit in the

7   Ninth Judicial Circuit Court of Orange County against Caring

8   First?

9   A     Yes.  I actually did not file it with Glorie (sic).  I

10  filed it on myself.

11        When I started giving the names of potential witness or

12  potential people that can speak and actually find out the

13  truth, Glorie spoke to the lawyer, and he said it's actually

14  going to be, you know, credible if she is actually in the

15  case as well.

16        So it's not something that we did together.

17              MR. BRAND:  Your Honor, may I approach?

18              THE COURT:  You may approach.

19  BY MR. BRAND:

20  Q     Let me show you what has been marked as the Complaint

21  For Demand For Jury Trial in the Ninth Judicial Circuit Court

22  for Orange County.  Do you see that?

23              THE COURT:  Please tell me what that's marked as.

24              MR. BRAND:  Your Honor, can we call it Defense

25  Number 1?

1      THE COURT:  Well, let's slow down here.  Are you

2  planning on introducing that or are you using it for

3  impeachment only?

4      MR. BRAND:  Your Honor, I'll use it for impeachment

5  only.

6      THE COURT:  All right.  Has opposing counsel had an

7  opportunity to review the document you just presented?

8      MS. PAUL:  No, Your Honor.

9      THE COURT:  It's the Complaint -- well, first of

10  all, tell me what it is.

11      MR. BRAND:  It's the lawsuit in the circuit court

12  case.

13      THE COURT:  All right.  Is that the attachment that

14  you filed with the recent document?

15      MR. BRAND:  Yes, Your Honor.

16      THE COURT:  Okay.  Go on ahead and continue.  It's

17  the Complaint.  I don't know what -- let's just keep going.

18      MS. PAUL:  Your Honor, we would object to the use

19  of this document as extrinsic evidence, improper extrinsic

20  evidence under 608(b).

21      THE COURT:  For the limited -- look, this is going

22  to be an entirely different situation at trial with all the

23  stuff that's coming in right now.  But in all fairness to

24  both parties, this witness's credibility is critical in

25  assisting the Court in reaching the appropriate conclusion

1    here.

2           So I'm going to give you a little leeway to do

3    this, but understand the problem with bringing in litigation

4    in unrelated cases is sort of like trying to impeach a

5    defendant in a criminal trial by claiming that he's been --

6    he or she has been indicted on other matters in other

7    districts.

8           These are allegations made in a lawsuit that are

9    unresolved at this point.  All they are are allegations.  So

10   it be would an understatement to say they have limited

11   relevance.  But in all fairness, if you believe that there's

12   some tie-in to this witness's credibility, I'll let you go

13   forward.  But it doesn't do me a whole lot of good to have

14   allegations in a lawsuit that's unresolved.

15          So the objection's overruled.  Go on ahead and

16   continue.

17          MR. BRAND:  Your Honor, just to enlighten the

18   Court, the reason why I'm bringing this out is because when I

19   put my clients on the stand and they talk about it, it will

20   be linked up at that point.

21          THE COURT:  That's fine.  I mean, I overruled the

22   objection.  Go on ahead.

23   BY MR. BRAND:

24   Q    Ms. Reyes, can you please identify this document?

25   A    So this looks like the original document filed at the

1  court for the lawsuit.

2  Q    And you said that you filed your Complaint, your lawsuit

3  without Ms. Gloria Rodriguez?

4  A    I called the lawyer by myself.  I didn't file anything.

5  The lawyer did.

6  Q    So you're aware then that Gloria Rodriguez had joined

7  you in the lawsuit against Caring First?

8  A    At the time that it was actually filed, yes, but I

9  called the lawyer myself.  Once I gave the witness names,

10  that's when he spoke to her.

11  Q    And did your attorney tell you that I served him with a

12  civil theft demand letter against yourself?

13  A    Yes.

14  Q    Okay.  And did he show you the letter and the

15  attachments?

16  A    I believe so.  This was a while back, but, yes.

17  Q    It was a while back.  It was November 1st, 2015.

18  A    Uh-huh.

19  Q    He showed you the attachments?

20  A    Yes.

21  Q    And are you aware that we filed a counterclaim against

22  you for theft in the circuit court case?

23  A    Yes.

24        THE COURT:  So we're clear on the record, the

25  document that he showed the witness has been -- it's on the

1   record as 101-1.

2            All right.  Go on ahead and continue.

3   BY MR. BRAND:

4   Q    Are you aware that I also -- did your lawyer also show

5   you that I filed a civil theft demand letter for Gloria

6   Rodriguez?

7   A    No.

8   Q    Okay.

9            MR. BRAND:  Your Honor, this, I am going to seek

10  for -- to admit.

11           THE COURT:  All right.  Has it been previously

12  marked?

13           MR. BRAND:  It has not been previously marked.

14           (Discussion off the record between Mr. Brand and

15  Ms. Paul.)

16           THE COURT:  Please bring it to Miss Darleen so she

17  can mark it.

18           MR. BRAND:  Thank you very much.

19           THE COURTROOM DEPUTY:  2, Judge.

20           THE COURT:  All right.  Go on ahead.

21  BY MR. BRAND:

22  Q    Ms. Reyes, I'm showing you the civil theft demand letter

23  that I sent to your attorney.  Is this the letter and the

24  exhibits that your attorney showed you?

25  A    No.  I've never seen this.

1    Q      The civil theft demand letter?

2    A      I've never seen this letter.

3    Q      Is that the letter that he explained to you?

4    A      He did explain to me about the -- the civil theft and

5    all that, but I didn't see the actual letter.

6    Q      Those are the documents that you went over with him?

7    A      Yes.

8           MR. BRAND:  Your Honor, I'd like to move that into

9    evidence.

10          THE COURT:  All right.

11          Any objection to the admission of Defense 2?

12          MS. PAUL:  Yes, Your Honor.  Lack of foundation.

13   The witness cannot authenticate the letter.  She says she

14   hasn't seen the letter.  It's also extrinsic evidence of, you

15   know, just allegations.  It's not relevant.

16          THE COURT:  I think they're of limited relevance.

17   I'll give you that.

18          But the objection is that she can't lay the

19   predicate.  She's never seen the letter before, and said that

20   she discussed the substance of a letter with her attorney.

21          So what's your objection to that?  It's not the

22   right person to lay the predicate here.

23          MR. BRAND:  Your Honor, I just asked Ms. Reyes if

24   those were the documents that -- that her attorney referred

25   to and went over with her, and she just said yes.

1          THE COURT:  Ms. Reyes, I'm showing you the civil

2    theft demand letter that you sent to your attorney.  Is this

3    the letter and the exhibits that your attorney showed you?

4               I've never seen this.

5               The civil theft demand letter?

6               I've never seen this letter.

7               Is that the letter that he explained to you?

8               He did explain it to me about the civil theft and

9    all that, but I didn't see the actual letter.

10              Those are the documents that you went over?

11              Yes.

12              So you think that's the predicate to get it in?

13              I've never seen this letter.

14              I've never seen this letter.

15              He discussed something with me that might be

16   consistent with what's in this letter.

17              So that's your predicate, correct?

18              MR. BRAND:  My predicate, then I went to the

19   exhibits of that letter --

20              THE COURT:  I understand.

21              MR. BRAND:  -- of which she said yes to.  So I

22   could remove the letter and leave the exhibits.

23              THE COURT:  All right.

24              Anything further from the plaintiff?

25              MS. PAUL:  Well, also there's additional documents

1  besides the letter attached to this exhibit which contain

2  hearsay statements and the witness has not identified.

3         THE COURT:  All right.

4         Again, we're going to move this along.  I'm going

5  to allow it but understand that this is by the skin of your

6  teeth and that's at a motions hearing.

7         So admitted over the objection.  You may proceed.

8  Go on ahead.

9         MR. BRAND:  Okay.

10 BY MR. BRAND:

11 Q    Ms. Reyes, you testified earlier that you created Excel

12 spreadsheets which were demonstrative of the pay periods and

13 those who worked to show who was getting paid for what,

14 correct?

15 A    Yes.

16 Q    Okay.  And where did that data come from?  In other

17 words, counsel for the plaintiff asked you only how you paid

18 the check from, and you said the Excel spreadsheet.  But

19 where did the data come from in order to generate the Excel

20 spreadsheet?

21 A    She actually did ask, and I said from the time sheets

22 that the nurses turned in.

23 Q    Okay.  And those are the AHCA forms, AHCA meaning the

24 Agency for Health Care Administration forms?

25 A    No, they are not.  They are time sheets that were done

1    in the office.  It has the caregiver name, the hours, the

2    total hours they worked for that week and with what patient.

3    Q    Okay.  So the caregiver or the nurse would sign a date,

4    correct?

5    A    Exactly.

6    Q    And they would put the times that they showed up for the

7    job, correct, and an amount?

8    A    I don't believe the time they would show up for the job.

9    They would just put the hours they were there.

10   Q    Okay.  And would the caregiver or the home that the

11   nurses went to, would they also have to sign, the guardian?

12   A    The patients -- in this case, it would be the patient's

13   mother or father, they would sign, confirming that that nurse

14   was there, the hours they were putting on the time sheets,

15   yes.

16   Q    Okay.  And you don't know if that form was an Agency for

17   Health Care Administration form or not?

18   A    It was not an official form, no.

19   Q    Okay.  Did the data from the spreadsheet come from

20   anywhere else other than those forms?

21   A    No.  That's what we're paying and billing based off of.

22   Q    Okay.  Was there any other way to get the nurses' times

23   or the days they worked other than those patient forms?

24   A    Other than the time sheets?

25   Q    Other than the time sheets.

```
 1   A     No.  That's -- basically, that's her turning it in,

 2   saying, I worked these hours.  This is what I have to get

 3   paid for.

 4   Q     And are these the same forms that are kept in the

 5   patient files?

 6   A     I don't believe it's in the patient files.  It's in the

 7   employee files.

 8   Q     And you're saying that there are employee files that

 9   exist?

10   A     Yes.

11   Q     You're saying that every nurse that works --

12   A     Yes, of course.

13   Q     -- works in conjunction with Caring First has an

14   employee file?

15   A     Yes.

16   Q     Yes?

17   A     Yes.

18   Q     Okay.  Is it course of habit in Caring First to leave

19   the computers on?

20   A     I believe the computers were always on, yes.  They

21   weren't turned -- powered off or anything.  They would go to

22   sleep and that's it.

23   Q     The same with your computer?

24   A     Yes.

25   Q     It was always on?
```

1    A    Yes.

2    Q    I'm going to show you what I believe was marked as

3    Plaintiff's Number 30.   I believe this is Plaintiff's Number

4    30, the check.

5         Plaintiff's number 30 is the check -- the only check

6    that they entered, and they asked you what are the dates on

7    the memo line and you said that was the pay period, correct?

8    A    Let me see.

9         Yes, so this is the pay period that they're getting paid

10   for.

11   Q    So that doesn't necessarily correspond with the dates

12   that they actually worked, correct?

13   A    Yes, I believe it does correspond with the days they

14   actually worked.

15   Q    You believe or you're not sure?

16   A    I don't remember right now.

17   Q    Okay.   And what happens if a nurse turns in their forms

18   late?   In other words, they miss a pay period?

19   A    They will miss a check.

20   Q    They will miss a check?

21   A    Uh-huh.

22   Q    So then they would have to get paid a different pay

23   period?

24   A    Exactly.

25   Q    Exactly, correct?

1   A      Uh-huh.

2   Q      And what happens if a nurse isn't paid on time?

3   A      If they did not turn in their time sheet, they're not

4   going to get paid on time.

5   Q      So then they would get paid on a separate pay period for

6   work?

7   A      Exactly.

8   Q      And when they finally were paid, that would be the pay

9   period reflected on the check, correct?

10  A      Yes.   Whatever pay period it was that they turned in the

11  time sheet, that's what's going to be on the memo line.

12  Q      You were fired, correct?

13  A      Yes.

14  Q      And in the room that you were fired in was Blanca

15  Valentine and Dr. Thomas, correct?

16  A      No.

17  Q      No?

18  A      It was my office and only Dr. Thomas was in there.

19  Q      So your testimony is only Dr. Thomas came in?

20  A      Yes.

21  Q      And did Dr. Thomas tell you about mistakes that were

22  being made by you?

23  A      No.

24  Q      You were only handling the billing for approximately two

25  months, correct?

1  A     About, yeah.

2  Q     It could be less?

3  A     I don't know exact dates, but it could be a little bit

4  more, a little bit less, yeah.

5  Q     Okay.  And in your office, you say after Dr. Thomas

6  fired you, how long before you left?

7  A     Ten minutes.  I picked up my things, I spoke to Blanca,

8  and I left.

9  Q     Okay.  Were you upset?

10 A     No.  I was sad.  I was crying.  I wasn't upset.  I

11 didn't -- I told her, you know, you're a mother.  You have to

12 do what you have to do, because she had fired me because she

13 was going to give the job back to Tim.

14 Q     Okay.  And it's your testimony that it was Dr. Thomas

15 that contacted you after you were fired?

16 A     Yes.

17           MR. BRAND:  I have nothing further, Your Honor.

18           THE COURT:  All right.  Thank you.

19           Are you asking for a redirect?

20           MS. PAUL:  Yes, Your Honor, just very briefly.

21           THE COURT:  All right.  Briefly.  Go on ahead.

22                     REDIRECT EXAMINATION

23 BY MS. PAUL:

24 Q     On the memo line of the checks, would there be an

25 indication if somebody's payment was late?

1    A    As far as it would say late payment or anything like

2    that?

3    Q    Right.

4    A    No.

5    Q    Or associated with the work week in which the payment

6    should have been for?

7    A    It would just say the work week that the payment should

8    have been for, but there's nothing indicating she turned in

9    her time sheet late or it's late payment, anything like that,

10   no.

11   Q    Okay.  You don't recall doing that?

12   A    No.

13   Q    Okay.

14          MS. PAUL:  Nothing further.

15          THE COURT:  All right.

16          Thank you, ma'am.  You have a good day.

17          I would invite the plaintiff to call their next

18   witness.

19          MS. CHASTAIN:  Your Honor, if I could get some

20   clarification on what would be most helpful for the Court.

21   We're prepared to present our agency witness to discuss the

22   time of knowledge when defendants would likely have been

23   aware of litigation.

24          THE COURT:  How many total witnesses do you have

25   today?

1      MS. CHASTAIN:  We have four -- five witnesses, Your

2  Honor, but we don't have to call all of them, depending on

3  your preference.

4      THE COURT:  I'll leave it in your capable hands,

5  but what's going to be pressing -- look, the prejudicial

6  prong of this is something you also have to address,

7  obviously.  But I would leave it in both your capable hands

8  to tie Ms. Reyes' testimony for the Court on your final

9  argument.  I'll give you some brief time to argue.

10      But go on ahead and call whoever you want.  We have

11  the morning and we just need to keep marching forward.

12      MS. CHASTAIN:  Thank you, Your Honor.  The

13  Secretary calls Wildali DeJesus.

14      THE COURT:  Okay.

15      THE COURTROOM DEPUTY:  Please come forward and be

16  sworn.

17      Do you solemnly swear or affirm under penalty of

18  perjury that the testimony you will give will be the truth,

19  the whole truth and nothing but the truth?

20      MS. WILDALI DeJESUS:  I do.

21      WILDALI DeJESUS, PLAINTIFF'S WITNESS, SWORN

22      THE COURT:  All right.  Good morning, ma'am.

23  Please make yourself comfortable, and state your full name

24  into the mic, spelling your last name.

25      THE WITNESS:  Probably my first name.

1    THE COURT:  That would be helpful, I think.  Thank

2    you.

3    THE WITNESS:  My name is Wildali DeJesus

4    W-i-l-d-a-l-i, and last name is DeJesus, D-e-J-e-s-u-s.

5    THE COURT:  Your witness.

6    MS. CHASTAIN:  Thank you, Your Honor.

7                          DIRECT EXAMINATION

8    BY MS. CHASTAIN:

9    Q    Thank you, Ms. DeJesus.  How are you?

10   A    Good morning.  Good.  How are you?

11   Q    Could you please tell me your occupation.

12   A    I'm the assistant district director for the Wage and

13   Hour Division in the Orlando office.

14   Q    What are your responsibilities as the assistant district

15   director?

16   A    I supervise the investigators that conduct

17   investigations.  I review -- I assign their work.  I review

18   their work, and I review their performance at the end of the

19   year as well.

20   Q    Tell me about how you first became involved with this

21   matter, the matter involving Caring First.

22   A    We set up a case file and it was assigned to an

23   investigator at the time.  Heriberto Fernandez was his name.

24   And I assigned that to him in February of 2014.

25   Q    So Heriberto Fernandez was your employee?  You managed

1   him?

2   A     Yes.  He was my investigator.

3   Q     What was the subject of the investigation?

4   A     It was an F.L.S.A., a Fair Labor Standards Act,

5   investigation for allegation of possible misclassification of

6   employees as independent contractors and possible unpaid

7   overtime.

8   Q     Tell me a little bit about the investigative files

9   created by investigators like Heriberto Fernandez.  What is

10  included in those files?

11  A     Our files have several exhibits and they're coded

12  differently.  So Exhibit A usually shows a copy of a profile

13  pay period, which is the most recently completed payroll at

14  the time the investigator arrives for the investigation, and

15  also any back wage computations that are done.

16       Then our B exhibits are usually statements or interviews

17  from employees or employer, depending on the situation.

18       Then C exhibits are notes taken at the initial

19  conference, which is the very first meeting where the

20  investigator meets with the employer or their representative,

21  and it mostly contains just general business information,

22  officers of the company, things of that nature.

23       Then D exhibits is communications between my

24  investigator or me sometimes and the employer or the

25  representative.

```
 1        And E exhibits is like miscellaneous.  It could be

 2   pictures.  It could be different things that are acquired

 3   during the course of the investigation that are relevant.

 4   Q    As part of your role as supervisor, do you review

 5   investigative files when they're submitted for approval?

 6   A    Yes.

 7   Q    And did you review the investigative file created by

 8   Heriberto Fernandez in this case?

 9   A    I did.

10        MS. CHASTAIN:  Your Honor, permission to approach

11   the witness?

12        THE COURT:  You may approach.

13   BY MS. CHASTAIN:

14   Q    I'm handing you what's been premarked as Government's

15   Exhibit 1.  Do you recognize this document?

16   A    I do.

17   Q    What is it?

18   A    It's our standard appointment letter that the

19   investigators prepare to send to the employer to set up an

20   appointment to start the investigation.

21   Q    And is this appointment letter, was it made by Wage and

22   Hour Investigator Fernandez?

23   A    It was.

24   Q    Did he have a duty to report facts accurately in this

25   document?
```

1  A    Yes, he did.

2  Q    Did Mr. Fernandez have personal knowledge of the facts

3  reported in this appointment letter?

4  A    Yes.

5  Q    And is this appointment letter kept in the investigative

6  file in the regular course of Wage and Hour Division's

7  business?

8  A    It is.

9  Q    Is this a fair and accurate copy of the appointment

10  letter issued in this case?

11  A    Yes, it is.

12         MS. CHASTAIN:  Your Honor, I move for the admission

13  of Secretary's Exhibit 1, the appointment letter.

14         THE COURT:  Any objection?

15         MR. BRAND:  No objection.

16         THE COURT:  All right.  Plaintiff's 1 admitted and

17  marked as such.  No objection.  Feel free to continue.

18  BY MS. CHASTAIN:

19  Q    What is the date of this appointment letter?

20  A    It was faxed on March 11, 2014.

21  Q    What is the purpose of issuing an appointment letter to

22  an employer?

23  A    First, to put the employer on notice that we are going

24  to be conducting an investigation and to set up a time and

25  date to do so, and also to request in writing the records

1   that are necessary to conduct the investigation.

2   Q    What happens after the appointment letter is issued?

3   A    Well, the investigator then goes to the business and

4   conducts the initial conference, and then gets the records

5   that he or she needs.

6   Q    In this case, did Heriberto Fernandez conduct an initial

7   conference?

8   A    He did.

9           MS. CHASTAIN:  Permission to approach the witness,

10  Your Honor?

11          THE COURT:  You may approach.

12  BY MS. CHASTAIN:

13  Q    I'm handing you what's been premarked Government's

14  Exhibit 2.  Do you recognize this document?

15  A    Yes, I do.

16  Q    What is it?

17  A    This is the initial conference notes taken by the

18  investigator at the time of the initial conference.

19  Q    And are -- these notes taken by Mr. Fernandez, were they

20  made by Mr. Fernandez?

21  A    They were.

22  Q    Were they made on or about the time of the

23  investigation?

24  A    They were.

25  Q    Is Mr. Fernandez under a duty to report facts accurately

1   in his notes for his investigative file?

2   A    Yes, he is.

3   Q    And do these notes fairly and accurately represent or --

4   I'm sorry.  Does this exhibit fairly and accurately represent

5   the notes taken by Mr. Heriberto during the initial

6   conference?

7   A    It does.

8           MS. CHASTAIN:  Your Honor, I move for the admission

9   of Government's Exhibit 2.

10          THE COURT:  Any objection?

11          MR. BRAND:  Yes, Your Honor.

12          THE COURT:  All right.  What's the objection?

13          MR. BRAND:  It's hearsay.

14          THE COURT:  Response?

15          MS. CHASTAIN:  Your Honor, I believe I established

16  a foundation under the business record rule as an exception

17  to hearsay.

18          THE COURT:  Are you using this to show that the

19  defendant had notice that an investigation had been

20  initiated?

21          MS. CHASTAIN:  Partially, Your Honor.  Also, the

22  contents of this exhibit, when we discuss it, will show that

23  the record -- who the records were maintained by at the time

24  of the start of the investigation in 2014.

25          THE COURT:  All right.  The objection is overruled

1  for that purpose.  It'll be admitted over the objection.  You

2  may continue.

3          MS. CHASTAIN:  Thank you.

4  BY MS. CHASTAIN:

5  Q    Ms. DeJesus, looking at these notes from the initial

6  conference, on what date did Mr. Heriberto (sic) have the

7  initial conference with defendants?

8  A    On March 17, 2014.

9  Q    Who was present at this initial conference?

10  A    Timothy Thompson.

11  Q    Was Dr. Thomas present as well?

12  A    I don't believe so.

13  Q    Looking on the third page of this exhibit, there's a

14  section entitled Recordkeeping.  Who was responsible and

15  maintained the records for Caring First?

16  A    Mr. Thompson.

17          MR. BRAND:  Your Honor, the same objection.

18          THE COURT:  What is the objection?

19          MR. BRAND:  The objection is at this point they're

20  getting into -- into the content of the record and this

21  witness wasn't there.  It's hearsay.  She has no firsthand

22  knowledge at all as to any of the content that was drafted on

23  this document.

24          THE COURT:  Well, it's been admitted.  So she could

25  literally read the document into the record.  But your point

1    is well taken, a matter I'm sure you'll bring up on cross-

2    examination.

3              All right.  Feel free to continue.

4              MS. CHASTAIN:  Thank you, Your Honor.

5    BY MS. CHASTAIN:

6    Q     There is a note here on Profile Pay Period.  What does

7    that mean?

8    A     That is the dates of the last -- the pay period for the

9    last completed payroll at the time the investigator arrived

10   at the initial conference.

11   Q     And then it says Exhibit E and has some dates listed.

12   What does that mean?

13   A     That is the dates that are on the exhibit for the

14   profile pay period.

15   Q     And by "exhibit," would that document then be included

16   in the investigative file?

17   A     Yes, it would.

18   Q     Did Caring First provide the documents requested in the

19   appointment letter, and that would be the payroll and time

20   records for the time period of March 13, 2012, through March

21   11, 2014?

22   A     At the time of the initial conference, they provided a

23   good amount of records.  Not all of it but most of it was

24   provided when he showed up at the initial conference, yes.

25   Q     And is Exhibit 3 in front of you, Ms. DeJesus?

1          MS. CHASTAIN:   Permission to approach, Your Honor?

2          THE COURT:   You may.

3   BY MS. CHASTAIN:

4   Q    Exhibit Number 3 has already been admitted into the

5   record.   Please review it.   What is Exhibit 3?

6   A    It is a fax received by the investigator with a copy of

7   the spreadsheet for the profile pay period.

8   Q    What is the date of this fax?

9   A    The fax was sent on March 18, 2014.

10  Q    And does -- the spreadsheet attached to this fax, does

11  it include all of the information necessary for Mr. Heriberto

12  to determine whether Caring First was in compliance and

13  whether or not overtime had been paid?

14  A    Yes, it did.

15  Q    Do you know, did Mr. Fernandez have any difficulty

16  receiving the full two years of back wages in this format

17  that he had requested?

18  A    Not at all.   He received all two years of it within a

19  week.

20  Q    How do you know that?

21  A    Because of the case diary and his activity.   If he had

22  not received it timely, he would have issued a 72-hour letter

23  that has to be signed by me.   And if the employer doesn't

24  respond at that point, then a subpoena would be issued to the

25  employer, which would also be issued by me.

1    Q      What did Mr. Fernandez find through his investigation?

2    A      He established that the nurses were misclassified as

3    independent contractors and they were not paid time and a

4    half for all the hours over 40 when they worked them.

5    Q      Did he calculate back wages owed to the nurses?

6    A      He did.

7              MS. CHASTAIN:   Permission to approach, Your Honor?

8              THE COURT:   You may.

9              MR. BRAND:   Your Honor, I object on grounds of

10   relevance.   This has nothing to do with this.

11             THE COURT:   All right.   So she's testified that the

12   investigator made a finding that the individuals were in fact

13   employees and not independent contractors.

14             So in your motion, you're alleging that they

15   willfully destroyed evidence.

16             So does this tie into that?

17             MS. CHASTAIN:   Your Honor, part of our finding --

18   part of our ability to show prejudice is to show that delay

19   as a result of this contemptuous conduct has caused really

20   excessive losses to these nurses, losses which may never be

21   recouped, depending on defendants' ability to pay.

22             We wanted to establish that at the time of the

23   investigation in 2014 the amount of the back wage liability

24   as opposed to the amount of back wage liability for which the

25   Secretary is seeking at this time.

 1              THE COURT:  All right.  For that limited purpose.

 2    I want to make clear, remember, in my order I was unconvinced

 3    as to whether or not the classification was independent

 4    contractor or employee.

 5              So I know she's testifying as to what her

 6    investigator told her, but that's a matter that's yet to be

 7    resolved and probably, in all likelihood, won't be resolved

 8    today.

 9              So the objection is overruled.  For the limited

10    purpose of establishing what you allege is prejudice, I'm

11    going to allow this to go forward.  But I'm not accepting

12    those conclusions, the ones that she just made.

13              All right.  Go on ahead.

14              MS. CHASTAIN:  Absolutely.  Thank you, Your Honor.

15    BY MS. CHASTAIN:

16    Q    I'm handing you what has been premarked Government's

17    Exhibit 5.  What is this document?

18    A    This is what we call the Summary of Unpaid Wages or Wage

19    and Hour Form 56.  It shows the back wages computed for each

20    employee during the period of investigation.

21    Q    And is this Wage/Hour 56 made by Wage/Hour Investigator

22    Fernandez?

23    A    It was made by him, yes.

24    Q    Does he have a duty to report the facts in this sheet

25    accurately?

1   A     Yes, he does.

2   Q     Does Wage and Hour maintain a copy of this form with the

3   computed back wages as part of its investigative file?

4   A     We do, yes.

5   Q     And does this Exhibit 5 fairly and accurately represent

6   the Wage/Hour 56 created by Mr. Fernandez in this case?

7   A     It does.

8           MS. CHASTAIN:  Your Honor, I move for the admission

9   of Exhibit 5.

10          THE COURT:  Any objection?

11          MR. BRAND:  Yes, Your Honor.

12          THE COURT:  All right.  What are they?

13          MR. BRAND:  I don't object for the purposes of --

14  if this is just a business document, coming in as a business

15  document.  But as to the dollar figures and the amounts and

16  the content, I do object to it, and especially she's not the

17  author of this document and cannot testify as to the true and

18  correctness of these figures and these dollar amounts.

19          THE COURT:  I understand.  I mean, this is a very

20  limited purpose for which this is being used, and for that

21  reason, I'm going to overrule the objection and allow it.

22          I think your objection would be a lot stronger if

23  we were at trial, and it probably will be.  I'm sure you'll

24  make them again.

25          But understand we're at a motions hearing and the

1    door -- the gates are much more open than they would be at

2    trial.  This is information that I need in order to make a

3    decision on an issue of law, whether or not -- well, it's

4    kind of facts and law.  But legally, I need to determine

5    whether or not their request for these sanctions are

6    justified, and they're trying to lay out why they think

7    they're justified.

8                So overruled.  Go on ahead.

9                MS. CHASTAIN:  Thank you.

10   BY MS. CHASTAIN:

11   Q    Ms. DeJesus, what was the total amount of back wages

12   that Mr. Fernandez computed as of March 2014?

13   A    It was $173,413.70.

14   Q    Did Mr. Fernandez give this document or a copy of this

15   document to defendants, Caring First?

16   A    He did.

17   Q    When?

18   A    At the final conference, which was held in May of 2014.

19   Q    What happens at a final conference?

20   A    Usually at the final conference, the investigator

21   explains to the employer how or why the law applies to their

22   establishment and discloses any violations, if any, that were

23   disclosed during the investigation, and then presents any

24   findings of how many employees are due money, if any, and

25   also gets a solid answer from the employer as to what are

1    they going to do to comply in the future.

2              THE COURT:  She doesn't stop talking until you say

3    "Objection."

4              MR. BRAND:  Your Honor, objection.

5              THE COURT:  All right.  What's the basis for the

6    objection?

7              MR. BRAND:  The basis for the objection is this

8    witness cannot testify as to anything the investigator told

9    or did not tell Caring First during the final -- their final

10   meeting.

11             THE COURT:  All right.  So she's testifying as to

12   hearsay outside of the documents admitted.  That's your

13   objection?

14             MR. BRAND:  That's my objection.

15             THE COURT:  Response?

16             MS. CHASTAIN:  Your Honor, my question really was

17   what is generally discussed at final conferences.

18             THE COURT:  I understand.  The objection is going

19   to be sustained.  She went well beyond that.  Go on ahead.

20             MS. CHASTAIN:  Very well, Your Honor.

21   BY MS. CHASTAIN:

22   Q    Was Mr. Fernandez able to resolve the violations he

23   discovered in his investigation at the time of the final

24   conference?

25   A    No.  At the time of the final conference, the employer

1  did not agree to pay the back wages computed.  So he wasn't

2  able to resolve it at his level.

3  Q    What was the next level?

4  A    So the next level was when it comes to me.  We call that

5  a second-level conference.

6       So most of our investigators, probably 90 percent of the

7  investigations are resolved by them independently, where the

8  employer both agrees to pay and comply at the final

9  conference.  Then I just make sure that things were done

10  properly.

11      But when they don't, I have a responsibility to conduct

12  a second-level conference with the employer or the

13  representative, if they have one.

14  Q    In this case, did you hold a second-level conference?

15  A    I did.  I held a second-level conference with Mr. Brand

16  over the phone.

17  Q    When was that?

18  A    It was on June 18th of 2015.

19  Q    What happened --

20  A    2014.

21  Q    -- during the conference?

22  A    We had a lot of difficulty scheduling the conference,

23  but when we did, we discussed the findings.  And the employer

24  had expressed to my investigator that they had inability to

25  pay such high amount of back wages, which --

1          MR. BRAND:  Your Honor, objection.

2          THE COURT:  Basis for the objection?

3          MR. BRAND:  Again, hearsay.

4          THE COURT:  I think this is turning into a bit of a

5    soup sandwich, because much of the information she's relying

6    on for her meeting -- let me just ask you a general question.

7    This investigator, are you planning on calling him at trial?

8          MS. CHASTAIN:  Yes, Your Honor.

9          THE COURT:  Okay.  The objection is overruled.  She

10   can testify as to what information she relied upon in having

11   her meeting.  That's not going to work at trial, though.

12         Okay.  Go on ahead.

13         And, by the way, we're getting towards the

14   outskirts of relevancy here.  You've established that they

15   owed money.  The amount is not particularly relevant here,

16   and that's part of the prejudice involved.  So I'll invite

17   you to continue with that proviso.  Go on ahead.

18   BY MS. CHASTAIN:

19   Q    So cut to the chase, as I know the Judge would like,

20   were you successful in resolving this matter at the second-

21   level conference?

22   A    I was not.  Mr. Brand expressed the same concern that

23   Investigator Fernandez relayed to me, where, you know, the

24   back wage amount was too high and that they don't think they

25   could afford to pay the back wages.

1    And we talked -- he talked to me about the possibility

2    of just having the nurses register as an LLC and see if that

3    would just make them independent contractors, and I explained

4    to him that that wouldn't work.

5              MR. BRAND:  Your Honor, objection.

6              THE COURT:  What's the basis for the objection?

7              MR. BRAND:  Again, she's -- it's hearsay as to what

8    I said or didn't say.

9              THE COURT:  We've entered into very strange waters

10   here.  So --

11             MR. BRAND:  Especially I'm not a party to this.

12             THE COURT:  What's your response to the objection

13   that she's testifying as to out-of-court statement used in

14   court for the truth of the matter asserted, A; and, B, he's

15   indicating that he's being made a party to this litigation by

16   her testifying as to what the attorney told her?  Response?

17             MS. CHASTAIN:  Well, I'm afraid, Your Honor, that

18   we believe that Attorney Brand has made himself a witness to

19   this case in a couple of different ways.  But responding to

20   this particular objection, we would say that the admissions

21   -- well, he's not the party, of course, but a representative

22   of a party is admissible under the hearsay exception.

23             THE COURT:  I've got to tell you, just as an F.Y.I.

24   here, if she's testifying to the fact that she had a meeting

25   with you -- and I understand that settlement conferences are

1  generally not admissible, but we're not talking about -- are

2  you a lawyer?

3              THE WITNESS:  No.

4              THE COURT:  All right.

5         So we're not talking about two lawyers trying to

6  settle a case.  We're talking about a lawyer trying to settle

7  a case with an agency director or assistant director, where

8  she's testifying to the fact -- and we're just at a motions

9  hearing, understand.

10         But it seems to me that she's saying that you kind

11  of admitted that they were liable for some amount.  You just

12  wanted to negotiate that amount down and, B, that you were

13  sort of indicating that you were brainstorming ideas on how

14  to reclassify these.  Implicit in that is an admission

15  tacitly that they were employees.  That's kind of what she's

16  saying.

17         So your concerns about, have you become a party?

18  It sounds like you may have.

19         So I'll let you make your decision appropriately.

20  But if she's testifying to that and you were authorized to

21  negotiate for the company, I think you might have some issues

22  here at trial.

23         So I'm not sure that's critically relevant to my

24  determination as to whether or not they're going to get their

25  sanctions at all.  But I think you should be thinking about

1   this as we head to trial, because if you did tell her these

2   things, the only way you're going to be able to rebut it is

3   to testify.  And she's saying right now you told her, A,

4   they're liable for something.  Can we negotiate the amount

5   down?

6          And, B, implicitly, yeah, maybe they are employees.

7   Can we do something to make them an LLC so we can get out of

8   this box?

9          MR. BRAND:  I'm not sure.  I didn't hear her say

10  that.

11         THE COURT:  I heard it and I can read it to you.

12         MR. BRAND:  But it's okay.  I'm prepared to take

13  the stand if I have to take the stand.

14         THE COURT:  If you're going to take the stand --

15  well, I'm not going to get involved with your relationship to

16  the bar.  But I will tell you -- and this is not an

17  admonishment or any kind of veiled comment.  You want to be

18  careful about testifying if you're the attorney representing

19  the defendants in this matter, because it sounds like -- you

20  might want to check on that, because we're in some very

21  strange waters.

22         All right.  I understand.  She can testify to this.

23  The objection is overruled.

24  A    So after the second level, I sent him an e-mail and I

25  told him thank you for your time and if you can please talk

1    to your client and get back to me by, I want to say, June

2    23rd.  And if we don't hear back from you, this case will

3    possibly be considered for litigation.

4    Q    Did you ever hear back from Mr. Brand?

5    A    He e-mailed me back and forth and would say different

6    reasons why he couldn't get back to me.  But after the

7    deadline passed, I gave him two more days and then I sent it

8    for consideration for litigation, as I told him I would.

9    Q    Thank you, Ms. DeJesus.

10              MS. CHASTAIN:  I have no further questions.

11              THE COURT:  Cross-examination?

12                        CROSS-EXAMINATION

13   BY MR. BRAND:

14   Q    Good morning, Ms. DeJesus.  How are you?

15   A    Good morning.  I'm good.  How are you?

16   Q    Good.  The -- Plaintiff's Exhibit Number 5 that was

17   shown to you --

18              MR. BRAND:  Your Honor, may I approach?

19              THE COURT:  You may.

20   BY MR. BRAND:

21   Q    Do you have a copy?

22   A    Yes, I do.

23   Q    You didn't actually run those numbers, did you?

24   A    No.

25   Q    You have no personal knowledge as to any damages that

1  may be alleged in this matter?

2  A     No.

3  Q     You personally didn't do any calculations with the

4  allegations of overpayments or overtime?

5  A     No, I don't do the calculations.  I just verify them.

6  Q     Okay.  And Plaintiff's Exhibit Number 3 was shown to

7  you?

8  A     Yes.

9  Q     Your testimony regarding Plaintiff's Exhibit Number 3

10 was what exactly?

11 A     I'm not sure what the question is.

12 Q     Okay.  What specifically on Plaintiff's Number 3 do you

13 allege establishes prejudice on the part of the defendant?

14          MS. CHASTAIN:  Objection, Your Honor.

15          THE COURT:  Basis for the objection?

16          MS. CHASTAIN:  Calls for argument.  Argumentative.

17 I also don't understand the question myself.  Assumes facts

18 not in evidence.

19          THE COURT:  Well, you're asking her to sort of tie

20 things together, like, what on this establishes prejudice.

21 Isn't that more appropriate for final argument from counsel?

22          I mean, she's not here to advise the Court on what

23 she thinks is prejudicial.  That's for you guys to argue when

24 we close out the testimony.

25          So for that reason, I'm going to sustain the

1  objection.

2          MR. BRAND:  Okay.

3  BY MR. BRAND:

4  Q    Plaintiff's Exhibit Number 2.

5  A    Yes.

6  Q    You weren't present on March 17, 2014, for this meeting

7  with apparently your investigator and Tim Thompson, correct?

8  A    Right.  I wasn't there.

9  Q    So you have no firsthand knowledge as to any of the

10  content in this document?

11  A    No.  I wasn't there.

12  Q    And you can't verify whether or not Tim Thompson

13  actually gave the investigator the information that's written

14  down in this document, can you?

15  A    Well, the investigators have a duty to report the actual

16  name and title of whoever it is that is providing information

17  to them.  So that's what he reported.

18  Q    Okay.

19          MR. BRAND:  Nothing else, Your Honor.

20          THE COURT:  All right.  Thank you.

21          Feel free to be seated at counsel table, ma'am.

22          I would invite the plaintiff to call their next

23  witness.

24          MS. CHASTAIN:  Thank you, Your Honor.  The

25  Secretary calls Liz Podczaski.

1          MR. BRAND:  Your Honor, I don't know if we're

2   waiting on Ms. Podczaski to get here, but may I use the

3   restroom?

4          THE COURT:  All right.

5          Let's take a ten-minute break.

6          Ms. Podczaski, you're welcome to sit in the pew.

7          Both of you, come up here just for a moment at

8   sidebar on the record.

9          MS. PAUL:  May I approach as well, Your Honor?

10         THE COURT:  Sure.

11         (Bench conference as follows.)

12         THE COURT:  All right.  This is the old analogy of

13   the lifeboat.  I don't know what's going to happen, who's

14   going to prevail.  It seems to me, reading through the

15   documents, that if you prevail, your client's business isn't

16   going to exist anymore.

17         MR. BRAND:  It's not going to.

18         THE COURT:  All right.  So I want to go through the

19   hearing and make my determination.

20         Do either of you see any value of my setting this

21   for a settlement conference with one of my magistrate judges

22   after this hearing but before trial?

23         MS. CHASTAIN:  We've already mediated the matter

24   once, Your Honor, and it was entirely unsuccessful.

25         MR. BRAND:  Here's -- I mean, we have just entirely

1     different views on this.  And I think it would be helpful if

2     somebody --

3              THE COURT:  Here's the deal, though.  I mean, I'll

4     just be blunt.  I don't want to turn into a mediator here or

5     preside over a settlement conference at sidebar.

6              It's their allegation that these people were not

7     independent contractors but, rather, they're employees.

8              MR. BRAND:  Correct.

9              THE COURT:  If they're employees and not

10    independent contractors, the way the law operates in this

11    way, you are in a very bad situation, in my view, factually

12    and legally.  And I think they know that.

13             If they are determined to be independent

14    contractors, and that sort of pulls the rug out from under

15    you, then that determination hasn't been I made.  So it seems

16    to me until that determination is made, you might have your

17    heels dug in, both of you, but that's really going to

18    dictate, in my view, the way this thing is going to unfold.

19             So I'm not telling you that you have to do

20    anything.  But if you're both telling me that you don't think

21    a settlement conference would be of any value, then I'm not

22    going to ask you to waste your time doing it.

23             MR. BRAND:  Certainly.

24             THE COURT:  But understand that this is going to

25    literally be a winner-take-all situation, the way I'm looking

1    at this.  Okay?

2              MR. BRAND:  I mean, as I have expressed to counsel,

3    there's no winner in this, because if they prevail and

4    there's a finding of the amount that they're asking for,

5    there is no money.  So it's a waste of time for everybody to

6    be here.

7              THE COURT:  The federal government never sleeps.

8    They're never going to stop coming after this money.  So you

9    should tell your client that.  Okay?

10              MR. BRAND:  But it doesn't exist, Your Honor.

11              THE COURT:  Well, that's in the eye of the

12   beholder.  Okay.

13              So I won't order a settlement conference.  We'll

14   continue.  Take your break.  We'll see you in ten minutes.

15              MR. BRAND:  And I need to get paid.

16              (In open court.)

17              THE COURT:  Court's in recess for ten minutes.

18   Thank you.

19              (Recess taken from 11:13 until 11:27 a.m.)

20              THE COURT:  Do we need to place the witness under

21   oath?

22              THE COURTROOM DEPUTY:  Yes, Judge.

23              Please stand and raise your right hand.

24              Do you solemnly swear or affirm under penalty of

25   perjury that the testimony you will give will be the truth,

1    the whole truth and nothing but the truth?

2              MS. ELIZABETH PODCZASKI:  I do.

3              ELIZABETH PODCZASKI, PLAINTIFF'S WITNESS, SWORN

4              THE COURT:  And, ma'am, once seated, please state

5    your full name for the record into that microphone, spelling

6    your last name.

7              THE WITNESS:  It's Elizabeth Podczaski.  It's

8    P-o-d-c-z-a-s-k-i.

9              THE COURT:  All right.  Your witness.

10              MS. CHASTAIN:  Thank you, Your Honor.

11                      DIRECT EXAMINATION

12    BY MS. CHASTAIN:

13    Q     Ms. Podczaski, what is your occupation?

14    A     A Wage and Hour investigator at the Orlando area office.

15    Q     What does that -- what are your responsibilities as an

16    investigator?

17    A     Sure.  So we enforce several federal laws, but the main

18    law we focus on is the Fair Labor Standards Act, the

19    F.L.S.A., which means we go into businesses and look for

20    compliance under the F.L.S.A.  Usually that means we look at

21    payroll and time records and also interview employees.

22    Q     How did you first come to be involved with the Caring

23    First matter?

24    A     I was asked back in February of 2016 to go to the Caring

25    First office and review some records.

1   Q    Why?

2   A    The previous investigator on the case had transferred to

3   the Tennessee office.

4   Q    And what sort of records were you looking to review at

5   the Caring First office?

6   A    Sure.  So before I went, the solicitors had forwarded me

7   a copy of the payroll spreadsheets the previous investigator

8   had used to calculate back wages.  So I had a copy of those

9   with me.  I was looking for those, and then also I was told

10  there were boxes of records that I was supposed to review.

11  Q    What date did you first go to the Caring First offices?

12  A    It was March 7, 2016.

13  Q    And who was there when you arrived?

14  A    When I got there, I met Mr. Brand and Mr. Timothy

15  Thompson.

16  Q    What did you learn during your time at the Caring First

17  office on March 7th?

18  A    Sure.  So, again, I had the weekly payroll spreadsheets

19  to show Mr. Brand and Mr. Thompson exactly the time of

20  records that I was looking for, and I had learned that those

21  had been destroyed.

22  Q    Who told you that?

23  A    I believe Mr. Brand told me that a disgruntled employee

24  had destroyed them, Ms. Karen Reyes.

25  Q    Did anyone else tell you that Ms. Reyes had destroyed

1    the records?

2    A     Yes.  Later that day, Dr. Thomas arrived, and when I

3    asked about those records, I was also told that they had been

4    destroyed when Karen Reyes left.

5    Q     Who told you that?

6    A     Dr. Thomas.

7    Q     What -- what time period did they claim that Ms. Reyes

8    had destroyed the time records?

9    A     So I believe they told me she left in spring of 2015.

10   So it would have been -- she would have destroyed since our

11   investigation, which ended in March of 2014, through when she

12   had left, Spring 2015.

13   Q     Again, what date were you on the work site?

14   A     I was there on March 7, 2016.

15   Q     Did you ask for the records created after Ms. Reyes was

16   terminated?

17   A     I did ask for those records and I was told that the

18   administrative employee that had taken over Ms. Reyes'

19   occupation, she kept the record, but she would write over it

20   every week.  So she would have the time record and the

21   payroll, and then it wouldn't be saved.  It would be written

22   over every week.

23   Q     Who told you that?

24   A     I want to say Dr. Thomas or Mr. Brand.  I don't remember

25   exactly.

1    Q    Would looking at a copy of your Declaration refresh your

2    recollection as to who told you that the records were written

3    over every week?

4    A    Yes.

5         MS. CHASTAIN:  Your Honor, one moment.

6         THE COURT:  Yes.  And for point of clarification,

7    you keep saying Dr. Thomas.  Is it Dr. Thomas or Thompson?

8         THE WITNESS:  Dr. Thomas.

9         MS. CHASTAIN:  Timothy Thompson is another

10   defendant, Your Honor.

11        THE COURT:  I understand.  Yes.  Feel free to do

12   so.

13        MS. CHASTAIN:  Mr. Brand, I'm showing the witness

14   document 38.2 from the docket.  It's her Declaration from our

15   original Motion for Sanctions.

16        May I approach, Your Honor?

17        THE COURT:  You may approach.

18   BY MS. CHASTAIN:

19   Q    Ms. Podczaski, if you could, review, I believe,

20   paragraph four of your Declaration and let me know if that

21   refreshes your recollection.

22   A    Okay.  Yes, it does.

23   Q    Could you tell me, please, who told you that the

24   administrator after Ms. Reyes was terminated wrote over or

25   destroyed every weekly payroll summary?

1    A    Both Mr. Thompson and Mr. Brand.

2    Q    Did they indicate why this payroll record was not kept

3    any longer?

4    A    No, I don't believe so.  I believe they said that the

5    record was made each week to help for the convenience of

6    payroll; but because they had other payroll and time records,

7    that they didn't feel the need to retain it.

8    Q    What documents were available at the work site on March

9    7, 2016?

10   A    So I had all of the patient files available, and in

11   those patient files, it would have all the Patient Service

12   Logs, and the nurse flow sheets from the caretakers for each

13   patient.

14   Q    What are Patient Service Logs?

15   A    So Patient Service Logs were how each caretaker

16   documented the care they gave for each patient on a weekly

17   basis.  It had medical indicators and it also had their start

18   and stop time on a weekly basis.

19           MS. CHASTAIN:  Permission to approach, Your Honor?

20           THE COURT:  You may approach.

21   BY MS. CHASTAIN:

22   Q    I'm handing you what's been premarked as Government's

23   Exhibit 6.  Do you recognize that document?

24   A    Yes.

25   Q    What is it?

1   A     It's a copy of a patient service log.

2   Q     Is it similar to or look like the kinds of Patient

3   Service Logs you collected in your time at the Caring First

4   office in March of 2016?

5   A     Yes, ma'am.

6           MS. CHASTAIN:  Your Honor, I move for the admission

7   of Government's Exhibit 6.

8           THE COURT:  Any objection?

9           MR. BRAND:  One second, Your Honor.

10          THE COURT:  Sure.

11          MR. BRAND:  No objection, Your Honor.

12          THE COURT:  Without objection, Plaintiff's 6 will

13  be admitted and marked as such.

14          Feel free to continue.

15          MR. BRAND:  Thank you, Your Honor.

16  BY MS. CHASTAIN:

17  Q     Tell me about the condition of the Patient Service Logs

18  like Exhibit 6 that you found in the Caring First office.

19  A     Sure.  So these records were kept on a per patient -- on

20  a per-patient basis.  So there would be several different

21  caretakers in each patient's file.  They would be bound into

22  the file with a metal clip.  They could be stapled front

23  side, back side, paper clipped.

24  Q     Was the information typed or handwritten onto the form?

25  A     It was handwritten.

1          MS. CHASTAIN:  Permission to approach, Your Honor?

2          THE COURT:  You may approach.

3    BY MS. CHASTAIN:

4    Q    I'm handing you what's been premarked as Exhibit 7.  Do

5    you recognize that document?

6    A    Yes.

7    Q    What is it?

8    A    This is a Nursing Flow Sheet that would also be found in

9    each patient's file.

10   Q    How is it different from the -- I'm sorry.  Does

11   Exhibit 7 look like the types of Nursing Flow Sheets that you

12   would see, that you just discovered when you were at Caring

13   First's office in March of 2016?

14   A    Yes.

15         MS. CHASTAIN:  Your Honor, I move for the admission

16   of Exhibit 7.

17         THE COURT:  Any objection?

18         MR. BRAND:  No objection, Your Honor.

19         THE COURT:  All right.  Without objection,

20   Plaintiff's 7 would be admitted and marked as such.  Feel

21   free to continue.

22   BY MS. CHASTAIN:

23   Q    How are the Nursing Flow Sheets different from the

24   Patient Service Logs?

25   A    The Nursing Flow Sheets recorded the same type of care

1   for patients, but it was on a daily level instead of it being

2   recorded on a weekly basis.

3   Q       Do you know how -- do you know why Caring First switched

4   from the Patient Service Logs to the Nursing Flow Sheets?

5   A       So I asked this when I was there in March, and Dr.

6   Thomas told me that they had switched from the Patient

7   Service Logs to the Nursing Flow Sheets in early 2016.

8   Q       Can you tell me, were there any other types of records

9   of payments made or hours worked that you found in the

10  office?

11  A       Yes.  There were also pay stubs for employees in the

12  conference room.

13  Q       What did they look like?

14  A       There were two different types of pay stubs.  There were

15  pay stubs for employees that they had classified as W-2 and

16  then there were pay stubs for employees they had classified

17  as independent contractors.

18  Q       And how were these two pay stubs different?

19  A       So the pay stubs for the W-2 employees had all their

20  information.  It would have the employee's name, address, the

21  net pay on there, and it would have the work week and then

22  the hours worked.

23  Q       What about on the employees called independent

24  contractors, their pay stubs?

25  A       So for the employees called independent contractors, it

```
 1   would just have the check number and then the gross amount.

 2   There was no one's name, no work week, no record of hours.

 3             MS. CHASTAIN:  Permission to approach?

 4             THE COURT:  You may approach.

 5   BY MS. CHASTAIN:

 6   Q    I'm handing you what's been marked Government's Exhibit

 7   8.  Do you recognize this document?

 8   A    Yes.

 9   Q    What is it?

10   A    This is a copy of one of the employees classified as an

11   independent contractor's pay stub.

12   Q    Does it fairly and accurately represent the type of pay

13   stub for independent contractors that you saw on the work

14   site?

15   A    Yes.

16   Q    In March of 2016?

17   A    Yes.

18             MS. CHASTAIN:  Your Honor, I move for the admission

19   of Exhibit 8.

20             THE COURT:  Any objection?

21             MR. BRAND:  No objection, Your Honor.

22             THE COURT:  All right.  8 will be admitted without

23   objection and marked as such.

24             Feel free to continue.

25   BY MS. CHASTAIN:
```

1    Q      Can you tell me on Exhibit 8, is there even a name of a

2    nurse on that document?

3    A      No.

4    Q      What information is on that pay stub?

5    A      We have the check number and the total paid.

6    Q      Is there a memo line or anything else?

7    A      No, ma'am.

8            MS. CHASTAIN:   Permission to approach?

9            THE COURT:   You may approach.

10   BY MS. CHASTAIN:

11   Q      I'm handing you what's been premarked Government's

12   Exhibit 9.   Do you recognize that document?

13   A      Yes.

14   Q      What is it?

15   A      This would be a copy of a pay stub for an employee

16   classified as a W-2 employee.

17   Q      Does it fairly and accurately represent the type of pay

18   stub for W-2 employees that you found in the work site on

19   March of 2016?

20   A      Yes.

21           MS. CHASTAIN:   Your Honor, I move to admit

22   Government's Exhibit 9.

23           THE COURT:   Any objection?

24           MR. BRAND:   No objection, Your Honor.

25           THE COURT:   Plaintiff's 9 will be admitted and

1    marked as such.

2            Feel free to continue.

3    BY MS. CHASTAIN:

4    Q    How many of Caring First workers were classified as

5    employees versus independent contractors?

6    A    I asked that when I was there as well, and Dr. Thomas

7    estimated that approximately 20 of the employees on that

8    payroll were W-2 employees, but not only is it nurses.  It

9    would also include administrative staff in the office versus

10   approximately 70 that were classified as independent

11   contractors.

12   Q    Why were the pay stubs for W-2 employees so much more

13   detailed, included so much more information than the

14   independent contractor pay stubs?

15           MR. BRAND:  Objection, Your Honor.

16           THE COURT:  Basis for the objection?

17           MR. BRAND:  Qualification.

18           THE COURT:  I don't know what the answer is going

19   to be.  I need to hear it and then I'll consider your

20   objection.  It depends.

21           So I'm going to table your objection and let her

22   answer that question.

23           Go on ahead.

24   A    Can you please repeat the question.

25   Q    If you know, why was -- why are the pay stubs for the

1  contractors -- why do they include so much less information?

2  A    This was the employer's copy of the pay stub.  So this

3  is -- for W2 employees, this is what the stub showed versus

4  that's what the employer stub showed for independent

5  contractors.

6  Q    While you were on the work site, did you ask for copies

7  of the paychecks themselves?

8  A    Yes.

9  Q    Did Caring First provide them?

10  A    No.

11  Q    Tell me about the online payment system used by Caring

12  First.

13  A    Sure.  So on my second visit to Caring First, I was

14  instructed by the solicitors to actually be shown on the

15  computer the Manage Payroll system to see what we could see

16  from, you know, the computer view, if we could see the

17  independent contractors' checks.

18     So Dr. Thomas took us through the Manage Payroll system.

19  You know, we told her what to click on.  There was a tab for

20  independent contractors, and when we clicked on that, it

21  showed the same blank stub for the employer stub, just the

22  net pay and the check number.

23  Q    Could you see pictures of the paychecks themselves

24  through the Manage Payroll portal?

25  A    Not that we saw.

1   Q      How long were you on site at Caring First?

2   A      I was there for three days.

3   Q      And ultimately what did you mark to be copied?

4   A      So we went through all of the patient files and flagged

5   essentially the Nursing Flow Sheets and the Patient Service

6   Logs to be copied.

7   Q      How many Patient Service Logs and flow sheets did you

8   mark to be copied?

9   A      At the time, and this was just an estimate of looking at

10   a patient file and then we extrapolated as best we could, I

11   estimated about 22,000 pages.

12   Q      How many ultimately were copied?

13   A      I believe over 40,000.

14   Q      You've already described a little bit the condition of

15   these logs.  How useful would these Patient Service Logs be

16   to determine hours worked during the time frame that the

17   payroll spreadsheets were unavailable?

18   A      They had time records on them, but to be -- to be able

19   to access that on a caretaker basis, it would have been very

20   tedious.  It would have been a lot of work, because they

21   were -- the files were quite large for each patient.  I mean,

22   they're filing this on a weekly or daily basis, and that

23   would -- that could mean several caretakers for the same

24   patient.  So you would really need to get through each file,

25   go page by page, essentially.

1    Q     You do computations for back wages as parts of your job

2    as an investigator, don't you?

3    A     Yes.

4    Q     How long do you estimate it would take you to do this

5    calculation, go through these 43,000 Patient Service Logs and

6    determine hours worked by the nurses during the relevant time

7    frame?

8    A     So in order to capture this again, we would have to go

9    page by page and then I would put it into an Excel

10   spreadsheet.  I would estimate it would take me a couple of

11   months, two months, three months.

12   Q     And that's not doing any of your other work?

13   A     Correct.

14   Q     Did the Patient Service Logs themselves indicate pay

15   rates or withholdings?

16   A     No, not at all.

17   Q     Ultimately, Ms. Podczaski, did you update back wages in

18   this case?

19   A     I did.

20   Q     How did you do that?

21   A     So for the time period after the end of our

22   investigation of March of 2014 through February of 2016, Mr.

23   Brand provided our solicitors Excel spreadsheets that had the

24   weekly hours per caretaker per patient and their gross pay.

25            MS. CHASTAIN:  Permission to approach?

1          THE COURT:  You may.

2  BY MS. CHASTAIN:

3  Q    I'm handing you what's been premarked as Government's

4  Exhibit 11.  Do you recognize this document?

5  A    Yes.

6  Q    What is it?

7  A    These are the -- this is a spreadsheet that Mr. Brand

8  sent the solicitor that had the caretakers by client by week,

9  hours and pay -- or pay rate.  I'm sorry.

10 Q    Is that -- can you tell us, is that the full version of

11 the spreadsheet he sent?

12 A    No.  This is just a sample.

13          MS. CHASTAIN:  If Your Honor doesn't mind, I'll

14 just represent that the document itself was over 200 pages.

15 So for purposes of this hearing, we only printed out a ten-

16 page example.

17          THE COURT:  I'll take note of that.  Thank you.

18 BY MS. CHASTAIN:

19 Q    Could you tell, looking at the master list -- I'm sorry.

20 Back up.

21      In what format was the master list provided?

22 A    This was provided in Excel.

23 Q    Could you tell, looking at the master list, whether it

24 was complete and accurate, captured all hours worked by the

25 nurses for the relevant time period?

1    A    We couldn't.

2    Q    Why not?

3    A    I mean, this is essentially just what was provided by

4    the employer.  So I'm at their mercy.  I'm not comparing this

5    to any time records or payroll.

6    Q    What time frame did the master list purport to cover?

7    A    I believe 2012 through the first two months of 2016.

8    Q    Were you able to compare the master list to any records

9    we already had in our possession?

10   A    Yes, I did.  We compared this to the weekly Excel

11   payroll spreadsheets that Investigator Fernandez had used to

12   compute his back wages in his original investigation.

13   Q    And what did you find?

14   A    That there were discrepancies, that it did not always

15   match.  The weekly hours and the pay did not always match.

16   Q    Were there any particular nurses that you noticed were

17   missing from the master list?

18   A    Yes.  I had actually spoken to a nurse that I know had

19   worked there after our investigation for the whole of 2014,

20   and they did not appear on this list.

21   Q    Nonetheless, you relied upon this re-creation in doing

22   your back wage calculation?

23   A    Yes.

24   Q    What other documents did you rely upon in doing your

25   back wage computation?

1    A    So beginning in February of 2016, Caring First started

2    keeping again that same weekly payroll spreadsheet that

3    showed the caretaker, the patients, the hourly rate, hours

4    worked, and then their pay for the week.

5    Q    Ms. Podczaski, I believe in front of you there should be

6    an exhibit that's already admitted, Exhibit 14.

7    A    Yes.

8    Q    Is that the type of spreadsheet that we received from

9    defendant -- or that you received from defendants after March

10   of 2016?

11   A    Yes.  Starting in March of 2016, yes.

12   Q    Going back to the master list, did you ever look at the

13   metadata or the Information page for this spreadsheet, Excel

14   spreadsheet that was provided by defendants?

15   A    Yes.

16              MS. CHASTAIN:  Your Honor, permission to approach?

17              THE COURT:  You may.

18   BY MS. CHASTAIN:

19   Q    I'm handing you what's been premarked as Government

20   Exhibit 12.

21              THE COURT:  Did you intend on admitting 11?  It

22   hasn't been admitted.

23              MS. CHASTAIN:  Thank you, Your Honor.  The

24   government moves to admit Exhibit 11.

25              THE COURT:  Is there any objection to 11 coming in?

1  That's the excerpts from the master list.

2          MR. BRAND:  That's that ten-page. . .

3          MS. CHASTAIN:  The excerpt, yes.

4          MR. BRAND:  No objection, Your Honor.

5          THE COURT:  Without objection, 11 will be admitted

6  and marked as such.

7          Feel free to continue.

8  BY MS. CHASTAIN:

9  Q    What is Exhibit 12 that I've just handed you, Ms.

10 Podczaski?

11 A    It was a screen shot of the metadata for the master

12 list.

13 Q    And is this a fair and accurate screen shot of what you

14 saw when you looked at the properties page for the master

15 list?

16 A    Yes.

17         MS. CHASTAIN:  Your Honor, I move to admit

18 Exhibit 12.

19         THE COURT:  Any objection?

20         MR. BRAND:  No objection, Your Honor.

21         THE COURT:  All right.  Without objection, 12 will

22 be admitted.

23 BY MS. CHASTAIN:

24 Q    Looking at the metadata for the Information page on the

25 master list, when was this document created?

1   A       On July 6, 2016.

2   Q       And who does it purport to be created by?

3   A       Carla Rosado.

4   Q       And who was the -- when was the last modification date

5   for this exhibit?

6   A       It was July 20th, 2016.

7   Q       And who was the last person to modify this document?

8   A       Craig Brand.

9   Q       In March of 2017, the Secretary filed his Motion For

10  Summary Judgment.  Did you provide the updated back wages for

11  purposes of that motion?

12  A       Yes.

13  Q       And since March of 2017, have you updated the

14  computations again?

15  A       Yes.

16  Q       How?

17  A       So since March 2016 and on, we have been using the

18  weekly payroll Excel spreadsheet putting in hours and the

19  gross pay.

20  Q       Was there any other information that we received that

21  you relied upon in updating your back wage computations?

22  A       Yes.  In August of 2017, Mr. Brand forwarded to our

23  solicitor another master list like Exhibit 11 except it had

24  the Foster nurses on it.

25  Q       What do you mean by the Foster nurses?

1  A    So there's a group of nurses that work at a home called

2  the Foster Home that did not appear on our original master

3  list.

4  Q    Did you know that these nurses had been excluded from

5  the master list?

6  A    Yes.

7  Q    How did you know that?

8  A    I had spoken to a nurse who worked at the Foster house.

9  Q    But did you know that any of the other nurses had been

10 excluded?

11 A    The assumption was made, because their back wages had no

12 longer been computed after March of 2014, after the first

13 investigator ended his investigation, they had dropped off,

14 and then when we started really receiving these -- the weekly

15 payroll spreadsheet in February of 2016, some of the Foster

16 nurses popped back up again.

17            MS. CHASTAIN:   Permission to approach, Your Honor?

18            THE COURT:   You may.

19 BY MS. CHASTAIN:

20 Q    I'm handing you what's been marked Government's Exhibit

21 15.  Do you recognize this document?

22 A    Yes.

23 Q    What is it?

24 A    This was the Foster master list.

25 Q    And are there nurses included in that Foster -- hours

1    worked for nurses on that list who are included in our

2    Appendix A relevant to this litigation?

3    A     Yes.

4    Q     How many nurses?

5    A     There were five.

6    Q     When you updated your back wage computation, did you

7    include hours worked as reflected in this Foster list?

8    A     Yes.

9    Q     And as a result of that, how much did the Secretary's

10   back wage and liquidated damages calculation increase?

11   A     Just over 64,000.

12   Q     How was the Foster list -- in what format was the Foster

13   list provided to us?

14   A     I'm sorry.  I don't know if it was a PDF or an Excel.

15   I'm going to go with Excel.

16   Q     Did you have an opportunity to look at the metadata or

17   Information page on the Foster Excel spreadsheet?

18   A     I did, yes.

19              MS. CHASTAIN:  Your Honor, permission to approach?

20              THE COURT:  You may approach.

21   BY MS. CHASTAIN:

22   Q     I'm handing you what's been marked Government's Exhibit

23   16.  Do you recognize this exhibit?

24   A     Yes.

25   Q     What is it?

1    A     It's a copy of the metadata for the Excel spreadsheet

2    for the Foster master list.

3              MS. CHASTAIN:   Your Honor --

4    BY MS. CHASTAIN:

5    Q     And does it fairly and accurately represent the metadata

6    that you saw when you looked at the Foster list metadata

7    page?

8    A     Yes.

9              MS. CHASTAIN:   Your Honor, I move to admit

10   Exhibit 16.

11             THE COURT:   15 hasn't been admitted either.

12             MS. CHASTAIN:   And 15.

13             THE COURT:   Are there any objections?

14             MR. BRAND:   There's no objections.

15             THE COURT:   All right.   15 and 16 will be admitted

16   without objection.

17             Feel free to continue.

18             MS. CHASTAIN:   Thank you.

19   BY MS. CHASTAIN:

20   Q     According to the Information page on the Foster

21   spreadsheet, when was it created?

22   A     It was created on July 7, 2016.

23   Q     And who created it?

24   A     Carla Rosado.

25   Q     When was it last modified?

1   A     It was modified on July 11th of 2016.

2   Q     Who last modified it?

3   A     Ivia Rosado.

4   Q     And, again, were you aware of this spreadsheet at any

5   time before August of 2017?

6   A     No.

7              MS. CHASTAIN:  Permission to approach, Your Honor?

8              THE COURT:  You may.

9   BY MS. CHASTAIN:

10  Q     I'm handing you what's been marked Government's Exhibit

11  13.  Do you recognize this document?

12  A     Yes.

13  Q     What is it?

14  A     This is a Summary of Unpaid Wages, what we call a WH56.

15  Q     Who created it?

16  A     I did.  I entered the back wages into our system called

17  Wizard, and then this is what we print out from Wizard.

18  Q     What date did you create it?

19  A     This was on September 22nd, 2017.

20  Q     And what time frame does it calculate back wages for?

21  A     This would cover the beginning of Investigator

22  Fernandez's investigation.  So March of 2012 through -- I'm

23  not sure -- September of 2017, but I'm not sure which work

24  week.  September 8th, I think, was our last week.

25             MS. CHASTAIN:  Your Honor, I move for the admission

1  of Exhibit 13.

2          THE COURT:  Any objection?

3          MR. BRAND:  No objection, Your Honor.

4          THE COURT:  All right.  Exhibit 13 will be

5  admitted.  Feel free to continue.

6  BY MS. CHASTAIN:

7  Q    How much in back wages and liquidated damages have you

8  computed are owed to the 107 nurses at issue in this case?

9  A    The total right now is $1,855,371.14.

10 Q    Thank you.  We have continued to receive payroll

11 spreadsheets, weekly payroll spreadsheets from defendants

12 since March of 2016; is that correct?

13 A    Yes.

14 Q    In what format are they provided?

15 A    Mr. Brand e-mails to the solicitors an Excel

16 spreadsheet.

17 Q    And have you reviewed these Excel spreadsheets to update

18 your back wage computations?

19 A    Yes.

20 Q    I'm going to hand you what's been premarked Exhibit 29.

21 What is this document?

22 A    This would be the Excel spreadsheet for payroll for the

23 week ending September 2nd, 2017.

24 Q    Did you rely upon this in updating your back wage

25 computation?

1    A      Yes.

2              MS. CHASTAIN:  Your Honor, I move for admission of

3    Exhibit 29.

4              THE COURT:  Any objection?

5              MR. BRAND:  No objection, Your Honor.

6              THE COURT:  It's admitted.

7              Go on ahead.

8    BY MS. CHASTAIN:

9    Q      Did you have an opportunity to review the metadata or

10   Information page of this Excel spreadsheet?

11   A      Yes.

12             MS. CHASTAIN:  Permission to approach?

13             THE COURT:  You may.

14   BY MS. CHASTAIN:

15   Q      I hand you what's been marked as Exhibit 29A.  Do you

16   recognize this document?

17   A      Yes.

18   Q      What is it?

19   A      It's a screen shot of the metadata for this Excel

20   spreadsheet.

21   Q      And according to that --

22             MS. CHASTAIN:  Your Honor, I move for admission of

23   29A.

24             THE COURT:  Any objection?

25             MR. BRAND:  No objection, Your Honor.

1            THE COURT:  All right.  29A is admitted.

2    BY MS. CHASTAIN:

3    Q    Ms. Podczaski, according to the Information page of this

4    spreadsheet, who created this document and when?

5    A    Timothy T. created it on June 11th, 2012.

6    Q    And when was it last modified and by who?

7    A    It was last modified on September 19th, 2017, by Ivia

8    Rosado.

9            MS. CHASTAIN:  I have no further questions for this

10   witness.

11           THE COURT:  All right.  Thank you.

12           Cross-examination?

13                        CROSS-EXAMINATION

14   BY MR. BRAND:

15   Q    Good afternoon, Ms. Podczaski.  It's Ms. Podczaski,

16   right?

17   A    Podczaski, yes.  Good afternoon.

18   Q    I have a flood of documents here that were just shown to

19   you.  So I don't know what order they fell on the desk, but

20   I'm just going to take them as they are and talk with you.

21           So counsel just showed you Exhibit 29A.

22   A    Yes.

23   Q    Do you have that in front of you?

24   A    Yes.

25   Q    And you could only testify what this document shows?

1    You don't have any firsthand knowledge as to whether the

2    content of this document is correct?

3    A     Correct.

4    Q     Okay.  So even though this document may show that a

5    particular computer was used or an author was there, you

6    don't actually have firsthand knowledge that any of those

7    people listed were the ones who actually authored this

8    document, correct?

9    A     Correct.

10   Q     So Exhibit 29, you wouldn't know -- you have no

11   firsthand personal knowledge as to who actually authored

12   Exhibit 29, correct?

13   A     Correct.

14   Q     So it would only be an assumption on the government's

15   part, the plaintiff's part that Timothy Thompson or Ivia

16   Rosado was the author, correct?

17   A     I -- sure.  I was just reading what's on the metadata,

18   the author of the metadata.

19   Q     Okay.  Perfect.  And Exhibit Number 13, this is a

20   Summary of Unpaid Wages, and I believe the amount that you

21   said, without looking at it, came to a million eight and

22   change --

23   A     Yes.

24   Q     -- correct?

25   A     Yes.

1   Q     The data that you entered into to make your computations

2   came from where?

3   A     The data came from both the weekly Excel spreadsheets,

4   and then again between March of 2014 and February of 2016,

5   from the master list and the Foster master list.

6   Q     Okay.  So the master list, the Foster list -- and we'll

7   get to those in a second -- and then the weekly spreadsheets,

8   that's what you said, correct?

9   A     Yes.

10   Q     Okay.  And the data that went into the weekly

11   spreadsheets, do you know where that came from?

12   A     I believe someone is entering the caretakers' weekly

13   hours and then their pay.

14   Q     Caretakers' weekly hours.  So would you agree with me

15   that the best evidence in order to assess when a caretaker

16   would have worked as far as the day and the time would be

17   from those caretaker forms?

18   A     From the Nursing Flow Sheets and the Patient Service

19   Logs?

20   Q     Correct.

21   A     Yes.

22   Q     That would be the best evidence in this case that you

23   found?

24   A     For hours.

25          MS. CHASTAIN:  Objection, Your Honor.  To the

1  extent she's relying on a legal conclusion, I object.

2            THE COURT:  And I'll take it in that context.

3            So the objection is overruled.  I'll determine the

4  legal application, but I appreciate the objection.

5            Overruled.  You can continue.

6  BY MR. BRAND:

7  Q    So Exhibit Number 13 is based upon weekly spreadsheets

8  that are provided to you and you didn't verify whether or not

9  the content of those weekly spreadsheets are correct?

10 A    Correct.  We're not comparing it to any time cards or

11 pay information, payroll.

12 Q    Yet you would agree with me that the defendants made all

13 the flow charts, the nursing flow charts, the weeklies, the

14 dailies all available to your office, correct?

15 A    As of the middle of August, when we received the missing

16 Foster master list.

17 Q    No, no.  I'm talking about the boxes.  Back in March of

18 2016, that you and I both sat in a conference room of the

19 defendants.  Do you remember that?

20 A    Yes.

21 Q    And there were almost 40 big banker boxes all containing

22 these flow charts, correct?

23 A    Right.

24 Q    So those were all available to you, correct?

25 A    Yes.

1  Q    Okay.  But yet you chose to mark them, but -- let me get

2  this straight -- you have not yet gone through them all?

3  A    I have not reviewed those Nursing Flow Sheets or the

4  Patient Service Logs that were marked.

5  Q    Okay.  So even though you would agree with me that the

6  best evidence in this case to determine the hours worked and

7  the days and the services where there was dates and hours

8  were sitting in those boxes and you have yet to look at

9  those?

10        MS. CHASTAIN:  Objection, Your Honor.  Again, he's

11  asking for a legal conclusion.

12        THE COURT:  Well, I mean, I understand.  She's

13  already answered this question.

14        I'm going to allow the question.  She didn't look

15  through them.

16        As to whether or not -- what the best evidence is

17  at this point, I'm not sure that's terribly critical at this

18  proceeding here today.

19        But the objection is overruled.  She can answer the

20  question.

21  A    Assuming everything was there, those would have the

22  caretakers' time records on a daily basis.  They would have

23  been there, yes.

24  Q    Okay.  And the caretakers' records were actually signed

25  by, for relevance of this case, one of the 107 people on

1    Schedule A attached to the Complaint, correct?

2    A    Off the top of my head, I couldn't say every one was

3    signed.  I think they were supposed to sign it when they

4    turned it in.

5    Q    Okay.  But the weekly time sheets as Exhibit Number 14,

6    you don't know -- these were not signed by the nurses,

7    correct?

8    A    Correct.

9    Q    So you don't know if there was human error involved in

10   the computation of these weekly spreadsheets?

11   A    I do not.

12   Q    And you didn't verify them against what the nurses

13   actually signed?

14   A    I did not.

15   Q    And all those weekly and daily flow charts that the

16   nurses did actually sign, those happened to be in the

17   government's possession, correct?

18            MS. CHASTAIN:  Objection, Your Honor.

19   BY MR. BRAND:

20   Q    I mean, you photocopied them, right, took them from our

21   office?

22            THE COURT:  All right.  Hold on.  You have to stop

23   when she objects.

24            The question was:  In all those weekly and daily

25   flow charts that the nurses did actually sign, those happened

1    to be in the government's possession, correct?

2              There was an objection.  What's the objection?

3              MS. CHASTAIN:  Well, I think he's calling for

4    speculation, Your Honor, matters outside this witness's

5    knowledge and --

6              THE COURT:  She can say she doesn't know.  But the

7    government is a vast and expansive entity.

8              So if she knows, she can answer.  If she doesn't

9    know, she can say that.

10             So the objection is overruled.  You can ask the

11   question.

12             Well, I've already restated the question.  You can

13   answer it.

14   A    I'm sorry.  Can you repeat it?

15   Q    Yes.  All of the nursing flow charts that the nurses

16   actually did sign setting forth the date that they worked and

17   the hours that they worked, those were photocopied by your

18   office, correct?

19   A    Not by my office.  I have no knowledge of the photocopy.

20   Q    Do you know if they happened to be in the possession of

21   the plaintiff?

22   A    I don't know.

23   Q    Okay.  Were you told -- when you came into the

24   defendant's office and sat in a conference room and put tabs

25   on the files, what were you told was going to happen?

1   A      I was told to mark those records to be copied.  I don't

2   know if they were ever copied.

3   Q      And who told you to mark them to be copied?

4   A      The solicitor.

5   Q      Okay.  And has the solicitor ever informed you whether

6   or not those records are available to you today in their

7   office?

8   A      No.

9   Q      Okay.  And Exhibit Number 16. . .

10  A      Yes.

11  Q      All you can tell the Court is what is written on this

12  piece of paper, but you can't actually verify the content of

13  this, correct?

14  A      I can't verify the content as far as hours worked and

15  pay, correct, no, just who the data was created.

16  Q      I'm talking about Exhibit 16.  Did I write down the

17  wrong --

18  A      Right.  I mean, the date it was created.

19  Q      Right.  Okay.  So -- but you don't have any personal

20  knowledge, you didn't see whether or not Carla Rosado or Ivia

21  Rosado was actually the true author of these records,

22  correct?

23  A      I have no knowledge.

24  Q      And as to the dates that are set forth here, too, you

25  don't have actual knowledge if those dates are correct, do

1   you?

2   A     I don't.

3   Q     Okay.  As to Plaintiff's Exhibit 15, do you have any

4   knowledge as to who created this document?

5   A     Besides what's written on the metadata, no.

6   Q     Okay.  And do you have any knowledge as to what this

7   document resembles or is supposed to signify?

8   A     This was, I believe, in lieu of the weekly payroll Excel

9   spreadsheets for the time period that we were missing.  So

10  this had the caretakers, the weekly hours worked on a

11  per-patient basis, and then their pay rate.

12  Q     This Exhibit Number 15, as opposed to all the other

13  documents --

14  A     I'm sorry.

15  Q     Yes.  So let me go back to that original question.

16  A     I'm sorry about that.

17  Q     No problem.  Do you have any personal knowledge as to

18  what the author of this document intended for it to be?

19  A     No.

20  Q     Okay.  And am I correct as to Exhibit Number 15, that as

21  opposed to all the other exhibits that have different

22  clients, this one only has one client listed?

23  A     Yes.

24  Q     Okay.  And which one client would this one list?

25  A     This is the Foster home.

1    Q    Okay.  Foster home.  And this document, if we compare it

2    to Exhibit Number 14 -- I mean, number 11 -- actually, hold

3    on.

4              MR. BRAND:  Which exhibit was the master list?

5              MS. CHASTAIN:  10 -- no, no.  Sorry.  It was 11.

6              MR. BRAND:  It must be on my desk.

7    BY MR. BRAND:

8    Q    If we compare Exhibit Number 15 to Exhibit Number 11,

9    they're different formats, correct?

10   A    (No response.)

11   Q    It's different information?

12   A    (No response.)

13   Q    Let me make my question -- you look puzzled.

14   A    Sure.

15   Q    So the pay rates are completely different, correct?

16   A    Yes, the pay rates are different.

17   Q    If you compare -- if you look at Exhibit Number 15, do

18   you know what the basis of that pay rate would be?

19   A    I had heard -- I was never told this by Caring First,

20   but I believe at the Foster house, the hourly rate starts out

21   at 21 and then each additional patient they care for is an

22   additional $2 an hour.

23   Q    There's no -- looking through Exhibit Number 15, there's

24   no pay rate starting at $21, though, is there?

25   A    No.

1    Q     The people that are in Exhibit Number 15, they're

2    limited to the Foster home, correct?

3    A     In the entire investigative period, no.

4    Q     Okay.  They would have -- they would be seeing patients

5    outside of the Foster home, you believe?

6    A     Before or after they worked at the Foster home.  While

7    they were at the Foster home, I think they were pretty much,

8    but I don't have firsthand knowledge.  I haven't interviewed

9    everyone.

10   Q     So you don't know if while these patients that are

11   listed -- while these caregivers listed on Exhibit 15 were

12   working at the Foster home, you have no knowledge if they

13   worked outside of the Foster home?

14   A     During that time frame, I would say no, when they were

15   employed at the Foster home.

16   Q     And Exhibit Number 12 -- again, I'm sorry for going out

17   of order.  I just grabbed the documents when I came up here.

18         Exhibit Number 12, you have no firsthand personal

19   knowledge as to who the authors of this -- of the master list

20   of caregivers was, do you?

21   A     Besides what's in the metadata, no.

22   Q     Okay.  You didn't see or you don't know firsthand

23   whether Karla Rosado or Craig Brand actually drafted that

24   document, do you?

25   A     No.

1  Q    And you don't know if those dates are even correct that

2  are set forth on Exhibit Number 12, do you?

3  A    No.

4  Q    Okay.  For all you know, that's just the information

5  that was on the computer, correct?

6  A    Yes.

7  Q    Exhibit Number 11.  Let's talk about Exhibit Number 11

8  for a second.

9       In the context of Exhibit Number 11, I believe the

10 questions and the answers were concerning whether or not the

11 documents were being overwritten by the new payroll personnel

12 at Caring First, correct?

13 A    (No response.)

14 Q    Do you understand my question?

15 A    I mean, I understand your question.  I don't see what

16 that has to do with Exhibit Number 11.

17 Q    I believe that somewhere during the testimony, I have a

18 little sticker on my note that you testified that at some

19 particular point, the weekly time sheets started to be

20 overwritten.

21 A    Right.  I'm sorry.  The administrative employee who took

22 over after Karen Reyes.

23 Q    So do you know if that administrative employee was --

24 why that administrative employee, who is now the payroll

25 person, why they were overwriting the weekly time sheets?

1  A     I don't.

2  Q     So you have no personal knowledge or firsthand knowledge

3  that that person was intentionally trying to delete or

4  destroy time records, correct?

5  A     I don't.

6  Q     Okay.  Do you have -- do you even know who took over the

7  payroll?

8  A     I don't.

9  Q     So you would have no personal knowledge as to why the

10 weekly sheets that were being done were being overwritten?

11 A     I don't.

12 Q     Do you know what data -- do you have any personal

13 knowledge as to knowing what data that new -- that new person

14 in charge of payroll was utilizing in order to create those

15 weekly time sheets?

16 A     I don't.

17 Q     Do you know if those weekly time sheets were even a

18 matter of a document produced in the normal course of

19 business or just something that was being created as a matter

20 of helping out their job, so to speak?

21         MS. CHASTAIN:  Objection, Your Honor.

22         THE COURT:  Basis?

23         I don't understand the question either.

24         MS. CHASTAIN:  I don't understand the question.

25 BY MR. BRAND:

1   Q     Do you know whether -- do you know why those weekly time

2   sheets were being produced by the billing person who took

3   over after Karen Reyes?

4   A     No.  Assuming to help her do payroll.  No, I don't know.

5   Q     Okay.  And where would you assume that that person would

6   get the data to enter into this, those payroll records or

7   those documents?

8          MS. CHASTAIN:  Objection, Your Honor.  His question

9   itself calls for an assumption.

10         THE COURT:  Where would you assume that person

11  would get the data to enter those payroll records or those

12  documents?

13         The objection is to speculation.  What's the

14  response?

15         MR. BRAND:  (No response.)

16         THE COURT:  I'll save you some time.  Sustained.

17         MR. BRAND:  Okay.

18  BY MR. BRAND:

19  Q     Exhibits Number 8 and 9, let me know when you have them.

20  A     Okay.

21  Q     They differ, correct?

22  A     Yes.

23  Q     Did you -- in the course of your investigation, did you

24  look into the Manage Payroll system that the defendant uses

25  to see if there was a way that the Manage Payroll system can

1  make them all one?

2  A    Can make what all one?

3  Q    In other words, you said -- let me see if I got this

4  right.  You said that you went with Dr. Thomas and she walked

5  you through the Manage Payroll system that they have,

6  correct?

7  A    Uh-huh.

8  Q    And that there was a tab for subcontractor pay?

9  A    Yes.

10 Q    Correct?

11 A    Yes.

12 Q    And you said you clicked on it and it showed exactly

13 what is shown here and what was provided to you, which is

14 Exhibit 8 --

15 A    Yes.

16 Q    -- correct?

17       Did you look to see if there was any way under that

18 category of that computer program that the defendant uses to

19 make Exhibit 8 under subcontractors look like Exhibit 9 under

20 employees?

21 A    I had verbally asked several times.  Again, I was at the

22 mercy.  Dr. Thomas was the one doing the computer and I was

23 telling her what to click on.

24       So once we got to subcontractor, I don't remember

25 anything else to click on, seeing anything available to get

1    this information.  But it certainly was asked over and over

2    again.

3    Q     Okay.  So if all you know, the computer program that the

4    defendant utilizes under subcontractors, the only option

5    available to the defendants is Exhibit 8?

6    A     Through the Manage Payroll, yes.

7    Q     Okay.  Exhibit Number 6 and Exhibit Number 7?

8    A     Yes.

9    Q     These are the documents that I was referring to earlier

10   on my questions to you.  I just want to make sure that these

11   are the same documents you thought I was referring to when I

12   was talking about the nurses, where they actually sign the

13   dates and the time and the hours that they worked and signed

14   for it.

15   A     Yes.

16   Q     You testified that you had asked for checks but that

17   checks were not given, correct, payroll checks?

18   A     Yes.

19   Q     Do you know if those checks would have been relevant in

20   helping your investigation?

21   A     After having reviewed some copies of checks, I would say

22   that they were relevant.

23   Q     And why do you believe that?

24   A     Because they have the caretaker's name, the work week,

25   the hours worked in that work week, and the pay.

1   Q      How do you know they have the work week?

2   A      Because I've read the memo line.

3   Q      I believe up there there's a copy of a check that Ms.

4   Reyes had given to you.   I believe it's number 3.   It's the

5   only copy of a check.

6   A      Number 3 I have is the updated phone list.   There's more

7   here.

8          Okay.   So 30.

9   Q      30.   Okay.   Is that the checks that you were referring

10  to?

11  A      Yes.

12  Q      And is that the same memo line you're referring to?

13  A      Yes.

14  Q      You're not referring to any other memo line?   That's the

15  memo line?

16  A      This is the memo line.

17  Q      And that's what you're referring to as the work week?

18  A      Yes.

19  Q      Or could that be the pay period?

20  A      That's the work week.

21  Q      That's what you believe?

22  A      Yes.

23  Q      Have you ever talked to -- let me back up for one

24  second.

25         You're aware that Ms. Reyes has a lawsuit against my

1    client separate from --

2              THE COURT:  All right.  No.  None of this.

3              What does it matter if she's aware?

4              I'm doing this sua sponte.  Her knowledge of

5    whether or not there's a lawsuit pending -- I gave you a full

6    and fair opportunity to cross her on the lawsuit.  You can

7    argue that, but I don't care if this witness knows about a

8    lawsuit.

9              MR. BRAND:  What I'm interested in knowing is her

10   conversations with Ms. Reyes' attorney regarding

11   documentations that had been provided to her or

12   documentations that he would have in her file that --

13             THE COURT:  You can ask that, but her opinion as to

14   about the lawsuit doesn't matter.

15             MR. BRAND:  I wasn't going to ask about --

16             THE COURT:  But that's what you opened up with.

17   That's why I stepped in.  Go on ahead and continue.

18   BY MR. BRAND:

19   Q    Let me skip that question, then.  Have you had

20   conversations with Ms. Reyes' attorney, Richard Celler?

21   A    No.

22   Q    Have you been afforded the opportunity to review Ms.

23   Reyes' file in this civil case?

24   A    No.

25   Q    Are you aware that there's another lawsuit against

1    Caring First by the Connors and a total of six people being

2    represented by Chris Pace and Joe Schwartz?

3              MS. CHASTAIN:   Objection, Your Honor; relevance.

4              THE COURT:   Why is her knowledge of a lawsuit being

5    in existence relevant?

6              MR. BRAND:   Again --

7              THE COURT:   If there were a jury here, I'd consider

8    declaring a mistrial right now at trial.

9         The reason you're asking this question is you're

10   trying to tell me something through this witness that I

11   shouldn't know if I were the trier of fact.

12        It doesn't matter if she knows about the lawsuit.

13   I already know about it.   I allowed you to cross-examine Ms.

14   Reyes about it.

15             The objection is sustained.

16             MR. BRAND:   Okay.

17   BY MR. BRAND:

18   Q    You did testify that you saw the Manage Payroll system

19   in the office, correct?

20   A    Yes, briefly.

21             MR. BRAND:   Your Honor, may I approach?

22             THE COURT:   You may.

23             MR. BRAND:   Actually, let me show Ms. Chastain.

24             (Discussion off the record between Mr. Brand and

25   Ms. Chastain.)

1          MR. BRAND:  Your Honor.

2          THE COURT:  You may approach.

3          MR. BRAND:  Okay.

4   BY MR. BRAND:

5   Q    Let me show you what I printed off the Manage Payroll --

6   I'm going to represent that I printed this from the Manage

7   Payroll yesterday -- and ask you if you could just look

8   through this and if this correctly resembles what you saw as

9   far -- as I'm not talking about the people because the people

10  may have changed, but as far as what the document or what the

11  computer would have shown you as far as categories that are

12  within that payroll system?

13  A    Okay.

14  Q    Can you please look through this.

15  A    Okay.

16  Q    So am I correct that when you looked at the Manage

17  Payroll system, it identified a range of dates from when data

18  was entered into?

19          MS. CHASTAIN:  Objection, Your Honor.  He's

20  referring to an exhibit that is not in evidence.  I've not

21  received a copy of this exhibit.

22          THE COURT:  All right.

23          Go on ahead back to the podium, if you would, Mr.

24  Brand.

25          All right.  He's laying the predicate now.  So he

1   hasn't moved it into evidence.

2           You can't read it into the record because it's not

3   evidence, but you're making general questions -- asking

4   general questions about the type of material on there.  I'm

5   going to give you some leeway on that because you're

6   attempting to lay a predicate.

7           So the objection is overruled, but you're invited

8   to make the objection, should he read it into the record or

9   without admitting it or try to admit it if you object.

10          Go on ahead.  You can ask her from the podium.  You

11  don't have two copies of it?

12          MR. BRAND:  I don't.

13          THE COURT:  All right.  That's fine.  You can

14  approach, share the microphone.  Go on ahead.

15  BY MR. BRAND:

16  Q   As to the type of information that is -- that the

17  document talks about, is that the same type of information

18  that you saw while you were there?

19          MS. CHASTAIN:  I'm going to object again, Your

20  Honor.  I don't have a copy of this document and I don't know

21  what he's referring to.

22          THE COURT:  All right.

23          MR. BRAND:  Actually, that's incorrect.  I'm asking

24  for the content of the document, which is exactly the same

25  content of the document that I was just shown.

1            MS. CHASTAIN:  Excuse me?

2            MR. BRAND:  It's right there.

3            THE COURT:  All right.  Hold on.  Hold on.

4            How many more witnesses do you have?

5            MS. CHASTAIN:  Three, Your Honor.

6            THE COURT:  How many do you have?

7            MR. BRAND:  Five.

8            THE COURT:  If this isn't done by 4:30 -- I'll give

9    you until 5:00 today, then I'll make my decision and you

10   won't get to present all your evidence.

11           So here are some thoughts, food for thought.  An

12   old mentor of mine told me when you're in a courtroom, you

13   need to figure out pretty quickly whether or not you're on

14   the train or on the tracks.

15           Right now, the way this presentation is going,

16   you're on the tracks.

17           Here's what I'd recommend you do.  Anything you're

18   going to show a witness that you're going to ask them about,

19   you need to have at least two copies, maybe three:  one for

20   opposing counsel, one for the witness, one for you on the

21   stand so you can ask questions about it.

22           Secondly, anything you're going to be admitting or

23   showing a witness from here on out, you have to have shown

24   opposing counsel first.

25           I understand they're objecting to that.  And I can

1   figure it out.

2          You might substantively have a document in there

3   that reflects the information they have in their files, but

4   it's in a different format.

5          As a courtesy, they need to see it before you

6   present it to the witness.

7          So we're going to take an hour and a half for lunch

8   and I'm going to give you the extra time to make sure you can

9   get this done here.  Everything that you are going to show me

10  or show any witnesses from now on, opposing party needs to

11  have seen.  And if you present it and opposing party hasn't

12  seen it, I will consider not admitting it at all or

13  sanctioning you on the spot.

14         So we're not doing any more of this stuff.

15  Everything better be shown to opposing counsel.

16         If you can stipulate -- and you don't have to, but

17  if you want to stipulate on anything, for example, there are

18  several things you had no objections to, those things can be

19  agreed upon in advance, so that when you walk in here after

20  lunch, you can say, we're hereby pre-admitting Plaintiff's

21  Exhibits 1 through whatever without objection, and we can

22  save the time on laying the predicate on every single thing.

23         So in summary, show each other everything you're

24  going to be showing witnesses or me from here on out so no

25  one says, I haven't seen that yet.

1              And, secondly, make sure you have multiple copies

2     of everything so that you can conduct your cross-examination

3     or your direct examination from the podium while your

4     witnesses look at a copy and you look at a separate copy, and

5     it would make sense to have a third if opposing party hasn't

6     seen or you want to make sure they have the document.

7              So this will give you some time to tighten up the

8     actual presentation.  Because, again, you're going to have a

9     limited amount of time.  Five witnesses is a lot of people.

10    So make sure your thoughts are in order.  I'm going to give

11    you all the time you need, but we have until the end of the

12    day.  There's another hearing set for tomorrow morning.  So

13    we're not going to go over.

14             Is there anything further from the plaintiff at

15    this point?

16             MS. CHASTAIN:  No, Your Honor.

17             THE COURT:  From the defense?

18             MR. BRAND:  No, Your Honor.

19             THE COURT:  All right.  Have a good lunch.  I'll

20    see you in an hour and a half.  Thank you.

21             (Recess taken from 12:26 until 2:00 p.m.)

22             THE COURT:  If our witness would be kind enough to

23    sit back in the witness chair we're ready to proceed.

24             As our witness makes her way back to the witness

25    stand, I would remind her that you remain under oath.

1          Thank you, ma'am.  Once you're seated and

2    comfortable, we'll get started.

3          MR. BRAND:  Your Honor, I already told the witness,

4    in order of to speed this proceeding up and to comply with

5    the Court, I'm done with this witness.

6          THE COURT:  All right.  So there are no further

7    questions.  Thank you, ma'am.  You have a good day.

8          I would invite the plaintiff to call their next

9    witness.

10          MS. PAUL:  The plaintiff calls Ms. Ivia Rosado.

11          THE COURTROOM DEPUTY:  Please come forward and be

12    sworn.  Raise your right hand.

13          Do you solemnly swear or affirm under penalty of

14    perjury that the testimony you will give will be the truth,

15    the whole truth and nothing but the truth?

16          MS. IVIA ROSADO:  Yes.

17          IVIA ROSADO, PLAINTIFF'S WITNESS, SWORN

18          THE COURTROOM DEPUTY:  Have a seat there, please.

19          THE COURT:  Good afternoon, Ms. Rosado.  And I

20    think I saw you here this morning.  So I certainly appreciate

21    your patience as we get through this hearing today.

22          If you would be kind enough to state your full name

23    into that microphone, spelling your last name.

24          THE WITNESS:  Ivia Rosado, R-o-s-a-d-o.

25          THE COURT:  And go on ahead and spell your first

1  name for us, too.

2           THE WITNESS:  I-v-i-a.

3           THE COURT:  All right.  Thank you, ma'am.

4           Your witness.

5                   DIRECT EXAMINATION

6  BY MS. PAUL:

7  Q    Good afternoon, Ms. Rosado.  What is your home address?

8  A    XX -- no.  It's XX River Park Circle, Apartment 617,

9  Orlando, Florida 32827.

10 Q    You are an employee of Caring First?

11 A    Yes.

12 Q    And you worked there beginning in -- well, when did you

13 start?

14 A    May 12, 2015.

15 Q    What job were you hired to do?

16 A    Billing and payroll.

17 Q    Do you do any other tasks?

18 A    No.

19 Q    What experience did you have for that job?

20 A    Zero.

21 Q    How did you get the job?

22 A    I went in to help out and there so happened to be a

23 position available at the moment and I like numbers and math

24 is one of my fortes.

25 Q    You say you went in to help out, what does that mean?

1   A      I was there to help out with some filing, maybe get some

2   HR paperwork done, shredding, mostly.

3   Q      Were you getting paid for that?

4   A      Yes.

5   Q      Do you have other family members that work at Caring

6   First?

7   A      Yes.

8   Q      Who are they?

9   A      Karla Rosado.  She does HR and basically any other

10  paperwork.  And Blanca.  I think she's the administrator.

11  Q      How are you related to Karla?

12  A      She's my sister.

13  Q      And how are you related to Blanca?

14  A      She's my mom.

15  Q      Does your father also work at Caring First?

16  A      Not anymore.

17  Q      But at one point he did?

18  A      Yes, ma'am.

19  Q      When did he work at Caring First?

20  A      2015, end of 2016.

21  Q      And his name was?

22  A      Rafael Rosado.

23  Q      So you were helping out with filing and shredding and

24  you just fell into the position of billing and payroll?

25  A      Yes, ma'am.

1    Q      You were processing the payroll starting in -- when did

2    you start doing that?

3    A      May 2015.

4    Q      Was that after Karen Reyes left Caring First?

5    A      Yes.

6    Q      Were you ever working there at the same time that she

7    was?

8    A      No.  I've never seen her.

9    Q      Were you processing the payroll in 2016?

10   A      Yes.

11   Q      Are you still currently processing the payroll?

12   A      Yes.

13   Q      Payroll is done on a weekly basis, correct?

14   A      Correct.

15   Q      And the nurses that do work for Caring First, they get

16   paid every week?

17   A      Correct.

18          THE COURT:  Forgive me.  I just want to make sure,

19   because you used the past tense in one of your questions.  Is

20   she currently working for the defendant or formerly employed

21   by the defendant?

22   BY MS. PAUL:

23   Q      You are currently working for Caring First?

24   A      I am still working at Caring First.

25          THE COURT:  All right.  Thank you for that

1    clarification.  Feel free to continue.

2              MS. PAUL:  Thank you, Your Honor.

3    BY MS. PAUL:

4    Q    And in processing the payroll, you make an Excel

5    spreadsheet each week?

6    A    Correct.

7    Q    And that spreadsheet includes the names of office

8    workers as well as nurses?

9    A    Not office workers.  No.  Yes.  For the patient

10   information, it's just a field staff.  And then for the

11   office, it's a separate spreadsheet.

12   Q    Okay.  So there are. . .

13   A    Multiple.

14   Q    There are multiple spreadsheets for the payroll?

15   A    Correct.

16   Q    So those payroll spreadsheets include the hours that the

17   nurses or other personnel worked in a particular work week?

18   A    Correct.

19   Q    And each payroll spreadsheet includes the dates of that

20   work week?

21   A    Correct.

22   Q    And those weekly payroll spreadsheets include the rate

23   of pay for the nurse or other personnel?

24   A    Yes, ma'am.

25              MS. PAUL:  Your Honor, may I approach?

1          THE COURT:  You may.

2    BY MS. PAUL:

3    Q    Ms. Rosado, I'm handing you what's been admitted into

4    evidence as Plaintiff's Exhibit 14.  Would you take a look at

5    that for a moment?

6    A    Uh-huh.

7    Q    This is a spreadsheet for the pay week of February 14,

8    2016, through February 20, 2016.  Do you see that at the top?

9    A    Yes.

10   Q    Is this something that you created in your job as

11   payroll processor?

12   A    It was not created by me originally, but I do use it

13   every week.

14   Q    Okay.  So there was an Excel spreadsheet template that

15   you used to create this document?

16   A    Correct.

17   Q    And that template was created by Timothy Thompson?

18   A    Yes.

19   Q    And so in 2015, when you took over the payroll, you were

20   creating these spreadsheets every week?

21   A    Timothy had to create the first one again after files

22   went missing from the computer.  So he had to redo this all

23   over again.  And since then, I've been pretty much

24   duplicating it.

25   Q    Okay.  And when you started doing the payroll

1    processing, were you saving these as separate files for every

2    week?

3    A    No, ma'am.  Just save right over it.

4    Q    So you would write over the spreadsheet from week to

5    week?

6    A    You just do the Save As function and it just duplicates

7    that sheet, and you can just change the name.  But I didn't

8    keep them.  I just delete it after I finished it.

9    Q    These spreadsheets are used to create the actual

10   paychecks, correct?

11   A    I'm sorry?

12   Q    The spreadsheets that include all this information are

13   actually used to create the paychecks?

14   A    Not the spreadsheet.  I use the spreadsheet to put the

15   information onto the paychecks.

16   Q    Right.  And the payroll checks include a memo line,

17   correct?

18   A    Correct.

19   Q    And the memo line is filled out, right?

20   A    Correct.

21   Q    It's filled out with information including the dates of

22   the work week covered by that paycheck?

23   A    Yes, ma'am.

24   Q    The memo line also includes the number of hours worked

25   by a nurse or other employee in that work week?

1    A    Yes, ma'am.

2    Q    So the information in the memo line is like a backup

3    record to the weekly payroll spreadsheet?

4    A    It's for the nurses to know what is being paid for that

5    week.

6    Q    So you agree that it's like a backup record for the

7    payroll spreadsheet?

8    A    Only if they are getting paid.  Let's say they work 24

9    hours, but if they only turned in twelve hours, that memo is

10   going to state that they're getting paid twelve hours, not

11   24.

12   Q    You would agree that the paychecks and -- the memo line

13   of the paycheck contains all the same information that is

14   found on the spreadsheet in Exhibit 14?

15   A    Yes, ma'am.

16   Q    And in looking at a paycheck, if you take the amount

17   paid and you divide by the number of hours worked, that would

18   tell you the person's hourly rate, correct?

19   A    Correct.

20   Q    And Timothy Thompson trained you on how to do the

21   payroll?

22   A    Yes, ma'am.

23   Q    He trained you to put that information that is in the

24   memo line of the checks?

25   A    Yes, ma'am.

1    Q    Did he explain why you needed to do that?

2    A    Yes.  So the nurses know exactly what they're getting

3    paid.

4    Q    And you did in fact put the hours worked, the work week

5    and the patient's name on the memo line of the nurse's check?

6    A    Correct.

7    Q    Every week?

8    A    Every week.

9    Q    You did that in 2015?

10    A    When I started, yes.

11    Q    Okay.  And then you continued to do that through 2016?

12    A    Correct, to this day.

13    Q    Okay.  And so you've done it up to present?

14    A    Uh-huh.

15    Q    Yes?

16    A    Yes.

17    Q    Did anyone else besides Timothy Thompson train you on

18    doing the payroll and billing?

19    A    No.

20    Q    Timothy Thompson was the vice-president of the company?

21    A    Is, yes.

22    Q    He still is?

23    A    If I'm not mistaken.

24    Q    And so he showed you what information to input onto the

25    payroll spreadsheet?

1    A    Yes.

2    Q    And that includes the hours worked by each nurse?

3    A    Yes, ma'am.

4    Q    And those hours are obtained from the nurse's log of

5    hours?

6    A    From the patient's notes.

7    Q    Okay.  You indicated that you did not save the Excel

8    spreadsheets as separately named files for each work week,

9    correct?

10   A    Correct.

11   Q    Did there come a time when you started doing that?

12   A    Not to my recollection.  I don't save them.

13   Q    Do you print them out?

14   A    I do.

15   Q    So --

16   A    And I e-mail.

17   Q    Who do you e-mail them to?

18   A    To Dr. Thomas.

19   Q    And when you -- when you started in June -- May of 2015

20   doing the payroll, were you printing out the weekly payroll

21   spreadsheets then?

22   A    I was.

23   Q    Have you always done that every week that you've done

24   payroll since you began working for Caring First?

25   A    Yes, ma'am.

1    Q     So you've always printed out hard copies?

2    A     Yes.

3    Q     Even though you said that you did not save them on the

4    computer as individual files?

5    A     Correct.

6    Q     Who would you -- where would you put the hard copy

7    files?

8    A     I shred them.

9    Q     Okay.  So you would print out the payroll spreadsheets

10   and then you would shred them?

11   A     Yes.  At the end of the year, I shred them.

12   Q     At the end of the year?

13   A     Yes.

14   Q     Does Caring First have a record retention policy?

15   A     Not that I'm aware of.

16   Q     Who told you to shred them at the end of the year?

17   A     I asked my administrator.  There's no need for me to

18   keep it.

19   Q     Who did you ask?

20   A     Our administrator.

21   Q     Who is that person?  What's the name?

22   A     Blanca.

23   Q     Blanca Valentin?

24   A     Yes.

25   Q     That's your mother?

1    A    Yes.

2    Q    And Blanca advised you that it was okay to shred them?

3    A    Yes.

4    Q    And you first asked her at the end of 2015 if you could

5    shred those documents?

6    A    Yes.

7    Q    Did -- to your knowledge, did Ms. Valentin ask anybody

8    else at Caring First if that was acceptable to shred the

9    documents?

10   A    I wouldn't know.

11   Q    Before you shredded these documents, how were they kept?

12   A    In a folder.

13   Q    Where in the office?

14   A    In my office.

15   Q    You have your own office?

16   A    Yes.

17   Q    Within the Caring First offices?

18   A    Yes.

19   Q    Was it in a file cabinet?

20   A    Yes.

21   Q    But you also said that -- in addition to printing them

22   out, did you always send an e-mail copy to Dr. Thomas?

23   A    No, not always.

24   Q    Okay.  When did you start doing that?

25   A    Sometime maybe late last year, early this year.

1    Q       Okay.   You think late 2016, early 2017?

2    A       Yes, ma'am.

3    Q       When Timothy Thompson was training you, did he tell you

4    to save the Excel spreadsheets into a separate computer file?

5    A       Not that I can recall.

6    Q       Did he tell you to -- did he tell you to print them out

7    in hard copy form?

8    A       No, he did not tell me to print them out in hard copy.

9    Q       What instructions did he give you regarding the

10   retention of the payroll records, the spreadsheets?

11   A       There was no instructions.

12   Q       Did he ask anyone if it was okay to write over the

13   spreadsheet from one week to the next?

14   A       No.

15   Q       Were you aware that before you started doing payroll,

16   that Caring First's practice was to save each weekly

17   spreadsheet in its own computer file?

18   A       Nope.

19   Q       Were you aware before you started doing payroll that

20   Caring First's practice -- before you started working there,

21   that their practice was to print out the weekly payroll

22   sheets and save the hard copies in a folder?

23   A       No.

24   Q       So when you started doing that, you just took it upon

25   yourself to do that all on your own?

1   A     Yes.

2   Q     When you started working for Caring First, did anyone

3   make you aware that the U.S. Department of Labor, Wage and

4   Hour Division had investigated Caring First and found wage

5   violations?

6   A     Nope.

7   Q     When you started working for Caring First, did anyone

8   make you aware that U.S. Department of Labor, Wage/Hour

9   Division had investigated Caring First and found

10  recordkeeping violations?

11  A     No.

12  Q     When you started working for Caring First, did anyone

13  make you aware of any lawsuits against the company for wage

14  violations?

15  A     No.

16  Q     So nobody told you that there was a lawsuit in state

17  court filed in May 2015 against Caring First?

18  A     I didn't find out until maybe last year.

19  Q     Okay.  And nobody told you about the Department of Labor

20  lawsuit?

21  A     No.

22  Q     When last year did you find out?

23  A     I think it was on the news.

24  Q     It was on the news.  So nobody at Caring First told you

25  it was being sued for wage violations --

1    A      No.

2    Q      -- under the Fair Labor --

3    A      And, honestly, I keep to myself in the office.  So I

4    don't really talk to many people in there.

5    Q      Okay.  Can I just ask you, please --

6    A      Sure.

7    Q      -- to let me finish my questions before you answer, so

8    it'll make it easier for the court reporter to take down what

9    we're both saying?

10   A      Absolutely.

11   Q      Okay.  Thank you.

12          So after May 2015, did Timothy Thompson tell you to save

13   the weekly payroll spreadsheets on the computer?

14   A      No.

15   Q      Did Dr. Thomas tell you to make sure to save the weekly

16   spreadsheets on the computer?

17   A      No.

18   Q      After March 4, 2016, did anyone at Caring First tell you

19   to stop writing over the spreadsheets each week?

20   A      No.

21   Q      Okay.  So even though you were writing over the

22   spreadsheets week to week and at the end of each year you

23   shredded the payroll spreadsheets you had printed out, the

24   information about how many hours a nurse worked in a

25   particular week was on the memo line of all the checks,

1   correct?

2   A    Correct.

3   Q    Are you aware that copies of cashed checks can be

4   obtained from a company's bank?

5   A    Yes.

6   Q    In 2016, did you help recreate summaries of payroll for

7   the missing payroll spreadsheets?

8   A    I don't understand.

9   Q    You indicated that Timothy had to recreate a template,

10   correct?

11   A    Correct.

12   Q    Because the previous template was destroyed?

13   A    Correct.

14   Q    Okay.  So was there a time when you had to come into

15   Caring First's offices and help go through the patient files

16   to pull hours and recreate those missing spreadsheets?

17   A    No.

18   Q    Do you know anybody who did?

19   A    No.

20   Q    So it's your testimony today that you didn't gather

21   information from any of the Patient Service Logs and put it

22   into a new spreadsheet for the time period from March 2014

23   through February 2016?

24   A    Correct.

25   Q    And you're not aware of anybody else in the office who

1    did?

2    A      No.

3    Q      Are you aware of anyone that's not employed by Caring

4    First that did that activity?

5    A      No.

6    Q      Are you getting paid to be here today?

7    A      I assume so.

8    Q      Like your normal hourly rate?

9    A      Correct.

10              MS. PAUL:  One moment, Your Honor.

11   BY MS. PAUL:

12   Q      Earlier in your testimony, Ms. Rosado, you indicated

13   that there was a separate payroll spreadsheet for the field

14   staff to distinguish from the nurses, correct?

15   A      Correct.

16   Q      Okay.  Did you save those worksheets on the computer?

17   A      Field staff is the nurses.

18   Q      Excuse me.  Office employees.  There was a separate

19   spreadsheet for office employees as opposed to the nurses and

20   field staff?

21   A      Correct.

22   Q      Okay.  Did you save that spreadsheet on a computer?

23   A      I did.  I created that spreadsheet myself.

24   Q      Okay.  And would you write over that one from week to

25   week?

1  A      No.

2  Q      So why would you write over the nurses' spreadsheet from

3  week to week but you preserved the employee -- office

4  employees' spreadsheet?

5  A      I just did.   I just created a new tab and that's it.

6  Q      So if I understand this, from -- there are documents --

7  there are Excel spreadsheets from June -- or May of 2015

8  for -- payroll spreadsheets for the office employees that you

9  have saved on the computer as separate files each week?

10  A      It's one file, separate tabs on one spreadsheet.

11  Q      Okay.   So do you save -- how many tabs do you have?

12  They go all the way out to the end of the year?

13  A      Yes, ma'am.

14  Q      And you can't tell me why you were saving the

15  spreadsheets for the employees but not for the field staff?

16  A      Correct.

17         (Discussion off the record between plaintiff's counsel.)

18  BY MS. PAUL:

19  Q      If you'll take a moment to look at Exhibit 14, is that

20  the only type of spreadsheet that was created in doing the

21  payroll and billing?

22  A      No.

23  Q      Okay.   What other spreadsheet was created?

24  A      It's a spreadsheet with patient information separated by

25  days so that we can put in the hours that each nurse worked

1  with a set patient.

2  Q    Was that spreadsheet more so for the billing aspect of

3  your job?

4  A    Mostly for the payroll.

5  Q    Okay.  So was that spreadsheet -- did you save that

6  spreadsheet every week?

7  A    No.

8  Q    So you have two separate spreadsheets that you were

9  creating to do the payroll, and you didn't save any of them

10 on a computer?

11 A    Correct.

12 Q    That second spreadsheet that we were just talking about,

13 did that have -- did you print hard copies of that one as

14 well?

15 A    Only to do this spreadsheet.

16 Q    So you used that spreadsheet to create what's in Exhibit

17 14?

18 A    Correct, to get the patient names.

19 Q    Okay.  So you did not print out that first spreadsheet?

20 A    The office staff spreadsheet?

21 Q    The one that you said you used to create Exhibit 14.

22 A    Yes, we print it out so that I can get the patient name.

23 And that gets shredded every week because it has patients'

24 names on it.

25 Q    Okay.  So that was getting shredded on a weekly basis?

1    A      Correct.

2    Q      You said earlier as well that you would e-mail those

3    spreadsheets to Dr. Thomas?

4    A      Yes, ma'am.

5    Q      When did you start doing that?

6    A      Earlier this year.  Not very long ago.  It's something

7    relatively new.

8    Q      Okay.  And who asked you to do that?

9    A      Dr. Thomas.

10   Q      Do you know why?

11   A      No.  I don't ask questions.  I just do what I'm told.

12              MS. PAUL:  That's all I have.

13              THE COURT:  Cross?

14              MR. BRAND:  Your Honor, question:  Would you -- I

15   don't really have a cross.  I would like to call the witness

16   on the defense side after the plaintiff --

17              THE COURT:  Why wouldn't you cross her?  You can

18   lead her.  You can do everything you're going to do when --

19              MR. BRAND:  Yeah.  I was going to ask, can I get it

20   done now?

21              THE COURT:  Yeah.  That's fine.  That makes a lot

22   of sense to me.  Thank you for telling me that.  Feel free to

23   continue.

24              (Discussion off the record among counsel.)

25                      CROSS-EXAMINATION

BY MR. BRAND:

Q    Good afternoon.

A    Good afternoon.

Q    One second.  Ivia, when you first started to work for Caring First back in May of 2015, approximately how long after you got there did you take over the billing?

A    By myself?

Q    Well, with Tim helping you or showing you what to do.

A    A week or two.

Q    Okay.  Did there ever come a point in time when you had to create a list such as what the plaintiff was previously asking you, which is Exhibit 14?  Do you see that?

A    Yes.  I'm sorry.

Q    Did there ever come a point in time when you had to start creating a list such as that?

A    That list had to be recreated when I started.

Q    Okay.  What do you mean by that?

A    Before I started working there, my assumption is that they already had this spreadsheet; but when I started, this spreadsheet was gone.  There was no files.  All the spreadsheets that I have now, Timothy had to recreate so that I can do what I'm doing.

Q    So -- and do you know who you took over the billing from?

A    Karen Reyes.

1    Q      So when you first got there and started the billing, the

2    spreadsheet, such as Exhibit Number 14, you had to create

3    brand new?

4    A      Yes.

5    Q      And then you continued with that?

6    A      Yes.

7    Q      Okay.  The plaintiff was referring to payroll checks and

8    a memo line.  Do you remember when she was asking you that?

9    A      Yes.

10   Q      It's very important for me to ask this question.  The

11   memo line has dates on it, correct?

12   A      Correct.  It has a week range.

13   Q      It has a week range.  So is it correct to state that

14   that week range reflects the payroll range but not

15   necessarily when the person actually did the work?

16   A      Correct.

17   Q      Okay.  So if a nurse, for instance, did not turn in her

18   forms -- and by "forms," I'm talking about the forms that

19   they would have to put down their days that they worked, the

20   hours they worked and sign it, I think it's Exhibit 6 or 7

21   here -- if they didn't turn those in to you, would they get

22   paid that week?

23   A      Not for those days.

24   Q      Okay.  And so the memo line would not -- would not

25   correlate then to the dates that they worked?

1  A    Correct.

2  Q    Okay.  And if a nurse did not get paid for a particular

3  week, for whatever reason, then that memo line would not

4  necessarily correlate with the dates and hours that they

5  actually worked as well?

6  A    Correct.

7  Q    Okay.  And if there's an employee that was in payroll or

8  in charge of checks and they issued checks improperly,

9  meaning they issued checks to themselves or to somebody else

10 with the wrong numbers, that, too, would not necessarily then

11 reflect the true days and hours worked, correct?

12 A    Correct.

13 Q    Okay.  So for you to get your payroll records straight,

14 where do you have to go to get the true and correct hours and

15 days that the nurses would work?

16 A    Anything that's on the paychecks, the most up-to-date

17 information for the paychecks would be on Manage Payroll.

18 Q    Okay.  And where do you get the information to put into

19 Manage Payroll?

20 A    Spreadsheets.

21 Q    Spreadsheets.  And that's the forms that the nurses

22 would sign that come into patient files?

23 A    The nurses would bring in the notes.  The information

24 from the notes gets put into the spreadsheet, and then from

25 the spreadsheet it goes into the payroll.

1    Q    And do you ever have occasions when the weekly -- the

2    weekly spreadsheets that you create, such as Exhibit

3    Number 14, when there's human error?

4    A    Yes.

5    Q    Okay.  So even these spreadsheets may not be accurate?

6    A    Correct.

7    Q    Okay.  And, again, if you needed -- let me ask you a

8    question.  Have you ever been present when the Agency for

9    Health Care Administration has come in to do an audit?

10   A    Yes.

11   Q    And if they're trying to compare the claims to the work

12   hours of the nurses, would they ask you for paychecks?

13   A    No.

14   Q    Would they ask you for spreadsheets?

15   A    No.

16   Q    What would they ask you for?

17   A    The nursing notes.

18   Q    And in the office, is there anything else that you could

19   think of that would be more true and correct information as

20   to the days and times these nurses worked?

21   A    No.  Just the nursing notes.

22   Q    Okay.  And exhibits such as Number 14, do you consider

23   that to be something that you do just to help you get to the

24   part of issuing a check or is that something that is a record

25   that you believe was supposed to be kept in Caring First?

1   A      It's just to help me out.

2   Q      Okay.  Do you actually know if Tim Thompson still holds

3   an officer position in Caring First or not?

4   A      To me, he's Timothy.  He's always been there.

5   Q      Okay.  But you don't actually know if he's still an

6   officer or director of the company?

7   A      No.

8   Q      Okay.  Do you know where he lives?

9   A      No.

10  Q      Okay.  I'm going to show you what has been marked as

11  Plaintiff's Exhibit Number 15.

12            MR. BRAND:  Your Honor, may I?

13            THE COURT:  You may.

14  BY MR. BRAND:

15  Q      I'm going to ask you, have you ever seen that before?

16  A      No.

17  Q      Do you know what that is?

18  A      I've never seen this.  I see nursing name -- nurses'

19  names, hours, pay rate, and weeks.

20  Q      Okay.  So I'm going to now show you what's marked as

21  Plaintiff's Exhibit Number 16 and ask you to look at this.

22  Do you see where it has your name on it?

23  A      Yes.

24  Q      Okay.  Could you explain why your name might be on it?

25  A      Other than somebody using my Desktop, no.

1   Q      Okay.   In the office, are the computers available to

2   anyone?

3   A      Yes.

4   Q      Are the computers password-protected or can someone such

5   as myself just go sit down and start using --

6   A      You can walk in right now to my desk and use my

7   computer.

8   Q      Right this second?

9   A      Right this second.

10   Q      Okay.   It doesn't lock down?

11   A      No.

12   Q      Are -- the computers, that you're aware of, how old are

13   they; do you know?

14   A      Maybe since the company started.

15   Q      Okay.   So, old?

16   A      Pretty old, yes.

17   Q      Do you know if the time or the stamps that are on the

18   computers are accurate?

19   A      Not always.

20   Q      Okay.   What do you mean by that?

21   A      The computer likes to do something funny where it

22   changes a date and the time.   For whatever reason, I was

23   locked out for a good two days, until IT could fix it,

24   because it was locked out.

25          It was logged in for September -- I want to say

1    September 7th and it was September 18th at the time.

2    Q    Okay.  So looking at Exhibit 16 there where it shows

3    dates, those dates may not necessarily be correct?

4    A    Correct.

5    Q    And the authors, just because it has your name, doesn't

6    mean that you authored anything?

7    A    Correct.

8    Q    So if a computer record such as what you're holding said

9    that you had something to do with Exhibit Number 15, that

10   would be incorrect?

11   A    That would be incorrect.

12          MS. PAUL:  Objection, Your Honor.  I move to strike

13   this line of testimony as both argumentative and there's no

14   foundation for her knowledge as to being able to testify

15   about computers and what they do and what dates are correct

16   and incorrect.

17          THE COURT:  All right.  Well, the objection is

18   contemporaneous only as applied to the current question.  So

19   you're arguing that she's testifying outside the scope?

20          MS. PAUL:  Yeah.  Her knowledge for testifying

21   about the computers and the date stamps and all that has not

22   been established.

23          THE COURT:  All right.  Let me read the question

24   again.

25          The question is:  So if a computer record such as

1   what you're holding said that you had something to do with

2   Exhibit 15, that would be incorrect?

3            And that's when the objection occurred.

4            The objection is sustained.   The answer she would

5   give would be a general answer, eliciting an opinion

6   generally about her name on something.

7            You can ask her specific to this document, but

8   that's it, whether or not she did it or not.

9            MR. BRAND:   Okay.

10  BY MR. BRAND:

11  Q    Specifically, did you have any part in drafting -- I

12  believe it's Plaintiff's Number 15?

13  A    In creating this spreadsheet?

14  Q    In creating that spreadsheet.

15  A    No.

16  Q    Specifically, let me show you -- there's another list

17  called master list of caregivers.   Did you have any part in

18  creating anything to that name?

19  A    No.

20  Q    So if a computer record was -- showed that you were the

21  author of a list that said master list of caregiver

22  providers, you have nothing to do with that?

23  A    Correct.

24  Q    Okay.   We know each other, correct?

25  A    I'm sorry?

1    Q     We know each other?

2    A     I met you three times.

3    Q     Okay.  Have you ever seen me on your computer?

4    A     Yes.

5    Q     Have you ever seen me on your sister's computer?

6    A     Yes.

7    Q     Have you ever seen me on Dr. Thomas's computer?

8    A     Yes.

9    Q     Have you ever seen me on other computers in the office?

10   A     Blanca's.

11   Q     And someone has a computer, Diena or something.  Who is

12   that, again?

13   A     Diena would be the reception.

14   Q     And you've seen me on those computers as well?

15   A     Yes.

16   Q     Okay.  And if I was on the computer, then my name

17   wouldn't show up as the author of -- on the system, correct?

18            MS. PAUL:  Objection; calls for speculation and

19   outside the scope of this witness's knowledge.

20            MR. BRAND:  I'll rephrase the question.

21            THE COURT:  All right.  The objection is sustained.

22   You can try to rephrase.

23            MR. BRAND:  Okay.

24   BY MR. BRAND:

25   Q     Are you aware or do you have any knowledge as to your

```
1    computer system and how it lists different people as authors

2    of certain documents?

3              MS. PAUL:  The same objection, Your Honor.  She has

4    not been established as an IT person, as understanding how

5    computers work and how programs put on metadata on the files.

6              MR. BRAND:  Your Honor, I could ask her -- I mean,

7    I should be able to ask her if she's aware of her system and

8    how her system works.

9              THE COURT:  All right.  She can answer that

10   question but don't ask one after that.

11             All right.  Ask the question.  Is she aware how

12   that works.  You can ask her that question and then we'll

13   stop.

14             MR. BRAND:  Okay.

15   BY MR. BRAND:

16   Q    Are you aware how the computer system in your office

17   labels people or claims -- labels people as authors of

18   documents in the office?

19   A    Yes.

20             THE COURT:  All right.  Go on ahead.

21             MR. BRAND:  Okay.

22   BY MR. BRAND:

23   Q    Does -- does the author of a record in your computer

24   system or the computer system that you're familiar with in

25   the office, does that necessarily correlate to who's actually
```

1    on the machine?

2    A    No.

3    Q    Can you please explain that?

4    A    Okay.  The spreadsheet that I would use -- that I use

5    personally to create this spreadsheet right here was created

6    by somebody else.  So their name is on as the author, but it

7    would say last modified by me.

8    Q    Okay.  And if someone sat down at your desk and used

9    your computer, would your computer say that it was you on it

10   or the other person?

11           MS. PAUL:  Objection; calls for speculation.

12   Again, this is beyond the scope of this witness.

13           THE COURT:  I understand.  I want to hear this

14   answer, though.

15           Go on ahead.

16   A    It would say that it was me.

17   Q    Even though it wasn't you?

18   A    Correct.

19   Q    Okay.

20           THE COURT:  I want to let you know the reason I'm

21   allowing this in is because I'm not 82 years old yet.  I

22   understand whoever is logged onto the computer is going to be

23   -- this is not -- this is common sense at this point.

24           So I understand that if she logs into her computer

25   and someone else sits down and starts typing it, then that

1    person is both the author and the last editor.  So I want you

2    to know that what she said previously defies everything I

3    know about computers.

4           So if she logs in and someone sits at her computer

5    and starts typing, that is the author and that is the editor.

6    And I know that and I think everyone who knows anything about

7    computers knows that.

8           So I'm going to allow you to continue and that's

9    why.  Go on ahead.

10          MR. BRAND:  I have no further questions, Your

11   Honor.

12          THE COURT:  Thank you.

13          Ma'am, you have a nice day.

14          THE WITNESS:  Thank you.

15          THE COURT:  Is the government ready -- or I beg

16   your pardon.  I'm used to calling you guys the government.

17          Is the plaintiff ready to call their next witness?

18          MS. PAUL:  We are, Your Honor.  The plaintiff calls

19   Ivanah Thomas.

20          THE COURT:  Is it Dr. Thomas?

21          THE WITNESS:  Doctor, Ivanah, it doesn't matter.

22          THE COURT:  Well, it's your title.  I want you to

23   feel comfortable with whatever I'm calling you.

24          THE WITNESS:  Ivanah is fine, sir.

25          THE COURT:  All right.  Raise your right hand and

1   let her place you under oath.

2              THE COURTROOM DEPUTY:  Do you solemnly swear or

3   affirm under penalty of perjury that the testimony you will

4   give will be the truth, the whole truth and nothing but the

5   truth?

6              DR. IVANAH THOMAS:  I do.

7              IVANAH THOMAS, PLAINTIFF'S WITNESS, SWORN

8              THE COURTROOM DEPUTY:  Have a seat there, please.

9              THE COURT:  And the same as before, Mr. Brand.  If

10  you were intending on calling this witness, you can just use

11  your cross-examination as both the direct and a cross again

12  for efficiency purposes.

13             MR. BRAND:  Thank you.  Can I do that for all of

14  them?

15             THE COURT:  That's fine.  Sure.

16             MR. BRAND:  Thank you.

17             I'm sorry (now standing).

18             THE COURT:  Ma'am, if you would be kind enough to

19  state your full name for the record, spelling your last name.

20             THE WITNESS:  Ivanah Thomas, T-h-o-m-a-s.

21             THE COURT:  All right.  Your witness.

22             MS. PAUL:  Thank you, Your Honor.

23                         DIRECT EXAMINATION

24  BY MS. PAUL:

25  Q    Good afternoon, Dr. Thomas.

1   A   Good afternoon.

2   Q   You're not a medical doctor, correct?

3   A   No.

4   Q   The doctorate is in theology?

5   A   I have three:  theology, philosophy and psychology.

6   Q   Okay.  I just wanted to be clear, because this is not --

7   A   I'm not a medical doctor.

8   Q   -- this is involving nursing.

9   A   Right.

10   Q   Okay.

11   A   I'm a registered nurse as well.

12   Q   And you are the owner of Caring First?

13   A   Yes.

14   Q   You are the 100 percent owner?

15   A   Yes.

16   Q   You've been 100 percent owner since you began the

17   company in 2003?

18   A   Yes.

19   Q   You're regularly in the office?

20   A   Lately, no.

21   Q   Okay.  But you -- you are there to run the day to day?

22   A   Yes.

23   Q   And you supervise nurses in the field?

24   A   No.

25   Q   You don't supervise nurses in the field?

1    A    No.

2    Q    Do you remember I took your deposition on Thursday,

3    February 9th, 2017?

4    A    I'm sorry.  What's the date?

5    Q    February 9th of this year I took your deposition?

6    A    That's --

7                MR. BRAND:  Your Honor, I'm going to object to this

8    line of questioning.  It's outside the purpose of what this

9    hearing is about.  That question goes to issues of

10   independent contractors or employees or --

11               THE COURT:  She's simply trying to impeach the

12   witness.  That's why she's pulling out the deposition, which

13   is perfectly fair game on direct.  So the objection is

14   overruled.

15               For the purposes -- am I guessing correctly what

16   you're about to do?

17               MS. PAUL:  Yes, Your Honor.

18               THE COURT:  All right.  Feel free to continue.

19   BY MS. PAUL:

20   Q    Okay.  Do you remember I took your deposition on

21   February 9th of 2017?

22   A    Right.  When I had just flown in from Africa, remember,

23   with the whole immigration ban and all that fiasco getting

24   in, and I was actually sick coming in but tried to do the

25   best I can.  But, yes, to some extent, I remember.

1   Q     Okay.  And you were put under oath by the court

2   reporter?

3   A     Yes.

4   Q     And you swore to tell the truth?

5   A     Yes, ma'am.

6   Q     And you did tell the truth?

7   A     As far -- I did the best that I could.  I said, given

8   the circumstances, very, very exhausted, and you guys didn't

9   know that, but we didn't want to cancel.

10  Q     Well, you actually --

11  A     And also not feeling well at the time as well.

12  Q     Well, you actually had a deposition the previous day?

13  A     Yes.

14  Q     Okay.  In a different case?

15  A     Right.

16          MS. PAUL:  May I approach the witness, Your Honor?

17          THE COURT:  You may.

18  BY MS. PAUL:

19  Q     Dr. Thomas, I've handed you a copy of your deposition.

20  If you would, look at page 34.  Beginning at line one, please

21  read along with me as I -- I'll read it aloud and then I'll

22  ask a question.

23      This is part of your answer from the previous question:

24  I go in as needed because sometimes I spend time out in the

25  field, again, visiting patients and stuff like that.  So just

1    depends.

2         Question on line four:  Are you supervising the medical

3    care that the nurses are providing to the patients?

4              Answer:  I do some of it.

5              Did I read that correctly?

6    A    You did do that -- read that correctly.

7    Q    Okay.  Thank you.

8         You oversee the daily operations of Caring First?

9    A    Not right now.

10   Q    Okay.  Back in 2014, you oversaw the daily operations?

11   A    Yes, I did.

12   Q    And 2015, you oversaw the daily operations?

13   A    Yes, I did.

14   Q    In 2016?

15   A    Part of it.

16   Q    Okay.  You reviewed the weekly payroll?

17   A    Sometimes.

18   Q    You signed the paychecks, correct?

19   A    Sometimes, yes.

20   Q    And so when you're not signing the paychecks, is Tim

21   Thompson, your son, signing the paychecks?

22   A    Used to but not anymore.

23   Q    Okay.  So who else is signing the paychecks, then?

24   A    The other signer would be Petra Shaw.

25   Q    I'm sorry.  What's the name?

1    A     Petra Shaw.

2    Q     Petra Shaw, who is that individual?

3    A     That is my sister.

4    Q     Your sister.  Do you remember when I took your

5    deposition that you told me the only people who had signatory

6    authority for Caring First were you and your son?

7    A     Right, but I'm giving you the time span in terms of who

8    has ever signed checks.  It's Timothy, Petra, myself.  I

9    can't tell you, like, dates exactly.  But we are the three

10   persons that have ever signed checks.

11   Q     Okay.  But during your deposition when I asked you those

12   questions, you never told me Petra, your sister, was signing

13   any checks?

14   A     She's a signer on the account.

15   Q     Okay.  You never told me that during your deposition.

16   A     Okay.

17          MS. PAUL:  Your Honor, may I approach?

18          THE COURT:  You may.

19   BY MS. PAUL:

20   Q     Dr. Thomas, I'm going to hand you back a copy of your

21   deposition transcript and have you look at page 97, please.

22          Beginning at line eleven or line twelve, question:  And

23   who signs the checks?  I mean, since you -- since Tim left,

24   who's been signing the checks?

25          Answer:  I do.

1       Question:  Is there anybody else authorized to sign

2  checks?

3       Answer:  No.

4  A   I'm sorry.  What page are you on?

5  Q   Page 97.

6  A   Okay.  You gave it to me at 25.  I'm sorry.

7       I don't have a 97 on here.  What am I looking at?

8  Q   Ninety-seven is right here.

9  A   I'm looking at the bottom of the page.

10  Q   The page numbers are up here.

11  A   All right.

12  Q   So I'll do it again.  Follow along with me, please.

13       Line twelve, question:  And who signs the checks?  I

14  mean, since you -- since Tim left, who's been signing the

15  checks?

16       Answer:  I do.

17  A   I do, yes.

18  Q   Question on line 15:  Is there anybody else authorized

19  to sign checks?

20       Answer:  No.

21       So you did not tell me during your deposition that your

22  sister had signatory authority on the payroll checks for

23  Caring First?

24  A   It was because it's not like she signed payroll checks

25  on a regular basis.  She's a signer on the account.  In case

1    of an emergency or something, she can sign checks.  I didn't

2    even think about it at the time.

3    Q    Okay.  So your testimony today is different than what it

4    was several months ago when I took your deposition?

5    A    I'm just saying it wasn't even something that I thought

6    about at the time because it's not something that she does on

7    a regular basis.

8    Q    You have administrative staff who prepare payroll

9    records each week, payroll spreadsheets?

10   A    I'm sorry?

11   Q    You have administrative staff who prepare the payroll

12   each week?

13   A    Yes, ma'am.

14   Q    And they prepare Excel spreadsheets for the weekly

15   payroll?

16   A    As far as I know, yes.

17   Q    The administrative staff take the information from the

18   nurses' time sheets and from those time sheets create the

19   payroll spreadsheet, correct?

20   A    Yes.

21   Q    And those weekly payroll spreadsheets include the date

22   of the work week?

23   A    They include the date of the work week?

24   Q    The dates of the work week?

25   A    I am. . .

1   Q    If you would like to refer to Exhibit 14, the payroll

2   spreadsheets include --

3   A    Yes, ma'am.

4   Q    Well, so, in the -- if you look in the column titled

5   Patient and Hours/Days, there are a range of dates in each

6   one.  Do you see that?

7   A    Patient and Hours/Days, correct.

8   Q    Okay.  So the date range that's in that column for each

9   nurse is the work week, correct?

10   A    Yes, ma'am.

11   Q    And the weekly payroll spreadsheets include the name of

12   the nurse, right?

13   A    Yes, ma'am.

14   Q    And they include the rate of pay for the nurse, correct?

15   A    Yes, ma'am.

16   Q    At the time of the Wage/Hour investigation in March of

17   2014, Caring First's practice was to create a weekly

18   spreadsheet like the one in Exhibit 14, correct?

19   A    I believe so.

20   Q    And at the time of the Wage/Hour investigation in March

21   of 2014, Caring First's practice was to print out a hard copy

22   of each weekly payroll spreadsheet, correct?

23   A    That, I am not sure.  Timothy was doing it and he

24   obviously had copies, because I think when the investigator

25   came, they did get some copies.

1          I really did not involve myself in that department, to

2     be honest, but they were there.

3     Q     Okay.  So you are aware that Timothy was keeping them at

4     the time?

5     A     Right.  We do not have a policy concerning it, however.

6     Q     So at the time of the investigation in March of 2014,

7     Mr. Thompson was able to provide the Wage/Hour investigator

8     with all the necessary documentation?

9     A     Correct.

10    Q     And the weekly payroll spreadsheet was used to create

11    the payroll checks for that particular work week, correct?

12    A     And anything else.

13    Q     Okay.  And the payroll checks include a memo line?

14    A     Yes, ma'am.

15    Q     And the memo line, as we've been through it, contains

16    the dates of the work week, the hours worked, the patient

17    name, that information, correct?

18    A     Right.  And also it would sometimes contain multiple

19    work weeks, depending on what they were being paid for.

20    Q     Okay.  So in the memo line, there's -- if there's

21    something out of the ordinary related to, like, a nurse

22    turning in a time sheet late, there would be a notation on

23    the memo line of the check, correct?

24    A     Not all the time, though.  Not all the time.  Not all

25    the time.

1    Q    Okay.  Well, referring to Exhibit 14, if you would take

2    a look back at the Patient and Hours/Days column, if you look

3    down towards the bottom at the individual named Secoia

4    Fonseca, do you see that caregiver name?

5    A    Yes, I'm there.

6    Q    Okay.  And if you go over to the Patient and Hours/Days

7    column, it indicates late notes and then has a date range of

8    February 7th, 2016, to February 13th, 2016.  Do you see that?

9    A    Correct.

10   Q    And that -- the information that's in this column

11   actually is the same information that appears on the memo

12   line of the check, correct?

13   A    Sometimes it does and sometimes it doesn't.

14   Q    If you look down at Mario Hussein, there's notations as

15   well for late notes?

16   A    Yes.

17   Q    Do you see that?

18   A    Uh-huh.

19   Q    And that one lists dates of January 31, 2016, through

20   the week of -- through February 8, 2016.  Do you see that?

21   A    (No response.)

22   Q    I know the font is small.

23   A    Yes.

24   Q    Okay.  So this means that Ms. Hussein was paid during --

25   let's see.  The paid-on date for this spreadsheet was March

1    4th.   She was paid on March 4th with this check for the work

2    week of January 31, 2016, through February 8, 2016; is that

3    correct?

4    A     Repeat that again.  I'm sorry.

5    Q     Okay.   The notes in the Patient and Hours column for Ms.

6    Hussein indicate that this paycheck was actually for the work

7    week of January 31, 2016, through February 8, 2016?

8    A     Correct.  Do you notice also, though, I don't see a date

9    for the additional extra hours that she worked?  I didn't see

10   a date.  I don't know when it was that she worked those extra

11   hours.  Do you notice that?

12   Q     I'm asking the questions.

13   A     Okay.

14   Q     And the practice of including information in the memo

15   line of the check has occurred since at least 2013, correct?

16   A     At some point.  I can't tell you specifically when.

17         And may I just add that I have on occasion done payroll.

18   And as you can notice if you look on the check, the memo line

19   that's there, sometime it depends on how many clients a

20   caregiver works with.  You can't even fit in all the

21   information on the memo line.  So I just have to get in where

22   it's cut off there.

23         And I've had to do that.  You don't put in all the

24   information on the memo line because it simply can't hold.

25   You'll have nurses that work with four patients in one week.

They choose to work with this one one day, this one the other

day, this one -- I'm sorry -- multiple patients in one week.

And so if they've worked with three or four patients and you

have to list each client and the hours that they work, the

memo line can't contain all of it.  So some of the

information will be left off, and I have personally done

that.  So it's not always correct, no.

Q    There's only maybe a handful of nurses that work for you

that work for three or four patients in a week; isn't that

correct?

A    Actually, no.  Actually, a lot of them actually work

with more than one client and they do that for a reason.

Q    Okay.  My question wasn't more than one.  My question

was three or four.

A    I said multiple.  More than one.  So it could be two or

three.  More than one.

Q    So my question was:  You only have maybe a handful of

nurses that work with three or four patients in any one week?

A    I wouldn't know the number.  I couldn't tell you a

percentage, but I'm just letting you know that it happens.

Q    It's more common that one nurse cares for one patient in

a work week?

A    Not necessarily.

Q    Or maybe two?

A    Yeah.  Multiple.  Yes, multiple.

1    Q     So back in March of 2014, when the Department of Labor

2    began investigating Caring First, you understood that they

3    were looking at -- or that the Department of Labor was taking

4    the position that nurses that worked for Caring First were

5    employees and not independent contractors, correct?

6    A     I was told that in May by Mr. Ariba (sic).

7    Q     Investigator Fernandez?

8    A     Yes.  I was told that in May.

9    Q     Okay.  By May of 2014, you understood that that was the

10   Department of Labor's position?

11   A     Yes, ma'am.

12   Q     And Investigator Fernandez held a closing conference

13   with you to discuss his findings of his investigation?

14   A     That was the first time I was meeting him, yes.

15   Q     And at that meeting, he told you that Wage and Hour had

16   determined that Caring First was misclassifying the nurses as

17   independent contractors?

18   A     That's what he told me.

19   Q     And that it was the Department of Labor's position that

20   because of that misclassification, that Caring First owed

21   back wages for failing to pay the nurses the overtime rate?

22   A     That's what he told me.

23   Q     So at that point, you understood the Department of

24   Labor's position were that the nurses were employees?

25   A     That's what he said, which I totally to this day

1  disagree with.

2  Q    Right.  But you understood at that time that that was

3  the Department of Labor's position?

4  A    That's what he was saying.

5  Q    So the answer is yes?

6  A    That's what Mr. Heriberto told me in May when he met

7  with me, that that's the department's stand.

8  Q    Okay.  And you did not resolve the case with

9  Investigator Fernandez at that time?

10 A    No.

11 Q    Okay.  And so after that meeting, you actually hired an

12 attorney, correct?

13 A    Yes.

14 Q    You hired Mr. Brand?

15 A    Well, actually, I had him on before.

16 Q    When did you have him on?

17 A    I don't know.  He was with us.  Because as a home

18 health, you just need to have an attorney.

19     We've never had to do anything legally, but he was

20 always on standby, but we've never had any legal issues.

21 Q    Okay.  So right after the meeting with Investigator

22 Fernandez, you contacted Mr. Brand?

23 A    Right.

24 Q    About representing you for the matter against Wage and

25 Hour?

1    A      Right.

2    Q      And you're aware that at some later point after May of

3    2014 that Mr. Brand attempted to negotiate the back wages

4    with Wage and Hour?

5    A      You know what?  I'm not sure all the dealings.  No, I'm

6    not sure.  So, no.

7    Q      Are you aware that Wage and Hour indicated to your

8    attorney that the back wages could not be negotiated because

9    the violations were on the face of the records?

10   A      I don't know.

11   Q      Were you present with Mr. Brand for any of the

12   conversations with Wage and Hour?

13   A      No.

14   Q      You are aware, obviously, that Mr. Brand wasn't able to

15   resolve the matter with the Department of Labor, correct?

16   A      By the -- to be honest, I thought the case was literally

17   forgotten about until late 2015, when we got served with

18   documents for a lawsuit, because I hadn't heard back anything

19   from Mr. Hernandez or Fernandez, and months and months and

20   months had passed and I hadn't heard a thing.  So I thought

21   it was just done and forgotten with, to be honest.

22   Q      You were aware that the Department of Labor was taking a

23   different position than you had on the issue of the

24   classification of employees, correct?

25   A      I found out via when I got served for the lawsuit the

1  latter part of 2015.

2  Q    Okay.  My question is that in May of 2014, you didn't

3  resolve the matter with Department of Labor, correct?

4  A    Yes.

5  Q    And Department of Labor at that time had told you that

6  there were over $173,000 in back wages owed, that Caring

7  First owed?

8  A    Correct.

9  Q    Okay.  So you were aware of the potential for a lawsuit

10  after not resolving the issue with the Department of Labor?

11  A    I guess operative word being "potential," because I had

12  no idea.  I had no clue until I got served.

13  Q    Well, you were served with a lawsuit in May of 2015 from

14  some of the Foster nurses, correct?

15  A    Correct.

16  Q    Okay.  And there's some nurses that work at that

17  household that brought their own lawsuit for overtime

18  violations, correct?

19  A    That's correct.

20  Q    And in this case, you were ordered by Magistrate Judge

21  Kelly to produce payroll records.  Do you recall that?

22  A    Somewhere along the line, yes.  I don't remember

23  specifics.

24  Q    Towards the end of 2015?

25  A    Whatever it is.  I mean, we tried our best to comply.

1    Q      And Judge Kelly required you and Caring First to produce

2    all the time sheets and payroll records in your possession,

3    custody or control that pertained to the employees listed on

4    the Schedule A of the Complaint?

5    A      Yes, ma'am.

6    Q      And Caring First did not produce all such documents,

7    correct?

8    A      We produced what we had.  So what we had in our

9    possession.  We produced what we had.

10   Q      And Caring First had not produced the payroll records

11   from the end of March 2014 through that particular time of

12   the lawsuit?

13              MR. BRAND:  Objection, Your Honor.

14              THE COURT:  Basis for the objection?

15              MR. BRAND:  I'm confused by counsel.  If counsel is

16   saying that we didn't produce them in 2014 or that we didn't

17   produce them after the conference with Judge Kelly.

18              THE COURT:  The question is and Caring First had

19   not produced the payroll records from the end of March 2014

20   through that particular time of the lawsuit?

21              I'm going to sustain but you can ask it.

22              MS. PAUL:  I'll fix it.

23              THE COURT:  You just need to be a little more

24   clear.

25              MS. PAUL:  Okay.

1    BY MS. PAUL:

2    Q    And Caring First did not produce the payroll records

3    from the end of March 2014 through and around the time of

4    Judge Kelly's order in December of 2015?

5    A    When we got the order from Judge Kelly, whatever it is

6    that he requested and we had, we produced.

7    Q    And so what you produced did not include the type of

8    weekly payroll spreadsheets that had -- for March 2014

9    through that time, December 2015 or January 2016, that Caring

10   First had previously provided for previous years, correct?

11   A    Understand, again, we were under no obligation or order

12   to keep those.  That is -- as a matter of fact, before

13   Timothy came, when he graduated from college and came on

14   board, he's the one that implemented and was just doing this

15   on his own.  So we never had them before.

16        And so we don't have a policy that you have to keep them

17   or any such thing.  So we weren't, I mean, storing them.  I'm

18   sorry.  So we just produced what we had at the time.

19   Q    I was just motioning you to slow down.

20   A    Okay.  Please do.

21   Q    Judge Kelly held a show cause hearing on March 4th of

22   2016 for the failure to provide all the pertinent records

23   that he had ordered?

24   A    Okay.

25   Q    Do you recall that?

1    A     Some -- a lot of things was happening last year,

2    but. . .

3    Q     Okay.  And you were present by telephone for that

4    hearing, correct?

5    A     Yeah.  I was on a phone call for some hearing, yes.

6    Q     Because you were in Jamaica at the time?

7    A     Yes.

8    Q     And Mr. Thompson was present with Mr. Brand in the

9    court?

10   A     Okay.

11   Q     Do you recall that?

12   A     Yes.

13              MR. BRAND:  Mr. Brand was --

14              MS. CHASTAIN:  Was on the telephone.

15   BY MS. PAUL:

16   Q     I'm sorry.  Mr. Brand was by telephone?

17              THE COURT:  Hold on a second.  If you want to

18   object, you can, but you can never do that in court, stand up

19   and correct her question.  Don't address counsel.  You can

20   address me.  Just F.Y.I.  That's fine.

21              So there's been a correction.  That's fine.  But

22   just object to me and I'll make her correct or I'll sustain

23   or overrule.

24              Go on ahead and ask your next question.

25              MS. PAUL:  Okay.

1  BY MS. PAUL:

2  Q     And at the time of the hearing on March 4th of 2016,

3  what Caring First had produced to the Department of Labor

4  were payroll register printouts which included the name of

5  the nurse, the date of payment and the amount of each

6  payment, right, and the check numbers?

7  A     Are you alluding to the same one with the contract to

8  print on the bottom, the stub?

9  Q     Right.  From the managepayroll.com?

10  A     Right, which is what we've had, yes, since we've started

11  using that system.

12  Q     Okay.  And the managepayroll.com system does not include

13  information about the wage rate for each nurse, correct?

14  A     No, it doesn't.

15  Q     And it doesn't include -- it does not include the dates

16  encompassing the work week for which that paycheck is being

17  issued, correct?

18  A     I'm sorry.  Can you -- are you asking me if in the

19  system, it makes provision for you to put in a week?

20        I don't understand the question.  I'm sorry.

21  Q     In the records that you produced to the Department of

22  Labor, those records, they show a date that a check was

23  issued, right?

24  A     Okay.

25  Q     You agree with that?

1    A    On the pay stub?

2    Q    No.  On the printout from the Manage Payroll.

3    A    Okay.

4    Q    Do you agree with that, the date that appears on those

5    documents that you produced to us is the date that the check

6    was issued?

7    A    Right.  Okay.

8    Q    Okay.  So that information that was produced did not

9    include the dates encompassing the work week?

10   A    Okay.

11   Q    Is that right?

12   A    Right.  And I did want to make a clarification.

13   Q    There's no further question right now.

14   A    Okay.

15             THE COURT:  Ma'am, you can be permitted to make

16   your clarification on cross-examination.

17             THE WITNESS:  Thank you, Judge.

18             THE COURT:  So go on ahead with your next question.

19             MS. PAUL:  Thank you, Your Honor.

20   BY MS. PAUL:

21   Q    So during that hearing with Judge Kelly, you never told

22   the Court that Caring First had a practice of creating and

23   maintaining weekly payroll spreadsheets prior to the

24   Department of Labor investigation?

25   A    No.  I didn't really say much because, again, we do not

1    have a policy regarding it.

2    Q    Okay.  And your attorney did not make that

3    representation to the Court?

4    A    I don't know what he represented.

5    Q    Well, you were present.

6    A    Again, as I said, I don't remember everything that

7    happened at the hearing.

8    Q    Okay.  And at that hearing, you never told Judge Kelly

9    that any of the weekly payroll records from after March of

10   2014 had been destroyed?

11   A    What do you mean the payroll records have been

12   destroyed?

13   Q    The Excel spreadsheets that we've been talking about all

14   day, you never indicated to Judge Kelly during that March

15   4th, 2016, hearing that those payroll spreadsheets from after

16   March 2014 had been destroyed?

17   A    But I don't know about the payroll spreadsheets just

18   being -- it's not like we took the payroll spreadsheets and

19   just destroyed them.

20   Q    Well, three days later, when Investigator Podczaski

21   showed up at Caring First's offices, that's the first time

22   that we had heard from Caring First, from you that the

23   records had been destroyed.

24   A    So you're making reference to 2015 when Ms. Reyes was

25   there and when she left, we couldn't find the records?

1    I'm sorry.  I'm a little bit confused because you're

2    saying 2014 and then last year.  I don't know.

3    Q    It's your contention that certain records from the

4    payroll spreadsheets -- let me back up.

5        It's your contention that the Excel payroll spreadsheets

6    from after March of 2014, after the D.O.L. investigation up

7    until Ms. Reyes left your employment were destroyed?  Am I

8    right?

9    A    We are saying when Ms. Reyes left, we could not find

10   them in the computer.  We couldn't find any trace of it in

11   the computer.

12   Q    Didn't you tell Investigator Podczaski on March 7, 2016,

13   when she showed up at your offices, that she had destroyed

14   the records?

15   A    Well, that's what we've been saying, that she destroyed

16   them, because once she left, we couldn't find them.

17   Q    Okay.  But you failed to mention that to Judge Kelly on

18   the March 4th -- during the March 4th, 2016, hearing.

19   A    I don't know if that was --

20        MR. BRAND:  Your Honor, I object.

21   A    -- brought up.  I cannot remember specifically.

22        THE COURT:  Hang on a second.

23        What's the objection?

24        MR. BRAND:  Argumentative.

25        THE COURT:  But you failed to mention to Judge

1   Kelly during the March 4th, 2016, hearing.  All right.  She

2   can answer that question.

3   A    I don't remember Judge Kelly asking me about

4   spreadsheets and whether they were destroyed or not.

5   Q    Well, that hearing was a hearing about why Caring First

6   had not at that time produced all the documents that were

7   required in Judge Kelly's order.  Don't you think that that

8   would have been appropriate -- an appropriate time to advise

9   the Court that those records didn't exist, for whatever the

10  reason was?

11              MR. BRAND:  Again, Your Honor.

12              THE COURT:  That one is argumentative.  Sustained.

13              Go on ahead and do your next question.

14  BY MS. PAUL:

15  Q    And you never told Judge Kelly that after two lawsuits

16  had been filed against Caring First for wage claims under the

17  Fair Labor Standards Act, that Caring First was then writing

18  over the weekly payroll spreadsheets week after week?

19  A    We were not obligated to keep them every week.

20              THE COURT:  The objection is what?

21              MR. BRAND:  It's argumentative.

22              THE COURT:  No.  That's a straightforward question.

23              The other one, she had answered the question, and

24  then she said, well, why didn't you bother.  That's

25  argumentative.

1          This is not argumentative.  This is a

2    straightforward question.  So it's overruled.  She can

3    answer.

4    BY MS. PAUL:

5    Q    Do you need me to repeat it?

6    A    Please.

7    Q    Okay.  You never told Judge Kelly that after two

8    lawsuits had been filed against Caring First for wage claims

9    under the Fair Labor Standards Act, that Caring First was

10   writing over the weekly payroll spreadsheets week after week?

11   A    And, again, I am saying I was in Jamaica on a telephone

12   listening.  I hardly said anything.  You can go back to the

13   record during that hearing.

14        I don't remember the details of that hearing or him

15   asking me about that or anything.  Do you have record --

16   well, I'm sorry.

17   Q    In fact, you never mentioned the weekly payroll

18   spreadsheets at all to Judge Kelly during that hearing, did

19   you?

20   A    Again, I do not remember the details of the hearing.  I

21   don't.  I wasn't in person with him.  It was a phone call.

22   Q    You did not mention to Judge Kelly at that hearing that

23   it was still Caring First's practice to include the dates of

24   the work week and the hours worked on the memo line of the

25   nurses' checks?

1           THE COURT:  These are the last two answers she

2    gave:  I don't remember the details of that hearing or him

3    asking me about that or anything.

4           The next answer was:  Again, I don't remember the

5    details about the hearing.  I don't.  I wasn't in person with

6    him.  It was a phone call.

7           So if you continue asking her questions about what

8    happened at the hearing, which is of record, by the way,

9    she's going to keep saying I don't know.

10           So I'm going to in a sua sponte manner invite you

11    to move on to your next line of questioning.

12           MS. PAUL:  Thank you, Your Honor.

13    BY MS. PAUL:

14    Q    You didn't contact your bank for copies of the paychecks

15    that were ordered to be produced by Judge Kelly, correct?

16    A    When I got the order, I did go --

17           MR. BRAND:  Objection.

18           Is there an order from Judge Kelly to produce

19    copies of --

20           THE COURT:  Are you asking counsel a question in

21    the courtroom?

22           By the way, this is the kind of stuff that produces

23    mistrials.

24           So not a mistrial but just a warning for the

25    future:  Object to me.

1          MR. BRAND:   Objection.

2          THE COURT:   All right.   What's the basis for the

3    objection?

4          MR. BRAND:   I believe it's a mischaracterization of

5    an order.

6          THE COURT:   All right.   The question was:   You

7    didn't contact your bank for copies of the paychecks that

8    were ordered to be produced by Judge Kelly, correct?

9          How is that misleading or a misstatement?

10         (No response.)

11         THE COURT:   The answer is either yes or no.

12         All right.   Do you have a reason why that's

13   misleading?

14         MR. BRAND:   I don't -- I don't know of -- at least

15   sitting right here right now, I'm not aware of a court order

16   requiring her to produce paychecks.

17         THE COURT:   Okay.   The objection is overruled.   You

18   can ask the question.

19   BY MS. PAUL:

20   Q    Did you ever contact your bank to get copies of

21   paychecks?

22   A    I went to my bank to see if we could get -- I spoke to

23   Nalini at Wells Fargo.   She told me they did not -- they

24   could not give them to me.   I mean, it's years worth of

25   records and we had electronic banking.   So all we got

1   literally are check numbers, the amount, but we don't get

2   hard copies of checks.

3   Q      Your testimony is that you can't order the old checks

4   from your bank?

5   A      I went to the bank and spoke to the service manager in

6   Apopka, Florida -- her name is Nalini -- and said can we get

7   copies going back how many years.

8          She says no.  We do not have them here, no.

9   Q      What specific records do you say were destroyed?  What

10  dates of records?

11  A      What do you mean?  What date of what records?

12  Q      Of the payroll spreadsheets.

13         Let me back up.  On March 7, 2016, when Investigator

14  Podczaski was at your offices, you informed her that Ms.

15  Reyes had destroyed the payroll records, the spreadsheets.

16  So what dates were destroyed?

17  A      From whatever the last that you guys had, whatever was

18  in the computer, when she left, as her testimony was, she

19  created her own password to protect the spreadsheets, that I

20  had no knowledge of.  When she left and we went on the

21  computer, those spreadsheets were gone.

22  Q      But which -- what dates exactly?

23  A      It would have been from the last batch you guys had.

24  That's why we had nothing to give you.  All that we had in

25  the office, we gave to you guys.  We had nothing left.

1    Q      And so were there all the ones from even before -- from

2    before March 2014, were they also missing?

3    A      I don't know what dates.  Whatever you guys got, because

4    my understanding was that I wasn't in the office when

5    Investigator Hernandez came in.  Whatever was there, Timothy

6    gave him.  Whatever he was making copies of, he gave to him.

7    All right?

8           When Karen left, all the files that were in the

9    computer -- I don't know the dates exactly -- we couldn't

10   find any file with payroll records.

11          And as Ivia testified earlier, Timothy showed her how to

12   create a new spreadsheet.  That's what she started doing.

13   They were gone.

14   Q      And -- and so a new spreadsheet had to be recreated?

15   A      Yes, ma'am.

16   Q      And you entered all the nurses' names?

17   A      I entered all the nurses' names?

18   Q      Right.

19   A      I have not entered any nurses' names.

20   Q      If you would, turn to page 125 of the deposition

21   transcript in front of you.  The bottom of 124.

22          At the bottom of 124, line 22, are you there?

23   A      Twenty-four, yes.

24   Q      The witness:  Again, I don't know what her intent was or

25   exactly happened.  All I know, once she left and we went into

1    the computer and try and access it, it wasn't -- as a matter

2    of fact, this had to be made out over again.  I had to go

3    back in and enter all the nurses again.

4         Did I read that correctly?

5    A    You read it correctly.

6    Q    Okay.

7    A    May I just say?

8    Q    (Shakes head negatively.)

9              MS. PAUL:  May I approach the witness, Your Honor?

10             THE COURT:  You may.

11   BY MS. PAUL:

12   Q    Dr. Thomas, I'm handing you what's been admitted into

13   evidence as Plaintiff's Exhibit 29 and 29A.  Do you see the

14   document Exhibit 29 is a copy of the weekly payroll

15   spreadsheet for the work week of August 27, 2017, through

16   September 2nd, 2017?

17   A    Yes, ma'am.

18   Q    Okay.  And that check -- those checks are actually paid

19   on September 19, 2017, correct?

20   A    If that's what it says, yes.

21   Q    The paid on date.  So this payroll record actually shows

22   that you were over two weeks behind on the payroll?

23   A    Okay.

24   Q    Okay.  If you look at the third page of that document --

25   or the fourth page -- turn to the page that has the -- it

1    says information about pay period, that page.  Do you see it?

2         Oh, I'm sorry.  Look at 29A.  That's the Information

3    page for that Excel spreadsheet.  Do you see on the

4    right-hand side the created date?

5    A    (No response.)

6    Q    The created date is June 11, 2012, isn't it?

7    A    Okay.

8    Q    Okay.  And the author was Timothy T., correct?

9    A    That's what it says on here.

10   Q    And that's your son, Mr. Thompson?

11   A    Yes, Timothy is my son.

12   Q    Okay.  So you've said that the spreadsheet had to be

13   recreated all over again, but the latest spreadsheet shows

14   that the one created back in 2012 was being used?  Isn't that

15   right?

16   A    That's what this is saying.  I have no knowledge of

17   these things.  I do not know why this is.

18   Q    Okay.  And during March 7th, 2016, when Investigator

19   Podczaski was at your office, so you had indicated that

20   Caring First was not keeping the Excel spreadsheets going

21   forward after Ms. Reyes left and Ivia Rosado took over,

22   correct?

23   A    Right.

24   Q    And you never instructed Ms. Rosado to save the weekly

25   spreadsheets on separate files on that computer?

1  A     No.

2  Q     And by July of 2015, you were aware that the Department

3  of Labor had filed a lawsuit?

4  A     No.  It was late 2015 when I got notice of it, which I

5  think was August.  I think it was August, when I just came

6  back from Africa, I got served with the notice, between

7  August and September of 2015.

8  Q     So when you got the Complaint from the Department of

9  Labor's lawsuit, you didn't instruct Ms. Rosado at that time

10  to start saving the Excel spreadsheets, did you?

11  A     No.

12  Q     And you were aware she was writing over the weekly

13  payroll spreadsheets from week to week?

14  A     Really, yes.  Yes.

15  Q     Mr. Thompson created -- or trained Ms. Rosado to create

16  the payroll spreadsheets, correct?

17  A     Yes.

18  Q     And when Mr. Thompson previously did the payroll and

19  check processing, he created weekly payroll spreadsheets,

20  correct?

21  A     He created the spreadsheets.

22  Q     And he saved them each week on the computer?

23  A     I don't know how he saved them, but he had some -- he

24  was keeping some kind of a record.  Again, like I stated

25  earlier, I don't get into all of that part of it, but, yeah,

1    I don't know.

2    Q    And so he was maintaining those records of weekly

3    payroll spreadsheets prior to the Department of Labor's

4    investigation in March 2014?

5    A    Whatever he had, however he was maintaining them, he

6    gave them up.  I don't know how.

7    Q    And so when he trained Ms. Rosado to do the same payroll

8    and check processing activities that he had done in the past,

9    he did not instruct Ms. Rosado to save the weekly payroll

10   spreadsheets?

11   A    I wasn't there, so I don't know.

12   Q    You have given Mr. Thompson responsibility in your

13   company, correct?

14   A    Yes.

15   Q    And he had the responsibility to train Ms. Rosado on

16   doing the payroll processing?

17   A    Right.

18   Q    And so he trained her differently than how he was

19   handling the records prior to the Department of Labor

20   investigation, correct?

21   A    I cannot say that is correct.  I don't know how he

22   trained her.  I wasn't there.

23   Q    Okay.  So despite the fact that Caring First's practice

24   before the Department of Labor investigation was to create

25   and save the weekly payroll spreadsheets, you failed to do so

1    after the investigation was over?

2    A    After what investigation was over?

3    Q    The Department of Labor investigation.

4    A    When is it over?

5         I don't understand the question.  I'm sorry.

6    Q    Okay.  Despite the fact that Caring First's practice

7    before the Department of Labor investigation was to create

8    and save the weekly payroll spreadsheets, you failed to do so

9    after May of 2015, knowing that the Department of Labor and

10   Caring First disagreed about violations of the F.L.S.A.?

11   A    We disagreed, but I didn't know that we were going to

12   have a lawsuit and that I had to keep any of it.

13   Q    Well, you did know that the Department of Labor had said

14   that Caring First owed $173,000 in back wages, right?

15   A    I agreed to that, yes, ma'am.

16   Q    Okay.  And that matter did not get resolved, correct?

17   A    No.

18   Q    And then in May of 2015, there was the Foster house

19   lawsuit for overtime wages?

20   A    I'm not sure.  I don't remember if it's May.  I doubt

21   it's May, but it was sometime in the summer.

22   Q    Okay.  So after notice of that lawsuit, Caring First

23   didn't keep the weekly payroll records?

24   A    I didn't see the relevance, no.

25   Q    You didn't see the relevance?

1    A     No, because all the nurses worked are on the nurses'

2    time sheet, and we also have the Manage Payroll that has a

3    record of all that they work.

4    Q     But you knew that there were lawsuits against you for

5    violations of overtime and you changed your practices from

6    prior to the Department of Labor investigation?

7    A     I wouldn't say changed practices.  Again, we had no

8    policy in it, and all the information that is needed are on

9    our nurses' notes.  We have to keep those records.  That is

10   what we are allowed by the State of Florida.  We must keep

11   those.

12        When they come in to do an investigation, they are not

13   interested in our payroll records, our checks.  All they want

14   to see are the nurses' notes, because they have the Florida

15   Medicaid system.  If we put two hours for one day time in and

16   out, they have it on their computer system and they come and

17   they go through the chart page by page, look at those notes

18   to verify that what we billed for was indeed what the nurses

19   worked and the parent signed off on.  So that is what is

20   critical, keeping those notes.

21   Q     You agree that AHCA has a different purpose than the

22   Department of Labor?

23   A     I can't agree to that.  I don't know.  But I know AHCA

24   is about compliance and making sure there's no Medicaid fraud

25   and fraudulently billing for what we did not provide, and we

1    were very astute in making sure we did not do that.

2    Q    Okay.  And the Department of Labor is concerned with

3    ensuring that employees are paid proper wages?

4    A    And that -- that -- finding that out is only going to be

5    correctly ascertained by going through the weekly time sheets

6    daily by what the nurses work, what they sign, and verify

7    that, yes, I worked these hours, and the parents or whoever

8    the legal guardian for the client did sign off on those.

9    Q    Well, you would agree that the records that you keep for

10   compliance within state law are not necessarily going to be

11   relevant to compliance under a different federal law?

12   A    I don't know.  I (sic) would not be relevant because

13   paychecks and spreadsheets do not give an accurate

14   determination of what is working the specific week all the

15   time.  Because if time sheets are turned in late, if nurses

16   worked a week and decided to hold onto the paycheck -- and

17   I've had nurses tell me they do that because they want a

18   bigger paycheck and it helps them to save.  So they purposely

19   don't turn in their time sheet so they can have a bigger

20   paycheck when they do get their pay.

21        So when you look at that spreadsheet, it's going to have

22   two weeks or however many hours on there.  It is not an

23   accurate depiction of what is accurately worked in a week.

24   The only way to ascertain that is by the nurses' notes.

25   Q    Okay.  So after you had notification that there were two

1   lawsuits against you for back wages for over -- for not

2   paying overtime properly, you did not stop Ms. Rosado from

3   destroying the records week after week?

4   A    No, because I didn't see the relevance.

5   Q    And you finally stopped destroying the weekly payroll

6   records in March of 2016 because the Department of Labor had

7   filed a Motion for Sanctions against you?

8   A    When we were asked not to do that, that's when we

9   stopped doing it and telling her to save it.  We didn't know

10  before.

11          MS. PAUL:  That's all I have.

12          THE COURT:  Cross?

13                      CROSS-EXAMINATION

14  BY MR. BRAND:

15  Q    Good afternoon, Ivanah.

16  A    Yes, sir.

17  Q    Is it your belief and contention that Caring First has

18  complied with the production of everything available as far

19  as payroll records?

20  A    Absolutely.

21  Q    Okay.  Is it your contention that there is nothing left

22  for us to give, have, provide, produce, that everything

23  possible has already been turned over?

24  A    As far as I know, when the investigator came to the

25  office, she can tell you how warm and welcoming we were.  We

1    opened up our door, showed her everything, all our files.  I

2    even brought her into my office.  She sat at my desk to log

3    on.

4         She stood behind me, watched as I navigated the Manage

5    Payroll.  She said click on that tab.  What comes up, click

6    on this one.  As she testified earlier, she literally stood

7    over me facing the computer, looking at everything as I

8    navigated and telling me what to click on so she could get a

9    good scope of what it is that we had in our Manage Payroll

10   system.

11   Q    And the Manage Payroll system is the only computer

12   system that Caring First utilizes in order to control the

13   payroll?

14   A    That's what we use, sir.

15   Q    Okay.  All the data that goes into your payroll comes

16   from where?

17   A    All the data comes from the nurses' notes.

18   Q    Okay.  Plaintiff's counsel brought up questions

19   regarding the Agency for Health Care Administration.  Have

20   you been present when they've done an audit in your office?

21   A    Yes.  I've been through tons of them.

22   Q    Okay.  And have they ever come in checking to make sure

23   that there was no billing fraud?

24            MS. PAUL:  Objection, Your Honor; relevance.

25            THE COURT:  Response?

1    BY MR. BRAND:

2    Q      Ivanah.

3    A      Yes.

4            THE COURT:  No, no, no.  I want the response from

5    counsel.

6            MR. BRAND:  Oh.

7            THE COURT:  By the way, you keep calling the

8    witness by her first name.  So I'm going to refer you to

9    Local Rule 5.03(b) paragraph eight, referring to all persons,

10   including witnesses, other counsel and parties, by their

11   surnames and not by their first or given names.

12           So last names only.

13           Please tell me what your response is to the

14   objection.

15           MR. BRAND:  The direct relevance is when Medicaid

16   comes in as the agency that has the jurisdiction over Caring

17   First, which is a home health agency, and they are checking

18   for billing fraud, they are checking to compare the time

19   sheets with what is being claimed or submitted for claimed

20   payment at AHCA, in order to do that, there's only one place

21   for them to go.

22           THE COURT:  Well, I guess my issue is whether or

23   not another agency comes in and clears is not relevant to

24   what the Department of Labor is doing here.  So it doesn't

25   matter.  So the objection is sustained.

```
 1           What those other things revealed or didn't, if it
 2   was bad, I wouldn't consider it.  If it's good, I'm not going
 3   to consider it.
 4           Go on ahead and continue your cross, please.
 5           MR. BRAND:  Okay.
 6   BY MR. BRAND:
 7   Q    Dr. Thomas, in your opinion, where is the only source or
 8   the truest source of records that would demonstrate or show
 9   the hours and the dates worked by a particular nurse?
10   A    The only one true, correct source would be the actual
11   nurses' notes time sheet.
12   Q    Okay.  I'd like to bring you back to the testimony of
13   Karen Reyes, if we could.  You were present when Ms. Reyes
14   testified, correct?
15   A    I was.
16   Q    Was she fired?
17   A    Yes.
18   Q    Why was she fired?
19   A    Because she kept making multiple, multiple mistakes.
20   Every week we had multiple errors on our payroll system.
21   Hence, the multiple voided checks that we had in the office.
22   Those were all errors she made on those checks, so we had to
23   void them out.
24   Q    Okay.  We had -- and I believe you're aware of this.  We
25   had provided the plaintiff with void checks from your office.
```

1    Do you remember those?

2    A    Yes, sir.

3    Q    Okay.  Can you please tell me about those?

4    A    Those were the checks that Ms. Reyes did for payroll

5    that she had errors on, just some of them, by the way.  There

6    were numerous amounts.  Those are just some of them.

7              MS. PAUL:  Objection, Your Honor.  Move to strike

8    this line of testimony.  This is extrinsic evidence.  It's

9    improper under Rule 608(b).

10             THE COURT:  Response?

11             Or these are not checks that have been admitted

12   here, correct, the ones she's referring to, the voided ones?

13             (No response.)

14             THE COURT:  The question was:  We had -- and I

15   believe you're aware of this.  We had provided the plaintiff

16   with void checks from your office.  Do you remember those?

17             And that's when the answer came.

18             Can you tell me about those?

19             So you're asking a question in reference to checks

20   that were provided via discovery.  Are they before the Court

21   at this time?

22             I don't think they've been admitted into evidence.

23             MR. BRAND:  I thought they were part of something.

24             THE COURT:  Let me just ask you this, because we're

25   at a motions hearing.  She's already testified that she fired

1   her because she kept making mistakes.

2              This is, by the way, why this hearing is taking so

3   long on both ends.  I understand that, for effect, there are

4   times when you want to ram a point home in front of a jury.

5   I'm not going to get excited about anything that's going on

6   in here.

7              So when you ask a question and it gets answered,

8   that's enough.  She's already told you she fired her because

9   she kept making mistakes on the checks.  I actually don't

10  need to see the checks, just as an F.Y.I.  So I get it.  She

11  fired her because she kept making error after error on

12  checks.  I understand what her testimony is.

13             The objection is going to be sustained.  Asked and

14  answered.  But feel free to continue.

15             MR. BRAND:  Okay.

16  BY MR. BRAND:

17  Q    Were there also claims or allegations of theft?

18  A    Yes.

19  Q    Can you please tell us about those?

20  A    We found after she left and when we got served with the

21  lawsuits and preparing for the lawsuit and going through her

22  payroll record in Manage Payroll system, we noticed the

23  discrepancies with the numbers and noticed that she had,

24  like, for example, one week where she had cut herself

25  double -- double the amount for that week, and then there's

 1   another week where it was, like, a couple hundred dollars she

 2   added to her check.

 3        Then also her very good friend, Glorie Rodriguez, she

 4   paid her for 80 hours in a 40-hour week.  Even though she

 5   only worked 40 hours, she paid her a check for 80 hours.

 6   Q    That would be another reason why looking at checks would

 7   be of no use --

 8   A    Exactly.

 9   Q    -- for determining hours worked and when those hours

10   were worked, correct?

11   A    Right, because there are errors.  They do make errors,

12   and that's an honest to God truth.  They do make errors.  The

13   correct source will be the notes.

14   Q    Okay.

15             MR. BRAND:  I have nothing further, Your Honor.

16             THE COURT:  All right.

17             Thank you, ma'am.  Feel free to be seated at

18   counsel table.

19             MS. PAUL:  Your Honor, may I just ask a brief

20   question on redirect?

21             THE COURT:  A brief question.

22             MS. PAUL:  Yes.

23                     REDIRECT EXAMINATION

24   BY MS. PAUL:

25   Q    Dr. Thomas, you had a number of people come into your

1  offices in 2016 to go through the patient files and recreate

2  the destroyed records, correct?

3  A    I'm sorry?

4  Q    You had a number of people come to your office and work

5  to go through the patient files and the hourly logs from the

6  nurses to recreate the destroyed spreadsheets from March 2014

7  through February of 2016, correct?

8  A    We had a couple of persons, yes.

9  Q    And one of those people was Ivia Rosado, correct?

10  A    No, because Ivia was doing billing and payroll.  The

11  main person that handled this was actually Karla.  Ivia was

12  always busy with her billing and payroll.

13  Q    Do you remember responding to discovery in this matter

14  where you listed persons of -- with knowledge of certain

15  facts in this case?

16  A    Okay.

17  Q    And you listed multiple members of the Rosado family?

18  A    Yes.

19  Q    And do you remember when I asked you in your deposition

20  about why those people -- what information those people have

21  or why they're relevant?

22  A    Right.

23  Q    Do you remember you told me that all of those

24  individuals assisted with the recreation of the destroyed

25  Excel payroll spreadsheets?

1    A    Right.

2    Q    And one of those people was Ivia Rosado?

3    A    Because in her office, she would have a lot of the time

4    sheets.  So we would have to go to her to get those.  But in

5    terms of the inputting of the information, that was primarily

6    Karla Rosado.  You did not ask specific explanation.

7    Q    Didn't it take a long time to go through all those

8    patient files to recreate the Excel spreadsheets?

9    A    I don't remember how long it took.

10   Q    Weeks?

11   A    Yeah, I would say a few weeks.  I don't remember exactly

12   how long, though.

13   Q    Or months?  That was with multiple people working on

14   that project, correct?

15   A    I was working on it.  We had -- yes.

16   Q    And it took several weeks of working full time just on

17   that project, correct?

18   A    Again, I don't remember how long it took.  I don't

19   remember how long it took.

20            MS. PAUL:  Your Honor, may I approach the witness?

21            THE COURT:  Yes.  I would remind you that you told

22   me you had a brief question.  We are really getting --

23            MS. PAUL:  I'm finishing this up.

24            THE COURT:  All right.

25   BY MS. PAUL:

1 Q    I'm going to direct your attention --

2         THE COURT:  Yes, you can approach.

3         MS. PAUL:  Thank you.

4         THE COURT:  Go on ahead.

5 BY MS. PAUL:

6 Q    I direct your attention to page 249, line ten.

7      Question:  How many days did it take all of those

8 individuals to put these documents together in going through

9 all the medical files?

10      Mr. Brand:  More like how many months?

11      The witness:  It took quite a while.  It took several

12 weeks.  Weeks, weeks, weeks working full time straight, yeah.

13 A    That's what I said.

14 Q    Question:  Like, eight-hour days?

15      Answer:  More.

16      Question:  Were all of those individuals that were doing

17 that all the Rosado family or are they all office workers?

18      Answer:  No.  Like, for example, Lisa, she's in school,

19 et cetera.

20      Did I read that correctly?

21 A    Yes, ma'am.

22 Q    That's all I have.

23 A    All right.

24         THE COURT:  Yes, you can have a recross, but after

25 -- if you have one more question, you can ask it, but that'll

1    be it with this witness.  Do you?

2              MR. BRAND:  I just want a two-minute break.

3              THE COURT:  Okay.

4              Ma'am, feel free to be seated at counsel table.

5    Thank you for your testimony.

6              Are you ready to call your next witness after a

7    break?

8              MS. CHASTAIN:  Yes, Your Honor.

9              THE COURT:  Would you be kind enough to have that

10   witness in the courtroom.

11             We'll take ten and then we'll get started.

12             By the way, 3:43.  The clock is ticking on our

13   hearing.  So I would invite you to make sure you use your

14   time wisely.

15             So ten minutes.  We'll see you in ten.

16             (Recess taken from 3:54 until 4:01 p.m.)

17             THE COURT:  All right.  I don't like to eavesdrop,

18   but I couldn't help but noticing that when Ms. Diane asked

19   who the next witness was, the plaintiff indicated it was

20   going to be counsel for the defendant.

21             MS. CHASTAIN:  Yes, Your Honor.  The plaintiff

22   would like to call Mr. Brand to the stand.

23             THE COURT:  We've been doing research the entire

24   break.  And there are circumstances where it can happen, and

25   I don't see these -- this as one of these circumstances.

1           So let me first read you -- because I think his

2    responsibilities are to his client and to the bar.

3           So this is Rule 4-3.7, which is cited by the

4    Eleventh Circuit on this issue:  A lawyer shall not act as an

5    advocate at a trial in which the lawyer is likely to be a

6    necessary witness on behalf of the client unless the

7    testimony relates to an uncontested issue, the testimony will

8    relate solely to a matter of formality, and there is no

9    reason to believe that substantial evidence will be offered

10   in opposition to the testimony, the testimony relates to the

11   nature and value of the legal services rendered in the case,

12   or disqualification of the lawyer would work substantial

13   hardship on the client.

14          So I am concerned.  Number one, here's the basic

15   question I have:  Are you objecting to being called as a

16   witness?

17          MR. BRAND:  Yes, I am, Your Honor.

18          THE COURT:  All right.  I need you to stand when

19   you address the Court.

20          MR. BRAND:  I'm sorry.

21          THE COURT:  All right.  You'll remember.

22          All right.  You are objecting?

23          MR. BRAND:  I am objecting.

24          THE COURT:  So I guess my basic question is:  How

25   are we going to work in cross-examination?  Assuming I let

1  him be called, are we just going to let him sit on the stand

2  and wax poetically about whatever is within the scope of

3  direct?

4        MS. CHASTAIN:  I am not sure, Your Honor.  I

5  believe that Mr. Brand should be aware.  He had to submit an

6  affidavit in support of the response to the Motion for

7  Sanctions in which he made several representations about his

8  own conduct in this case, which is certainly relevant to the

9  misconduct the Secretary has alleged regarding the creation

10  of the cure for spoliation.

11        Mr. Brand, I think, perhaps should have considered

12  that and brought his own attorney to this hearing.  I

13  understand that he did not, but that --

14        THE COURT:  Well, if his position is that he is

15  objecting to your calling him as a witness, considering --

16  and we didn't have a lot of time to do a lot of in-depth

17  research, but it seems that there is some leeway for the

18  Court.

19        But he's objecting.  The bar rules are sort of

20  limiting his ability to testify, which is his ultimate

21  responsibility.  And I'm concerned that this is not a minor

22  issue in terms of the big picture of this case.

23        So unless you have some authority from the Eleventh

24  Circuit indicating that this is an appropriate course of

25  action, I'm not going to make him produce something saying he

1   doesn't have to testify.  I'm satisfied that what we're doing

2   here is an attempt at the exception rather than the rule.

3        So unless you have something that I could rely on

4   in terms of legal authority for this attempted exception, I'm

5   not going to make him testify.

6        MS. CHASTAIN:  Your Honor, I do believe that there

7   are a number of e-mails that we received from Mr. Brand

8   making representations about this recreated document which

9   are relevant and support the Secretary's position that it has

10  been prejudiced in this case.

11       THE COURT:  Well, have you considered admitting the

12  e-mails to the Court and then extrapolating as you will on

13  your final argument?

14       MS. CHASTAIN:  I would certainly be willing to do

15  that, Your Honor, particularly if we're not allowed to ask

16  Mr. Brand questions directly.

17       I have provided Mr. Brand with copies of all of the

18  exhibits we intended to introduce during his direct.  If he

19  has no objection, I will proffer them to the Court.

20       THE COURT:  What are they?  Exhibit numbers what

21  through what?

22       First of all, identify them, and then I'll ask him

23  a few questions.

24       MS. CHASTAIN:  Yes, Your Honor.  One moment.

25       THE COURT:  Was he your last witness, by the way?

1              MS. CHASTAIN:  Yes, Your Honor.

2              THE COURT:  All right.  Just food for thought.

3    When -- and I learned this a long time ago.  I'm not here to

4    coach anyone up, but if you're ever going to come into a

5    courtroom and do something -- and I think we could all agree

6    that this is sort of a bit outside the box, right?

7              So most judges, when you want to take a course of

8    action strategically that's outside the box, are not just

9    going to let you do it.  You're going to need some legal

10   authority that paves that road for you, and I don't see that

11   here at this point.

12             So, Mr. Brand, your objection is going to be

13   sustained.  I'm not letting them call you as a witness.

14             So that being the case, if you could identify the

15   exhibits that you think are relevant, because I do think --

16   they have asked for sanctions against the defendant and

17   against counsel.  So I think in that context, I would

18   consider admitting those, but I need you to -- are they on

19   your witness -- or exhibit list?

20             MS. CHASTAIN:  Yes, Your Honor.

21             THE COURT:  All right.  Which ones are they?

22             MS. CHASTAIN:  They are Exhibits 18, 19, 20, 21 --

23             THE COURT:  Not 20.5?

24             MS. CHASTAIN:  I'm sorry.  20.5.

25             THE COURT:  All right.

1        MS. CHASTAIN:  22, 23, 24, 25 and 25.

2        THE COURT:  So we're looking at 18 through 25 as

3   listed.  All right.  And it's your representation that these

4   are all e-mails from opposing counsel to you that you argue

5   are pertinent in my determination on whether or not sanctions

6   are appropriate against counsel, not just defendant?

7        MS. CHASTAIN:  They are, Your Honor.  One of those

8   exhibits, Exhibit 23, is defendants' response to Plaintiff's

9   First Request for Production.

10        THE COURT:  Okay.

11        All right.  I mean, these are your e-mails, and you

12   may not have -- you may be looking at them for the second

13   time today.  But are you objecting to my consideration of

14   those e-mails?

15        MR. BRAND:  Of these e-mails, I are -- I am, Your

16   Honor.  Some of these e-mails are counsel to counsel

17   regarding partial settlement negotiations.  So we're talking

18   about --

19        THE COURT:  Which ones are the settlement

20   negotiations?

21        MR. BRAND:  Well, I'll give you -- just the first

22   page, Ms. Chastain and I had been talking about productions

23   of certain materials from Dr. Thomas that they were taking

24   into account concerning if in fact a settlement could be had.

25   So just right off the -- just this first one that I'm looking

1    at starts right away into my client's financials and talks

2    about her bank accounts and what's in the accounts, and

3    there's nothing in there talking about -- then I go in -- the

4    next paragraph is about AHCA.  It has nothing to do with

5    anything that we've heard today.

6              THE COURT:  This could conceivably be no different

7    than my reviewing a document in camera.  It's just that

8    there's no jury here.  I'm the trier of fact for this

9    particular hearing.

10             So from the government's perspective, if you could

11   give me an idea of what specifically is relevant about these

12   documents, that might help.

13             MS. CHASTAIN:  Absolutely, Your Honor.  As you're

14   aware, you've read our motion.  You know what our allegations

15   are.

16             We contend that Mr. Brand -- or defendants created

17   the master list, which excluded certain nurses from the list,

18   and then produced it to us in 2016, July of 2016, and we only

19   found out a couple of weeks before the first scheduled trial

20   date that there was in fact an additional spreadsheet of

21   hours worked during the period in which the spreadsheets had

22   been destroyed, which had been hidden from us and which

23   contained hours worked by six -- by five other nurses

24   relevant to our litigation.

25             These e-mails between me and Mr. Brand are mostly

1    from May and June of 2016, the time frame in which we believe

2    the master list and the Foster list were created.  And in

3    these e-mails, Mr. Brand talks several different points about

4    how the billing personnel for Caring First is going through

5    the files and is getting far along, making this spreadsheet

6    that will cure the spoliation that you've alleged.  That was

7    on May 18th.

8           He makes a similar representation on June 30th,

9    saying that for two months my client has been really hard at

10   work reproducing the time records so that both parties have

11   an accurate read in spreadsheet format as to what person

12   worked on what day.

13          I'm not just going to read this to you, Your Honor.

14   But it directly contradicts what's in Mr. Brand's Affidavit,

15   his sworn statement to the Court where he claims that he

16   created these spreadsheets as potential trial exhibits.

17          THE COURT:  All right.  And how would you respond

18   to the assertion by opposing counsel that the information was

19   gathered by all the people in the e-mail and then he just

20   summarized it for you?  I mean, I have a feeling that's going

21   to be the response.

22          MS. CHASTAIN:  That may be what he claims now, but

23   that is not what he said in his sworn statement.

24          THE COURT:  All right.  I understand.

25          Look, I have to be a filter.  And the oddity of

1    this situation is I have to look at things that I'm not

2    necessarily going to consider, but I think I need to read

3    those e-mails based on the allegations that have been made

4    against you.

5         I'm going to give you an opportunity during your

6    summation -- and it's going to be timed for both of you -- to

7    tell me what I should or shouldn't consider or why it is or

8    isn't relevant.  But I think it's information that for the

9    limited purposes of this hearing -- I'll hear from you one

10   more time, but I'm inclined to consider it.

11        And if there are things in there that are not

12   relevant, like references to AHCA, et cetera, or attempts to

13   settle this matter short of trial, then I'm not going to

14   consider any of that.

15        But let me tell you, in a normal situation where

16   there's a proffer or I need to look at items to determine

17   whether or not a trier of fact can consider it, this is

18   exactly how it goes.

19        So when we go bench trial, this is what happens.  I

20   have to look at things to make informed decisions on them.

21   And these e-mails, I need to look at before I can decide how

22   much, if any, credibility I'm going to assign to them.

23        So anything from the defense?

24        MR. BRAND:  Your Honor, enjoy.  Admit them, please.

25   Go ahead, because you're not going to be able to -- I just

1    looked through all of these.

2              What Ms. Chastain has done is take in a fish in a

3    fishbowl instead of in a fish tank.

4              So to try to go ahead and point to one e-mail when

5    we probably have had a million e-mails between the two of us

6    that further clarified things and further elaborated upon

7    things, and to try to take one e-mail and say, ah-ha, this

8    goes my secret weapon, impossible.

9              THE COURT:  All right.  Well, if I can't find any

10   context, then it's going to be of limited value to me.  So I

11   appreciate that clarification.

12             MR. BRAND:  There's -- Your Honor, if I may, and

13   I'm sorry to interrupt you, but there's one other point

14   that -- and I don't know if you want me to save this for my

15   closing remarks or not, talking about the master list.  I

16   don't know -- if you want me to save that, I'll do it at

17   closing.

18             THE COURT:  Go on ahead and make your comments.

19   Go.

20             MR. BRAND:  Okay.  The master list that she's

21   talking about is, for lack of a better description, it's a

22   work product.  It was done as a professional courtesy because

23   I had to and my client had to examine the case from the

24   reality of what the payroll records are and looking through

25   the whole files.

1           There was no -- that was produced after the fact.

2    So the master list was not something that was had.  It was

3    not something that was already created by the client.  It was

4    not something that was destroyed.  It was a work in progress

5    that we were making by doing what they should have done,

6    which is go through the actual files and look at the nursing

7    forms and add, okay, this person worked on this date for this

8    time, which they didn't do.

9           So we were doing that, and as a professional

10   courtesy, we were forwarding them a work in progress.

11          It was never meant to be a replacement for what

12   they actually had to do to go prove their case, which is go

13   through the boxes of documents that we had to suffer to

14   produce that apparently they never even did.

15          And what's further annoying is we had an hour and

16   something time hearing in front of Judge Kelly.  I had just

17   had surgery.  I had requested an extension of time.  I had

18   both knees go out.  I mean, they went like this.  I had pain

19   for a year.  And I sat there just a few weeks after all that

20   on the telephone trying to hear everybody, and Ms. Thomas

21   was -- Dr. Thomas was calling in from Jamaica, which was even

22   more difficult.

23          So that whole hearing was to get to where are the

24   best records in order to show when people are going to --

25   when people worked and what days they worked.

1          And it was all about getting those 40 boxes back to

2     Dr. Thomas' office, that I had to do on crutches, in pain.   I

3     fell.   I had to go back to the doctor three times during

4     that, and to find out today that they didn't even look at any

5     of that.

6          THE COURT:   Okay.   I understand.   And I'll

7     certainly allow to you expand on that on your argument -- on

8     your summation.

9          Plaintiff's 18 through 25 will be admitted and

10    marked as such.   I'll consider them during my deliberations

11    in preparing a final order.

12         Will the plaintiff be calling any further

13    witnesses?

14         MS. CHASTAIN:   No, Your Honor.   The plaintiff does

15    have a proffer of a couple other exhibits for you to

16    consider.

17         THE COURT:   All right.   What are they?

18         MS. CHASTAIN:   They are -- in preparation for this

19    hearing, I did contact our vendor, the person -- the company

20    that provides litigation support to the Department of Labor,

21    we have a contract with them -- to get quotes for how much it

22    would cost if we were to do the analysis that Mr. Brand

23    suggests, going through the 43,000 Patient Service Logs and

24    doing that analysis and creating the spreadsheet, how much

25    that would cost.

1          THE COURT:  All right.

2          MS. CHASTAIN:  And I have a copy of that invoice to

3    provide to the Court.

4          Included on that invoice is an alternate invoice or

5    estimate from the same contractor, how much it would cost for

6    them to recreate the hours worked for the relevant nurses

7    during the time frame if instead they were given copies of

8    the paychecks as opposed to --

9          THE COURT:  All right.  So what exhibit is that

10   current -- are those marked as?

11         MS. CHASTAIN:  Twenty-seven and -- I'm sorry, Your

12   Honor.  I think it's 27 or 28.

13         MS. PAUL:  Both.

14         MS. CHASTAIN:  No.

15         THE COURT:  Twenty-seven is actual cost of copying

16   Patient Service Logs.

17         Twenty-eight is estimated cost of analyzing Patient

18   Service Log versus payroll checks.

19         MS. CHASTAIN:  Twenty-eight is the document I'm

20   referring to, Your Honor.

21         And then 27, I also wanted to make a proffer.  This

22   is the actual invoice from Deloitte, our vendor, with the

23   costs associated with the copying of the 43,000 pages of

24   Patient Service Logs that we were required to do under Judge

25   Kelly's order in March of 2016.

1              THE COURT:  So are you introducing this as your

2    argument that you have been prejudiced by the non-moving

3    party?

4              MS. CHASTAIN:  Yes, Your Honor.

5              THE COURT:  All right.

6              What's the defense's position on this?

7              MR. BRAND:  Again, Your Honor, I'm floored.  This

8    was -- this was something they had already told us that they

9    had done.  They took those records out of our office, said

10   that they were making copies.

11             THE COURT:  No.  I'm with you.  Look, I'll hear

12   argument in a moment.  They just want them introduced because

13   they're apparently going to make this as part of their

14   argument.

15             Their argument -- I know you figured this out.

16   They weren't truly available, because the amount of manpower

17   and cost it would have taken to sift through the documents --

18   this is what they're arguing; I'm not arguing that -- made it

19   implausible or impossible, and they're providing me with

20   evidence showing me how much time and cost it would have

21   taken versus just looking through files that they are arguing

22   should have never been deleted.

23             So just on this particular piece of evidence,

24   without an argument on the facts, do you have any objections

25   as to my considering those two documents?

1              MR. BRAND:  I do.

2              THE COURT:  Okay.  And what is the objection?

3              MR. BRAND:  My objection is without them being

4    here, whoever these people are, to tell us what they're going

5    to do and how they're going to do it and how they're going to

6    copy it, if they're doing upcharges or if they're not giving

7    discounts or any of that, then I do have an objection to that

8    being the stated amount charged.  And that was something that

9    was discussed during the hearing with Judge Kelly, was cost

10   and time and vendors.  And I had to do it all myself.

11             THE COURT:  All right.  I'll -- go on ahead and

12   bring them forward.  Make sure that Miss Darleen has them.

13             I'm going to table my decision on these.  I need to

14   review them, and I'll make that determination.

15             What they could have done is had an accountant from

16   Deloitte come in here and testify to that.  And I'm not sure

17   that would have been a wise use of anyone's time or we would

18   have had time to do that.

19             So they've been identified.  They've been marked.

20   I'll make a determination in my order as to whether or not

21   I've considered them for the purposes of the motion.

22             Is there anything else from the plaintiff?

23             MS. CHASTAIN:  No, Your Honor.

24             THE COURT:  Okay.  So let's go over this.  You have

25   your exhibit list.  I want to be clear on what's been in

here.  Grab your exhibit list and I'll go through what's been

admitted.

Darleen follow with us, too, before we move on to

the defense case.

Are we ready?

MS. CHASTAIN:  Yes, Your Honor.

THE COURT:  1 through 3, 5 through 9, 11 through

16, 18 through 25, 27 and 28 are tabled at this time, and

then 29, 29A and 30.

From the defense side, all I have is Defense 2 at

this point.

Is that a correct assessment of what you've

admitted?

MS. CHASTAIN:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

Will the defense be calling any witnesses?

MR. BRAND:  Yes, Your Honor.

THE COURT:  All right.  Call your first witness,

please.

MR. BRAND:  Tim Thompson.

THE COURT:  Mr. Thompson, if you would be kind

enough to come on forward, we're going to place you under

oath.

THE COURTROOM DEPUTY:  Raise your right hand.

Do you solemnly swear or affirm under penalty of

1    perjury that the testimony you will give will be the truth,

2    the whole truth and nothing but the truth?

3              MR. TIMOTHY THOMPSON:  Yes.

4              TIMOTHY A. THOMPSON, DEFENDANTS' WITNESS, SWORN

5              THE COURTROOM DEPUTY:  Have a seat there, please.

6              THE COURT:  Once seated, please state your full

7    name into that microphone, spelling your last name.

8              THE WITNESS:  Timothy A. Thompson, T-h-o-m-p-s-o-n.

9              THE COURT:  All right.  Your witness.

10             MR. BRAND:  Thank you, Your Honor.

11                        DIRECT EXAMINATION

12   BY MR. BRAND:

13   Q    Mr. Thompson, good afternoon.  I'm going to try to hurry

14   this along and be as short as possible.

15        I'm going to show you what has been marked as Exhibit

16   29A by the plaintiff.  That is a document that represents a

17   computer printout.  Do you see your name?

18   A    Yes.  Yes, I do.

19   Q    Do you see what that document purports?

20   A    Yes.

21   Q    Okay.  And you were present during the prior testimony

22   of Ivia Rosado?

23   A    Yes.

24   Q    Okay.  Do you know why your name would be on that

25   document as an author?

1   A      Well, if either I or someone who was logged into my

2   profile on any one of the computers were to go in and create

3   a file in Excel or any one of the office programs, it would

4   be saved as myself as the author, regardless of whether or

5   not that person was there.  If someone is logged in, which

6   the computers do our main log in, whether or not we're there.

7   Anyone can go in and save a file and it would show up as

8   myself as the author, as long as I'm a registered user in the

9   network.

10  Q    I should have asked you this to start with, but where do

11  you live?

12  A    I live in Norcross, Georgia.

13  Q    So what is the date of that document there that's by

14  your name that says that you logged in?

15  A    It says it was last modified September 19th of 2017.

16  Q    On that date were you in Georgia or here?

17  A    I was out of the country, actually.

18  Q    Okay.  Where were you?

19  A    I was on a cruise ship headed towards Cozumel, Mexico.

20  Q    Okay.  So if that document says that that was you that

21  was the author, it would be incorrect?

22  A    It's very possible it could be incorrect, because

23  regardless of whether or not I'm physically present, as long

24  as it's logged into my profile, someone can create it and

25  it'll show them as the author.

1  Q      Okay.  It says that there was a document that was

2  present -- created in 2012.  Do you see that?

3  A      Yes.  Yes, I do.

4  Q      Can you explain that?

5  A      Well, it would mean that the original file itself was

6  authored back in 2012.  Whether it was by myself or another

7  user, what happens is especially with these network

8  computers, they're a registered user.

9         CFL, the technology company that we use, whenever we

10 have registered users that go on the network, if there's a

11 document that's created by a user, it will remain in the

12 system until that user is removed by our technology company,

13 at which point if anyone were to come in with their own

14 profile and save, they can save over and become the new

15 author, especially if the original author is no longer a

16 registered user on the network.

17 Q      So let me just see that document.

18         THE COURT:  Are you asking to approach?  We live

19 and die by rules here.  They have to be abided by.  You may

20 approach.

21         MR. BRAND:  Thank you, Your Honor.

22 BY MR. BRAND:

23 Q      So this document claims that you last modified a payroll

24 sheet from a pay period 8/27/17 through 9/2/2017.

25         MS. CHASTAIN:  Objection, Your Honor.

1        THE COURT:  What's the objection?

2        MS. CHASTAIN:  He's mischaracterizing the evidence.

3   I believe that the document says that it was modified on that

4   date, not that it was modified by Mr. Thompson on that date.

5        THE COURT:  Well, that's what the document says,

6   but the witness would know whether or not he modified

7   something, wouldn't he?

8        And if it's a matter you disagree with, I'm sure

9   you can take it up on cross.

10        Thank you.  The objection is overruled.  Go on

11   ahead.

12   BY MR. BRAND:

13   Q    The question, Mr. Thompson, is did you have anything to

14   do with a document concerning a pay period of 8/27/2017

15   through 9/2/2017?

16   A    Unequivocally, no.

17   Q    You were present during the testimony of Karen Reyes?

18   A    Yes.

19   Q    Ms. Reyes claimed that she did not delete or destroy

20   payroll information from the company.

21   A    I heard that, yes.

22   Q    Okay.  When Ms. Reyes left the company, who immediately

23   took over the billing?

24   A    The immediate aftermath, I was asked to come in and

25   train Ivia Rosado.  She had been, you know, kind of, I guess,

1    helping out around there.

2         And when she was about to be fired, I believe it was the

3    week of, my mom had approached me about coming back in a

4    temporary position while she sought new help.  I learned I

5    wasn't really interested at that time.  I had already

6    separated from the company.  I was attempting to try to move

7    on with my life, but I did offer to help train whatever new

8    person she was willing to bring in.

9         But at that time in the immediate aftermath, I just came

10   in and trained Ivia to kind of do it right away.  And I was

11   there maybe that first week before going back to living my

12   life.

13   Q    Okay.  Ms. Reyes testified that the payroll records were

14   created off of a template that you created.  Do you remember

15   hearing that?

16   A    Yes.

17   Q    Did you -- when you came back in for -- as you said, for

18   a temporary purpose to train Ivia, did you ever find any of

19   those payroll records?

20   A    No.  That's what actually made the training

21   extraordinarily tedious, is because when I was going in to

22   attempt to show her the way that the documents had been being

23   maintained, there were no documents.  In fact, I'm pretty

24   sure Ms. Reyes perjured herself, but that's another matter

25   for another time.

1          The documents in question, there is a network that is

2     saved and documents can be viewed by other users when saved

3     in certain folders on the network.  It's a shared

4     infrastructure.  No business is going to run without an

5     office where people can't communicate with each other.

6          The files themselves were saved in a way so that if I

7     wasn't able to be there, others might be able to go in.  It

8     was never password protected because there was never really a

9     need.

10          The fact that she would even password protect the

11     individual documents, remove it from the publicly shared

12     network and put it onto her private desktop, thereby removing

13     it from visibility of everyone else, I was actually pretty

14     disgusted to hear that, but that's because it was a fact that

15     was coming from something I didn't know had happened.

16          But at any rate, this was a few days after she had been

17     let go and I came in to try and start training Ivia.  The

18     training was delayed by several, several hours because I had

19     to go back in -- when I realized that none of the documents I

20     had created were in there, I had to go back in and start anew

21     and create a brand new Excel spreadsheet.

22          Luckily, I had some physical copies of older ones that I

23     could kind of use to say, okay, this is how it looked before.

24     So I didn't have to make one completely from scratch.

25          But as far as the digital documents that we had created

1  and saved up to that point, they had been erased.  For what

2  reason, I'm not sure.  Obviously, a disgruntled employee

3  might do something like that, but Ms. Reyes will have to

4  answer for that.

5  Q    Okay.  And prior to that, when Investigator Fernandez

6  had come to Caring First and met with you and asked you for

7  copies of whatever payroll records you had, did you provide

8  him with those?

9  A    To the best of my ability, I did, yes.

10 Q    So there was no hiding?

11 A    No.  I mean, I didn't feel a need.  There's been no need

12 to hide anything.

13 Q    Okay.

14         MR. BRAND:  I have nothing further, Your Honor.

15         THE COURT:  Cross-examination?

16                   CROSS-EXAMINATION

17 BY MS. CHASTAIN:

18 Q    Good afternoon, Mr. Thompson.

19 A    Good afternoon, counsel.

20 Q    When did you first start working at Caring First?

21 A    In May of 2013.

22 Q    Did you work for Caring First in 2012?

23 A    No.  I was in college, Florida State University.  Go

24 'Noles.

25 Q    Didn't you testify in your deposition that you worked

1  for Caring First during your senior year?

2  A    Did I testify in my deposition that I worked for Caring

3  First during my senior year of college?

4  Q    Yes.

5  A    Do you have that paper showing that?

6  Q    Do you recall telling Ms. Paul --

7  A    I don't recall saying that.  So if you have that,

8  please.

9  Q    One moment.

10  A    Yeah.  No problem.

11  Q    And when you worked with Caring First, you created the

12  payroll spreadsheet that was used to record hours worked?

13  A    I created a payroll spreadsheet.  There had been an

14  older one, but it was inefficient.  So I went back in -- it

15  was -- you know, she said, formula.  It was a simple

16  multiplication and addition that I put into the tables to try

17  and make sure that people could accurately correct or could

18  accurately take down the information and calculate what we

19  would bill and what would be paid for.

20  Q    And that was the spreadsheet that was used from then on

21  out?

22  A    To the best of my knowledge, yes.  There was that

23  spreadsheet and then the final payroll spreadsheet.

24  Q    What is the final payroll spreadsheet?

25  A    That's the one that you guys have.  The one that has the

1    nurses; names and the hours, that have them listed.  You have

2    it in your evidence.  You've submitted it.

3    Q    Okay.  So you're referring to the payroll spreadsheets?

4    A    Yes.

5    Q    The Exhibit 14 that we've been referring to throughout

6    this?

7    A    Yes.

8    Q    Okay.  You say you trained Ivia Rosado?

9    A    Yes.

10   Q    Did you train her to delete the payroll spreadsheets

11   every week?

12   A    No.

13   Q    Did you know she was doing that?

14   A    No, I did not.

15   Q    Did you instruct her to save them every week?

16   A    I -- I don't recall.  I'd like to believe that, but I

17   don't recall the specifics of the conversations that we had.

18   I just showed her the general basics of what she should be

19   doing as far as when the time sheets come in, you take these.

20   You enter them in.

21        It could have just been a common knowledge assumption

22   she would know to save her work.

23   Q    But one that she did not do; is that right?

24   A    I'm sorry?

25   Q    Are you aware that she deleted the payroll spreadsheets

1  every week?

2  A    Yeah, I became aware a few hours ago when she was

3  testifying.  I don't know if you saw me in my chair fidgeting

4  as she was doing it, but I couldn't believe what I was

5  hearing.

6  Q    Because you had always saved the payroll spreadsheets

7  each week?

8  A    Once again, yes.  Common knowledge, business records

9  maintenance.

10  Q    Ivia Rosado also testified that there was a second

11  spreadsheet created every week, a billing and payroll

12  spreadsheet, more like a worksheet.  Are you familiar with

13  that document?

14  A    Yes.

15  Q    Did you create that document as well?

16  A    Yes.

17  Q    Did you instruct Ivia Rosado to destroy that spreadsheet

18  every week?

19  A    No.  You're asking in a matter of fact way, but that

20  would be a very stupid thing for me to do.  I did not.

21  Q    Did you instruct her to shred that document every week?

22  A    No.

23  Q    Did you ever instruct her that it was appropriate to

24  shred the payroll spreadsheets at the end of every year?

25  A    No, I haven't.  I don't know how involved you guys think

1   I am in the business.  But even when she said that she

2   believes I'm still an officer of the company, I haven't lived

3   in the state of Florida for well over a year now.  She hasn't

4   seen me around.

5       So I was also flabbergasted by that answer.  But, no, I

6   did not instruct her to shred anything at the end of the

7   year.

8   Q    But did you train Ms. Rosado when she started in her

9   payroll and billing function?

10  A    I believed that I trained her properly.  Apparently, she

11  took some things into her own hands.  She can't find it, can

12  she?  Because I didn't say that.

13  Q    I have no further questions for you.

14  A    Thank you, counsel.

15          THE COURT:  All right.  Feel free to be seated at

16  counsel table.

17          Is the defense calling any further witnesses?

18          MR. BRAND:  No, Your Honor.

19          THE COURT:  All right.  You need to stand when

20  addressing the Court.

21          MR. BRAND:  No, Your Honor.

22          THE COURT:  All right.  I might have to get a

23  buzzer for this courtroom.

24          MR. BRAND:  (Laughing.)

25          THE COURT:  All right.  How much time do you need

1    for your closing argument?

2             MS. CHASTAIN:  Your Honor --

3             THE COURT:  Fifteen is all you're going to get.  Is

4    that enough?

5             MS. CHASTAIN:  Yes, Your Honor.

6             THE COURT:  All right.  And I'm going to time it.

7    I'll give you a two-minute warning.

8             It's your burden.  So you can argue first.  Do you

9    wanted to save any time for any rebuttal?

10            MS. CHASTAIN:  If I could save five minutes, Your

11   Honor.

12            THE COURT:  All right.  So I'll tell you when

13   you're at the nine-minute mark.

14            And defense will get 15 minutes for their argument.

15            +all right.  Feel free to proceed.  As soon as you

16   start your argument, I'll start the timing.

17            MS. CHASTAIN:  Thank you, Your Honor.

18            Your Honor, first of all, I want to thank the Court

19   for the opportunity to present evidence supporting this

20   Motion for Sanctions.

21            As I'm sure you saw from our motion and the

22   supporting records, that the chronology of this case is

23   complicated.  I hope that today we've been able to clarify

24   things that otherwise might have been a little unclear.

25            One thing that I think has been made clear is that

in this case, almost from the beginning, it's been attended

by defendants' unwillingness or inability to comply with the

civil rules, ordinary and expected litigation procedures, and

the direct orders of this Court.

The motion before the Court is actually the Third

Motion for Sanctions that the Secretary has brought in the

course of this litigation related to defendants' litigation

misconduct.  It's also the third time the Secretary has

accused defendants of willfully destroying their own payroll

records in order to obstruct this litigation and obscure the

amount of damages owed to their nurses.

Until today, when Dr. Thomas testified, defendants

have been unwilling to present actual explanations or

evidence in support of how these records were destroyed.

And, in fact, even after Dr. Thomas testified, she gave no

explanation for how these documents came to be destroyed,

saying only that, well, they just weren't there anymore after

Ms. Reyes left.  She stopped short of even accusing Ms. Reyes

of destroying the evidence.

Your Honor, I believe that the evidence here shows

that there is no innocent explanation for the disappearance

of these records.  The calculations that the Secretary made

for back wages during its investigation were on the face of

the records.  Defendants were aware that their own records

supported the back wage calculations made by the Secretary.

And suddenly, you know, in the face of impending litigation
on multiple fronts, these records disappear.  Defendants have
offered no explanation that makes any sense as to where these
records would go or why.

        We heard the testimony of Ms. Reyes.  I believe she
came across very credible and did not seem to be grinding an
ax.  I know there's litigation pending, but, Your Honor, I
don't think that any bias would on her part point to evidence
that she would be the one to destroy any records.

        In any event, Your Honor, regardless of how the
records were initially destroyed -- and we do maintain that
they were initially destroyed by defendants -- even under
their own explanation for how events unfolded, they admit
that the records continued to be destroyed week after week
after week, long after this litigation had started and long
after, months after the judge -- the judge had entered -- the
Court entered its order requiring the production of records
that demonstrate hours worked and wages paid.  Defendants
have offered no explanation that makes any sense at all as to
why that would be their process.

        And, you know, Ms. Rosado, who testified, is a very
young woman, seemed fairly inexperienced.  The fact that they
would leave their payroll responsibilities to such a person
with no instructions to preserve the records, in light of
this litigation, really defies all logic.

1        I remind the Court that defendants have been

2   represented by counsel since May of 2014 regarding this

3   matter.   And under any reasonable understanding of attorney's

4   duty of diligence and assistance, he should have instructed

5   his client what documents were relevant and how to preserve

6   them.

7        These are the very records that Wage/Hour

8   Investigator Fernandez relied upon in doing his initial

9   calculations.   There is no way that defendants did not know

10  that these records were relevant, clearly relevant to this

11  case.

12       You know, even assuming, Your Honor, moving beyond

13  the destruction of the payroll spreadsheets themselves,

14  defendants continued to violate their obligations and the

15  Court's direct order when they failed to disclose that their

16  own paychecks contained the next best records describing

17  hours worked and wages paid.

18       They failed to produce the checks even when

19  specifically requested by the Secretary's request for

20  production, a document which has been admitted as Exhibit 25.

21  And I urge Your Honor to look at the request for production

22  three and four, which specifically asks for records of all

23  hours worked as well as copies of the paychecks.

24       No such checks were produced at that point, over a

25  year ago, and Judge Kelly nor the Secretary were ever

1    informed that these checks included the information that we

2    needed to compute our back wages.

3           To the contrary, as we mentioned in our motion,

4    Attorney Brand actually represented to Judge Kelly that the

5    paychecks themselves were less than redundant because they

6    contained no information not included on the register

7    printout, which included only check numbers and amounts of

8    payment.  This was a misrepresentation to the Court.

9           And when the Secretary repeatedly asked and the

10   Court repeatedly ordered defendants to produce all evidence

11   of hours worked and wages paid, the mind boggles as to why

12   they never once came forward with these paychecks, which were

13   not only specifically requested but would have provided in

14   one document all of the information necessary to compute back

15   wages and establish compliance under the law.

16          Your Honor, since learning that the pay checks did

17   include this information, which again we only learned in

18   August of this past year, when Mr. Brand produced some

19   potential paychecks as potential trial exhibits, that's when

20   the Secretary learned of their practice of including this

21   information on the memo line, since then, the Secretary has

22   subpoenaed Wells Fargo and received just yesterday a sampling

23   of the relevant paychecks from the time period at issue, and

24   every single one of the paychecks that we received from Wells

25   Fargo contained these memo lines.

1           Defendants have presented no evidence today

2     suggesting that that was not their practice or that these

3     paychecks would not have been a better source of the

4     information that the Secretary needed and which was destroyed

5     during the pendency of this litigation.

6           And that's not all, Your Honor.  Attorney Brand

7     also misrepresented the contents of the, quote, "master

8     list," the spreadsheet that was created by someone purporting

9     to include -- to recreate the hours worked during the time

10    frame in which the payroll records had been destroyed.  This

11    master list was presented by Mr. Brand to the Secretary in

12    July of 2016 as a cure to the spoliation of the evidence.

13          Now, Mr. Brand, he was not allowed to testify here

14    today, Your Honor, of course, but in his Declaration Mr.

15    Brand admits that this master spread list -- master list did

16    not actually include all of the nurses listed in the

17    Secretary's Appendix A.  He admits that he created at least

18    one other undisclosed spreadsheet, called the Foster's

19    spreadsheet, which is entered as an exhibit here, and it

20    contained hours worked by nurses working in a particular

21    home, five of whom are listed as nurses on our Appendix A,

22    workers entitled to overtime wages.

23          When Mr. Brand presented the master list to us in

24    July of 2016, his e-mail specifically notes that this

25    spreadsheet includes all nurses during the relevant time

frame.  We did not learn that that was not true, again, until August of this past year, when he allegedly unintentionally sent us a copy of the Foster list.

Mr. Brand in his Declaration now, surprisingly and strangely, claims that he never intended to provide the Secretary with this list of hours worked by relevant nurses.

He also, strangely, offers no reason for his exclusion of these nurses from the master list.

The hours worked by nurses on the Foster list accounts for nearly $65,000 in damages to nurses, damages which would have been obscured forever if not for Attorney Brand's unintentional disclosure of this super secret spreadsheet only weeks before our scheduled trial is to begin, set to begin.

Now, I believe defendants are going to argue that there's no prejudice to the Secretary in this case because we have been in possession of the source documents, the 43,000 Patient Service Logs that --

THE COURT:  One minute.

MS. CHASTAIN:  One minute?

THE COURT:  One minute until your ten is up.  If you go over, that's fine.  It'll just come off your 15.  But go on ahead.

MS. CHASTAIN:  Thank you, Your Honor.

But defendants really missed the point.  As is

1  shown in the proffer that we've just made, if the Secretary

2  had taken the steps to do that analysis himself, it would

3  have cost $35,000.

4         Defendants, in fact, came forward pretty quickly

5  after we discovered the spoliation and offered to do this

6  analysis themselves, not out of the goodness of their hearts,

7  but because the Motion for Sanctions that we filed for

8  spoliation was pending before the Court and they wanted to

9  save their hides.  They wanted to keep this case from being

10  dismissed.  They wanted to avoid being charged the

11  Secretary's costs with doing this analysis if they didn't do

12  it themselves.

13         This was not an altruistic measure on their part.

14  It was, in fact, what they thought they had to do in order to

15  keep judgment from being entered against them.

16         In any event, Your Honor, for the majority of

17  reasons or a number of reasons, the Secretary decided to rely

18  on the spreadsheet created by defendants, the master list in

19  doing its updated back wage computation, but it did so not

20  knowing that they had created this secret other list, and we

21  did it without knowing that we could have, if we had the

22  paychecks, done the analysis ourselves in a much more

23  efficient and cost-effective way.

24         In terms of prejudice, Your Honor, and I know

25  that's what the Court really needs to hear about in this

1    case, I think that there is a lot of prejudice to the

2    Secretary as a result of the spoliation and the attendant

3    misconduct throughout this litigation.

4            The nurses may never recover the full measure of

5    back wages owed to them.  We have no confidence that the back

6    wage computation recreation is complete and accurate, and at

7    this point I don't know how we can get to the point where we

8    will have that confidence.

9            Further, defendants' misconduct taints this entire

10   proceeding.  What other relevant documents have defendants

11   destroyed or allowed to be destroyed or just failed to

12   disclose?  How can we trust any of defendants'

13   representation?

14           Furthermore, and I think this is important, Your

15   Honor, this is basically a simple issue of misclassification

16   of employees, an issue that the Wage/Hour Division

17   investigates all the time and which the Solicitor's Office

18   litigates all the time.  They're not generally particularly

19   document-intensive or complicated cases.

20           But this case, because of defendants' contemptuous

21   conduct, has stretched on for over two years, and every week

22   that goes by is thousands of dollars that these nurses are

23   not getting paid in overtime.  It's only to defendants'

24   benefit to draw this litigation out, delay and delay.  Every

25   week that goes by is money that they're saving by not

1    complying with federal law.

2            And at this point, the evidence shows that we have

3    computed over $1.8 million in back wages and liquidated

4    damages, an amount which I don't know if defendants will ever

5    been able to pay.

6            Regardless, there's definite prejudice here related

7    to the delay in this case and real harm done to these nurses,

8    who again may never be made whole.

9            Your Honor, even after Judge Kelly rebuked

10   defendants and Attorney Brand in March of 2016 and even after

11   he ordered sanctions but held them in abeyance if defendants

12   continued to cooperate, the misconduct continued.

13           They created the secret spreadsheet, they

14   misrepresented the contents of the disclosed spreadsheet, and

15   they did not disclose the content of the paychecks, which

16   again would have been a much better source document for

17   figuring back wages.

18           As a result of this contemptuous conduct, we do

19   believe that default is appropriate.  Of course, lesser

20   sanctions would also be appropriate:  Striking some or all of

21   defendants' defenses, finding willfulness or lack of good

22   faith as a matter of law.

23           The Secretary believes the Court has already made

24   these findings as part of its order on Motion for Summary

25   Judgment; but if that is not the case, certainly they could

1  be ordered as an appropriate sanction.

2  THE COURT:  You're about out of time for rebuttal.

3  MS. CHASTAIN:  Finally, waste and excessive costs,

4  Your Honor.  I believe the record clearly shows that we have

5  spent hundreds of attorneys hours and thousands of dollars

6  unnecessarily because of defendants' conduct.  The Exhibits

7  27 and 28 show, I believe, what the costs would be with

8  making this right if that is in fact the measure of recovery

9  Your Honor sees to be appropriate.  Thank you.

10  THE COURT:  Thank you.  You have two minutes left

11  for rebuttal.

12  Argument?

13  MR. BRAND:  Thank you, Your Honor.

14  Your Honor, not to stand up on the soapbox out

15  loud, because what this really is about is the same way the

16  plaintiff's attorneys keep trying to turn an act of omission

17  into an admission is the same way that they have been dealing

18  with this case as far as trying to establish a case that they

19  don't have because it doesn't exist.  And it's really simple.

20  They have had and we have made available to them

21  the best source of evidence in this entire case, better than

22  any spreadsheet that contains human errors, better than

23  paychecks, which my client has explained do not give a fair

24  assessment and accurate testimony.

25  THE COURT:  The Patient Service Logs?

1          MR. BRAND:  The Patient Service Logs.

2          THE COURT:  And that's specifically the nurses

3   filling out how much -- how many hours they worked and who

4   they worked for?

5          MR. BRAND:  Specifically -- not only do they have

6   to sign it, Your Honor, but so does the caregiver.

7          So, in other words, my client takes care of

8   terminally ill children or chronically ill children --

9   chronically, not terminally.  Chronically ill children.

10  They're put in either Medicaid homes in which there's a

11  guardian ad litem or they have parents that take care of them

12  as well.  So the guardian ad litem was in charge of the home

13  or the parents will sign off on the bottom of those as well.

14         So the nurse signs giving the day, the time, and

15  it's signed, and so is it signed by the caregiver.  You can't

16  get any better than that.

17         The Secretary keeps trying to say that we have

18  somehow delayed the pendency of this action.  We've never

19  asked for a continuance.

20         The Secretary keeps trying to say that somehow we

21  are at the cause of them not being able to get records when

22  all along -- I -- I went back and I looked at Judge Kelly's

23  transcript for March 4th, 2016, and in spite of my injury and

24  in spite of learning the fact that, wait a minute, these

25  documents just aren't in my client's office and that they're

1   somewhere else, we made it and we got them those records.

2          So to come here now and find out today that they

3   never even bothered to look at those records, all that big

4   hype about us -- in their first Motion for Sanctions against

5   us, all that big hype, which we complied with and we had to

6   pull these records out of storage, I had to do it in

7   crutches, Timothy Thompson had to help me carry boxes like

8   this, on crutches, getting everything to my client's office,

9   to be there so when the inspector was there, I was still

10  there, even going back and forth to doctors' appointments to

11  find out that they never even looked at them, to have to go

12  ahead and explain to AHCA who came in, like, two weeks later

13  to do an audit and we didn't have any of the records, you

14  know why not?  Because they took them out of our office to go

15  get them copied.  And we had to explain to the Agency for

16  Health Care Administration why we don't have our original

17  records.

18         And now to find out that they didn't even do that.

19  So where did my records go?  So now I'm all concerned -- I'm

20  sitting here at the table thinking if they took my records

21  and they weren't for purposes of copying, what did they do to

22  them?  Because those are my originals.

23         So right now what we do have and what we do know

24  for a fact is the following:  We know that all diligence was

25  done.  There was nothing left.

1      THE COURT:  All right.  Let me -- I'll give you

2  more time because I have some questions for you.

3      Number one, I'm not sure I accept your premise that

4  Patient Service Logs, in an F.L.S.A. case where the dispute

5  is over hourly pay and/or overtime, is the most accurate

6  document for opposing party or the Court to rely on in making

7  a determination.  I think it's abundantly that it's the

8  checks.  Just because they submit that and someone signs off

9  on it, that's not evidence of what was paid.  A check is.

10     Having said that, here's where I'm having a little

11  bit of trouble.  And I'm not making any commentary to their

12  sanctions for you as an attorney.  I need to review

13  everything, and I'm going to be very careful with that.  I'm

14  not sure I'm there, but I need to review everything.

15     But here's what we have.  A letter dated March 11,

16  2014, with a fax sheet that's been admitted as trial

17  Exhibit 1.

18     They're told here's what's going on.  It's there in

19  writing.

20     Now, let's start with Ms. Rosado.  It's inexcusable

21  that while this is pending she's saving over those records.

22  They should be preserving everything, not whatever they think

23  is relevant.  That's a problem.  And I'll give you a chance

24  to address that.

25     So that begs the question, taking a step back:

1    What about Ms. Reyes?  Did she do it on purpose?  Is this her

2    figurative way of showing rebellion as she's being fired from

3    a job?

4              Well, the argument from your perspective is

5    disgruntled employee.  She destroyed it, got no control over

6    that.

7              One could reasonably question that argument in

8    light of the fact that Ms. Rosado was just destroying or --

9    and the owner of the business testified during direct or

10   cross that she knew they were being destroyed at some point

11   and she didn't immediately stop that from happening,

12   notwithstanding the fact that at some point in the fall of

13   2015 she knew that this investigation was going on.

14             It's hard for me to conclude that the owner of the

15   business didn't have any understanding about when this

16   investigation started, considering that a letter was sent on

17   3/11/2014.

18             But notwithstanding that, your argument is that she

19   was disgruntled, she destroyed them to pay everyone back, yet

20   the lady that was working after her was destroying them or

21   erasing or recording over in the normal course of business.

22             So one could reasonably conclude that the reason

23   that Ms. Reyes was just recording over, destroying or

24   whatever you want to call it is because that's the way they

25   did business.  In fact, the lady working after her did the

same thing, maybe for different reasons, according to your

argument, and at the end of the year would shred everything.

So your argument, that's sort of the moment in the

case where you get a window into someone's soul.

And I'm wondering, why in the world is that

appropriate?  Why is it appropriate for a business, knowing

this is going on, to have employees who are their agents,

arms of the business, erasing, destroying anything?

Now, I know your argument is there was a better

source of information they could have extracted what they

needed from in order to litigate this case.  But I'm in a

different place than that.  They shouldn't be destroying

anything while this is going on.

And part of the foundation upon which this system

is built is when someone's given notice that litigation is

beginning, they can't go out and destroy any or part of the

evidence.  And I'm concerned that that -- that's what

happened here.

So here are three prongs, and I want you to focus

on these.  And none of this time counts against you.

Number one, entering a default judgment for

violating discovery requires, one, a willful or bad-faith

motive to obey the order; two, prejudice to the moving party;

three, showing that no lesser sanctions would adequately

punish the violation and deter further violation.

1            So my question generally to you is a letter is

2     sent, and that's documented as evidence in this case, on

3     March 11, 2014.  This is beginning.  There's a fact sheet

4     attached to it.

5            On what plane of existence is it appropriate for a

6     business owner to allow or to have agents of that business

7     erasing over, destroying or otherwise creating a situation

8     where documents can't be produced for the opposing party?

9     That's where I'm having trouble.

10           So go on ahead.

11           MR. BRAND:  So what -- actually, it's in -- it just

12    so happens to be in Document 24 that the plaintiff -- that

13    the plaintiff introduced.

14           There's a Manage Payroll system that we can't

15    forget about.  That Manage Payroll system has been produced.

16    It was produced from the very, very first day, which was, off

17    the top of my head, I can't recall, but sometime, I believe,

18    back in 2013, I think.

19           That Manage Payroll system had -- and I'll read to

20    you exactly what, because I had it during that first hearing

21    with Judge Kelly.  We talk about we have a Manage Payroll web

22    portal that handles all of the company's payroll records, and

23    we produce the payroll register printouts from everything

24    going back when the company started with this.  With this

25    electronic payroll system, which goes back to the beginning

of 2013, which shows the name of each of the contractors, the date of the payment, the amount of the payment, and any and all reimbursements, the total amount paid, and the check number of each payment.

So everybody would like to talk about something else, but the fact is we have provided them.  And even in, I believe, that same hearing, Ms. Chastain admits to receiving all those records, which I had sent them, because my client printed those out and we immediately sent these to Ms. Chastain.  I forgot how many pages it was, but it was a lot. But those were -- if you don't look at the patient records to find those forms, then the Manage Payroll system becomes the second best source of all information, which they had.

So they would like to not tell the Court about the Manage Payroll system.  And in all those e-mails, I talk about the Manage Payroll system.  Even in Exhibit Number 24 that the state (sic) put forth is a letter from me to Ms. Chastain, and on the third page, I do a question/answer.

So Ms. Chastain sent me an e-mail with the following verbiage:  WHI Podczaski reports that the patient file she was reviewing consists entirely of time sheets such as the ones you produced to us via Dropbox.  She reports that there is nothing to flag within these files because all documents therein report the hours worked by the nurses.

And then there's more, but I then go on and say

there's nothing further to produce.  Caring First pulled from

its warehouses all the boxes, all the parts thereof that

contained the clients' files and within which you can find

each of the caregivers' time records, and it goes on and on.

So they had at their disposal this entire time.

Now, they chose not to look at them and somehow want to blame

that on us, but I went through all those files.  My client

went through all those files.  Apparently, I was under the

impression that to get to $1.8 million, they, too, went

through all those files, but apparently they did not.  So

their laziness, they now would like to somehow put onto my

shoulders and blame Mr. Brand for it.

Mr. Brand didn't tell them not to go through what

is known as the best evidence.  Mr. Brand did not tell them

not to go through the managed care portal system.  Mr. Brand

did not tell them, hey, if you believe there's other checks

out there -- it's not like we didn't keep checks hidden.

It's even talked about during the hearing in front of Judge

Kelly.  Then, by all means, go subpoena Wells Fargo.  Mr.

Brand didn't tell them not to file motions to compel if they

believed they should be entitled to something.

But what they would like to do is say, Judge, we're

here because we file all these motions, and somehow, just

because we say it, it's true.  And that's not the case.

In this particular instance, so you asked a

1    question.  How do you account for these documents

2    disappearing?

3              And, one, I believe the testimony from my clients

4    is they didn't believe it to be willful.  It wasn't a willful

5    or wanton exercise to destroy the records.  As a matter of

6    fact, I don't believe that they even knew that Ms. Reyes had

7    destroyed the records until after the fact.

8              But they didn't hide them before.  Mr. Thompson

9    testified as well as the inspector testified that Mr.

10   Thompson gave them the documents before from what he had.  So

11   it's not like they were trying to hide anything.

12             And then subsequently, we went ahead and created

13   lists and did everything we can in living documents, keep

14   going forward to make sure that what was out there and what

15   we were seeing in the patient records was coming to light.

16             Nothing was ever being hidden.  There was no

17   bogeyman behind the bed in this particular case.

18             So the only thing that I keep coming back to is,

19   wow, they didn't review what they had and still, I believe,

20   they have in their possession this entire time, which is

21   copies of my original files.

22             Why not?  Because my documents and my client's

23   documents to them, as I said before, Your Honor, were never

24   to be a replacement.  That was never the intent.

25             Ms. Chastain could say what she wants to say and

believe what she wants to say.  But I'm not -- nowhere in my

mind did I ever believe that I would be coming to court,

especially months before a trial, where I'm going to have the

opportunity to cross-examine the inspector and find out and

have the inspector tell the jury that they didn't even look

at the best evidence that they've had, that we went to great

lengths to be able to get.  So, again, nothing was hidden.

Did Dr. Thomas not take affirmative means to be

able to go and secure documents that were on Ms. Reyes' file?

Maybe, but I don't think there was willfulness on

that.  I think in her beliefs, she believed that, just like

her office has to do, they have to get the information from

its original source, which is those forms that get filled out

by the actual nurses.  And then you have the managed care

portal system, which then would be the second source of

getting the information.

You heard Ivia Rosado testify that human error

could occur on the spreadsheets at all times.  You also heard

Dr. Thomas testify that as to those checks, they're not a

source of information because the checks don't accurately

depict when the payment was.

So even Ms. Rosado -- I mean, Ms. Reyes, even Karen

Reyes admitted that on the stand, that the checks are for the

payment period, not for the work period.  So, therefore, the

checks are not going to line up.

1          The other thing that Dr. Thomas testified to is

2     that some nurses work for multiple patients multiple days.

3     If that's the case, then there's different degrees of

4     payment.

5          So for one patient, a nurse may get paid $19.  For

6     another patient, the nurse may get $21.

7          So if you get a check and it's on one of those

8     nurses, it's not going to give you -- there's no just

9     dividing it by the hours worked because there was multiple

10    patients involved.

11         The only way you're going to drill down to what was

12    that real number is by going to the actual patient forms or

13    to those forms that we're talking about with the caregiver

14    signing.

15         So was there willfulness?  Absolutely not.  And I

16    know my client.  Absolutely not.

17         Was there prejudice to the plaintiff?  There's

18    prejudice to the defendant, not to the plaintiff.

19         There's no prejudice to the plaintiff in this case.

20    The plaintiff has had in their possession the entire time --

21    and, again, I stand here in shock because of what I went

22    through, not what my client went through.

23         I filed even a motion to try to get that hearing

24    continued.  Judge Kelly let me attend by telephone two weeks

25    or so after my surgery and waiting for my next surgery to

1    occur on my other knee.

2          No.  I stand -- they've never been prejudiced.

3    They've always had the records.  They've just chose not to go

4    after them.

5          So I really -- to me, I don't know why I'm not

6    bringing the motion for sanctions against the plaintiff,

7    because the plaintiff made us go through all the trouble of

8    bringing down all those boxes, of the hour and a half hearing

9    with Judge Kelly, at our expense and our troubles, and I even

10   going through them and reviewing them.

11         Yes, I was in Caring First's office a lot in order

12   to be able to do what I thought they would be doing.  So the

13   only one who is now prejudiced on this, I believe, is us.

14   But they're not prejudiced.  The information has been in

15   their hands this entire time.

16         As to no lesser sanctions, Your Honor, I don't

17   believe that sanctions at all should be imposed on us,

18   because in spite of Ms. Chastain's prosecutorial approach to

19   this, believing that there's always some kind of wrongdoing

20   on every angle, no.  It's her arguments in her Motion for

21   Summary Judgment and her arguments in all the motions before

22   that, all try to say that because Mr. Brand didn't argue it,

23   it must be true.

24         No.  If Mr. Brand didn't argue it, Mr. Brand may

25   have thought it wasn't relevant or germane to the issue or

1   didn't directly deal with the point.  It's not an admission

2   by omission.

3            And in this particular case, she's now trying to do

4   the same thing, saying because they didn't review something

5   that they knew they should have reviewed, that it was up to

6   me to go ahead and supply them with the evidence then to make

7   their case.

8            It's not up to me.  I'm not the plaintiff in this

9   action.  If I was the plaintiff in this action, I would have

10  gotten those original documents.  I would have asked for

11  them.  I would have got them.  I would have done what I had

12  to do, which was review them, and I would have come up with

13  the real and true correct numbers and not leaving the

14  defendant with the position to be able to argue that there's

15  something else better that should have been reviewed.

16           So that's the truth to where we are right now.

17  It's not Mr. Brand's fault.  It's not Mr. Brand telling Ms.

18  Chastain how she should conduct her case or what evidence she

19  should rely on or who she should call as a witness or what

20  documents she should review.  That's -- that's not my job.

21           My job is to my client, and I did my job and I did

22  it the best I could, and I'm one person and was under the gun

23  trying to make it all happen.  And I did.  I did my heart's

24  content.  I could stand before this Court, put my hand up and

25  say I could not have done any better, especially being the

1  one person I was and taking a year of recovery after my

2  surgeries.  So I could not have done any better.

3          And I got it all to them.  I got it all to them so

4  there's no prejudice before trial.  I have everything.  I'm

5  ready to go to trial.  They have everything.  They should be

6  ready to go to trial.  And that's it.  Thank you.

7          THE COURT:  All right.  One more question.  I think

8  the bulk of your argument -- and I think that the plaintiff

9  focused on this pretty aggressively, too -- is the prejudice.

10         I'm having a little trouble with your argument that

11 after receiving that letter in 2014 and after the testimony

12 of Ms. Rosado, which I'm sure you don't disagree with, I just

13 -- I'm having a little trouble with the assertion that

14 someone is erasing records, recording over them with the

15 knowledge of the owner of the company, and because -- I think

16 your argument is because the same information was available

17 through another source, that somehow that's not actionable.

18         And I'm telling you now that I need to make a

19 decision.  It seems to me -- and the exact language is

20 willful or bad-faith failure to obey the order.  I think that

21 Ms. Rosado erasing that information and her blunt admissions

22 here along with the doctor's testimony that in the fall of

23 2015, at least at that point she knew that the investigation

24 and the litigation was beginning, knew that the information

25 was being deleted or recorded over by Ms. Rosado and didn't

1    stop it is a bigger problem than you're acknowledging.  In

2    fact, it is a huge problem.

3         And here's what I'm not -- I reject the notion that

4    a defendant has the option of destroying whatever they don't

5    think is relevant and preserving what they think provides all

6    the information.  That's not their option.

7         It's abundantly clear that no one is to delete

8    anything.  And I don't accept the argument that while there

9    was a better source of information for what they were looking

10   for, she shouldn't have deleted it.  She was deleting it and

11   she continued deleting it after I have testimony here

12   indicating the owner of the company knew she was deleting it,

13   and that's a big problem for me.

14        I do accept your argument.  I'm not saying I side

15   with you, but I understand your argument that even if one in

16   three are met, your argument is that it didn't prejudice the

17   party.  They got it all anyway.  I understand that.

18        But I think you're giving short shrift to, number

19   one, the willful failure to obey the order.  I think there

20   was a willful failure to obey the order, and there's no

21   excuse for deleting that.

22        And I don't want to get into a situation where

23   litigants to a party get to decide on their own what they can

24   delete and what they can turn over.

25        Turn everything over in an abundance of caution and

1  we're never in this situation.

2          And I want to be clear that I don't assign any of

3  that to you.  I understand that you're representing a client.

4  I'm not there yet.  I need to review all the evidence with

5  regard to the allegations they're making against you, but I

6  have a major problem with that.  Whether or not it prejudices

7  the moving party, I have to determine that as well.  But I

8  think I'm having a lot of trouble with one and I'm not just

9  walking away from that.

10          And I hope that you as an officer of the court --

11  and you don't have to say anything because you represent

12  someone in here.  That's a problem, and I think it was

13  willful.

14          Now, was there -- was it bad faith?

15          It doesn't have to be bad faith.  It has to be

16  willful or with bad faith, and I think it was willful.

17          MR. BRAND:  Your Honor, and I certainly don't have

18  a problem if we want to put Dr. Thomas back on the stand.

19          THE COURT:  That part of the proceeding is over.

20          MR. BRAND:  Then it's the defense position that it

21  wasn't willful, that there was a belief, especially she said

22  in 2015 or 2016 -- I forgot whenever which -- which -- when

23  Ivia Rosado started to work there.

24          THE COURT:  She got back from her trip in the Fall

25  of 2015.  She learned of the litigation and knew at that

point, per her testimony, that things that needed to be
destroyed.  She also testified during the session today that
she knew, learned at some point when she came back that Ms.
Rosado was recording over and didn't stop it immediately.
That's a problem.

    MR. BRAND:  I believe Dr. Thomas, in her belief
that there was a Manage Payroll system, would have captured
all that information, which we produced, and that going to
the best source is the documents.

    I don't believe and I still don't believe, because
I think Tim Thompson said today it was the first he had heard
of it.  So he did not even know that it existed.

    I do believe that Dr. Thomas had in her mind and in
her formative belief that I've got a Manage Payroll system
that I'm producing and I've got the best source of documents
that I am producing.

    What Mrs. Rosado is doing is creating something to
help her in her job, which is to actually get to that
paycheck.  But I don't believe that she's believing that to
be a business record, so to speak.

    So it could be ignorance.  It could be -- it could
be lack of -- lack of knowledge.  It could be any of that.
But I don't believe that she would intentionally do that.
There would be no reason for that to happen, and there would
be nothing to gain by that happening, because Timothy

1    Thompson was producing those records ahead of that, and then

2    all that information became available through the managed

3    care system and through the original records, anyway.

4            So it's not like destroying them would have gotten

5    her anywhere.  As a matter of fact, when I started putting

6    together my records -- and, by the way, the plaintiff forgot

7    to inform the Court that I did -- I think it's Document

8    Number 5 in this case, a Notice of Pendency of Other Actions,

9    of which I went ahead and let them know about the Foster

10   case, for which I was producing other work and have another

11   case to prepare for at the same time and I would like my work

12   product back because that applies to an entirely different

13   case.  That's the Foster case.

14           So they were aware of those -- they were aware of

15   the pendency of that case this entire time and, as I said,

16   Document Number 5.  So to come now and try to say otherwise

17   is not happening.

18           But, again, Dr. Thomas would have nothing to gain

19   by if she actually believed that Ivia Rosado, by making those

20   notes -- and one of the e-mails that I just saw that the

21   plaintiff submitted to Your Honor, one of the e-mails I

22   even -- it may even be the letter, I told them what was

23   happening.  So I'm the one who brought that forward and said

24   it was Ivia Rosado's belief that producing that -- those

25   records were the same as if she were scribbling notes in

order to get to her paycheck.

So she was -- they're not believing that these were actual business records to be produced.  They believed that the business records to be produced were the managed care system, which is a more formal document system that contains everything, as well as the original records.

But with Timothy Thompson producing them before and with us giving them what we gave them afterwards and with the original records being what they are, there would be nothing to gain at all by the destruction.  That's why for Ms. Reyes, when she deleted the files, we recreated -- we were able to recreate them.

So did we complain?  Yeah, we complained.

Did it slow us down?  It slowed us down.

But we then said, hey, wait a minute.  You know what?  Why are we complaining?  Because all the waste of time doing that, we need to just go ahead and hit the records and --

THE COURT:  You're talking about the master list that you recreated?

MR. BRAND:  I'm talking the records show -- yes, the records -- the master list were in two different cases: one for the Foster case, one for this case.  And they were living documents.  They were being constantly updated, constantly regenerated.  It was a lot of work.  And as I

1    said, I don't have an entire Department of Labor force behind

2    me.  I'm me.  I'm one person.

3              So did I utilize their help?  Yes.

4              Did they utilize my help?  Yes.

5              And there was living, breathing documents going

6    forward back and forth.  But there's no court order saying I

7    had to do that.  That's actually us trying to give them the

8    truth, justice and the American way that they're seeking.

9    That's us coming forward and offering transparency.  That

10   wasn't the other way around.

11             If we were trying to hide something, there's no way

12   we would be creating something.

13             THE COURT:  Their names weren't on that master

14   list, though.

15             MR. BRAND:  It is.  And I think, as I say in my

16   Affidavit, my name is in one of those lists because -- I

17   don't -- I can't remember.

18             THE COURT:  The investigator testified that there

19   were names of nurses that weren't on those master lists, that

20   she personally interviewed and discovered were missing from

21   the master list.

22             MR. BRAND:  I -- I -- I can't -- I can't talk to

23   that issue.  I don't have -- I could tell Your Honor that

24   there's no way that myself or anybody I know would

25   intentionally try to omit nurses.

1              THE COURT:  All right.  Let's assume I accept your

2    explanation that no one intentionally tried to omit the

3    nurses.

4              You know how you can make sure all the nurses are

5    on the list when they get turned over?  Don't delete anything

6    once the litigation begins.

7              And I know that your -- we're two ships passing in

8    the night when you continue telling me that you don't believe

9    and you're vouching for your client that your client had any

10   negative intentions, and I take that at face value.  I have

11   to go on actions and words.  That stuff shouldn't have been

12   deleted, and Ms. Rosado should have immediately been stopped

13   from deleting that.  In fact, the doctor's own son said that

14   he was stunned to hear that that was going on.  So he knew it

15   was a problem.

16             So why didn't they stop it when they found out

17   about it?

18             MR. BRAND:  Again, I believe that --

19             THE COURT:  I believe.  I believe.  I believe.

20             MR. BRAND:  Well, I believe the testimony from the

21   doctor was that the Manage Payroll system covered that as

22   well as the original records.

23             THE COURT:  Again, I take you at face value the

24   Manage Payroll system, assuming your argument, covers that.

25             But my proposition to you that has gone unresolved

1   is the defendants don't get to decide what they record over,

2   what they save over or what they destroy.   Once the

3   litigation begins, it all stays.

4          So I appreciate your argument, and I think the

5   battle lines are drawn over element number two on the

6   prejudicial effect of this, and I understand your argument.

7          Notwithstanding the fact that I am firmly convinced

8   that the deletion of those -- no, ma'am -- were willful.   I

9   understand your argument they've got to get all three.   And

10  your argument is that they haven't been prejudiced because

11  the items that could have been available are available, and

12  they should be ready to go to trial.   So I understand that

13  argument and I thank you for your argument.

14          MR. BRAND:   Thank you, Your Honor.

15          THE COURT:   The plaintiff has more time now.   You

16  went over but I was interrupting.   So I gave you more time,

17  not including my interruptions.   So you have four minutes

18  instead of two now.   Are you ready to proceed with your final

19  argument?

20          MS. CHASTAIN:   Thank you, Your Honor.   Yes.

21          THE COURT:   All right.

22          And I'll give you more time, too.

23          Come on forward.

24          This is going to turn into a bit of an appellate

25  argument.

1          No.  You come forward, ma'am.  It's their argument

2     that, hey, you had to take the long and winding road to get

3     from Point A to Point B, but you're at Point B and everything

4     you need to go forward, you now have, notwithstanding the

5     fact that you were inconvenienced somewhat in getting there.

6          So how do you argue with his position that you're

7     not prejudiced?  You have it all and you're ready to go to

8     trial.

9          MS. CHASTAIN:  Your Honor, I disagree that we have

10    it all.  We -- as shown by our exhibits that we submitted, it

11    will cost $35,000 and take weeks, if not months, to recreate

12    a spreadsheet based on the Patient Service Logs.

13         And, frankly, Your Honor, we have no confidence

14    that the Patient Service Logs are complete and accurate

15    records.  They were kept in this course of business and

16    stored in a certain way.

17         At the end of the day, I think that it's impossible

18    to have confidence that the back wage computations we reach

19    are going to be accurate.  And I recognize that that goes to

20    damages, not necessarily to the kernel of this case.

21         But, Your Honor, I can't help but comment that this

22    hearing shows me that -- or I -- defendants seem to have a

23    hard time remembering their own stories in this case.  And I

24    know time has passed and memories could be to blame for some

25    of it, but I believe that the defendants have shown

1    themselves to be not entirely credible.

2           And given that and given the spoliation of evidence

3    in this case and the continued misconduct after the rebuke of

4    Judge Kelly over a year ago, they have not taken this

5    litigation seriously.  I don't know how we can expect them to

6    do so moving forward.  And I do think the default is the most

7    appropriate sanction for this continued misconduct.

8           THE COURT:  All right.  So let's say for the sake

9    of argument, just to make sure that all your bases are

10   covered, that I don't accept your notion that the only

11   solution is default.  Give me your -- go on ahead and state

12   your alternatives.  And I have them in writing, if you want

13   to argue for an alternate remedy, assuming that I find that

14   there was fault on behalf of the defendants.

15          MS. CHASTAIN:  Yes, Your Honor.  As I mentioned

16   earlier, there's lesser sanctions, such as finding in favor

17   of plaintiff for the willfulness alleged as well as finding

18   the good faith was not satisfied under the F.L.S.A., finding

19   that as a matter of law.

20          Also, a lesser sanction could be striking the

21   affirmative defenses of defendants.  And, of course, there

22   are monetary sanctions that I think would be appropriate in

23   this case.  You know, the costs associated with this

24   misconduct are fairly clear.  We have not to date quantified

25   them out of attorney hours, but just the processing fees are

 1   substantial.

 2              THE COURT:  One minute.

 3              MS. CHASTAIN:  Yes, Your Honor.

 4              Oh.  And, Your Honor, I do just want to point out,

 5   once again, that the plaintiff just last -- two weeks ago

 6   subpoenaed from Wells Fargo copies of the paychecks, and we

 7   were only able to get a sampling, given the time frame before

 8   this hearing, but had no problems recovering a large number

 9   of sampling of paychecks from this time period, all of which,

10   as I said, indicate that the relevant information is in the

11   memo line.

12              I have not seen a single one which does not include

13   the information that we would need to compute back wages,

14   contrary to Judge (sic) Thomas's statement.  And it belies

15   defendants' claim that they could not have received these

16   checks.

17              You know, as the actual custodians -- or the actual

18   owners of this banking account, they could have received

19   these checks even without a subpoena.  But certainly if they

20   felt it necessary to subpoena it, they could have recovered

21   them, you know, as soon as the Secretary sought them in 2016

22   through discovery or when the Court ordered them to produce

23   them, also in 2016.

24              So their conduct has really been -- I mean, I don't

25   see how we can find that it wasn't willful when they not only

destroyed the records that have the information on its face,
but failed to come forward with the evidence that summarizes
the same information in the best format, which could have
been produced chronologically.  It would have been simpler to
do this analysis.

As a possible sanction, Your Honor, I would suggest
that Your Honor order the defendants to produce immediately
all the checks to the 107 nurses listed on Appendix A for the
time period in which the payroll spreadsheets were destroyed;
and to pay the $6,000, $6,500 it would cost for our vendor to
analyze the paychecks as opposed to the Patient Service Logs,
which, again, I believe are not particularly good records for
doing this analysis; and also pay the Secretary the $7,299
the Secretary spent copying all of the Patient Service Logs,
which ultimately ended up being not useful for our
determination.  So that would be another sanction that we
think would be appropriate.

THE COURT:  You are out of time.  I will certainly
take a look at your recommendations.

If both of you want to come up to the podium, just
a couple of housekeeping things.  I'm going to get -- both
you and opposing counsel.  All counsel are welcome up to the
podium.

All right.  So in order to make sure we're moving
smoothly as we approach trial, I know that you can't prepare

in earnest until you know what my order is going to be.
We're going to be working on that.  It's going to be a
priority here, as trial is looming.

Once we decide -- once I issue my order, I'm going
to give you about 48 hours and we're going to appear
telephonically to talk about where we're headed at that
point.

Assuming we're still headed for trial, I want to
make sure that you're clear.  If you -- I'm confident that
being admitted to the Middle District, you've read the local
rules.  Make sure you brush up on them, because I'm going to
be pretty strict in terms of enforcing them during the trial.

So a couple of things.  If you can agree to the
pre-admissibility of any items that are on your exhibit
list -- and you're going to have to create an exhibit list --
let me know because we can open up by just pre-admitting all
those items and just moving into the actual meat of the
litigation.

Make sure that you have -- anything that you're
going to be presenting, you probably need three copies:  one
for the Court, one for opposing counsel, one for you.

Both of you should make sure that you employ that
tactic, because that prevents the other side from saying, I
don't know what you're talking about.

You hand it to them not just when you walk into

1    trial, but as soon as you have it put together, that we can

2    put all that to rest.

3            When we begin, I am going to take a wholistic

4    approach here, and whatever I do or don't do may result in

5    some -- narrowing down some of the issues that we may be

6    going to trial.  And assuming you get a remedy and you've met

7    your burden, I think that's where I'd be headed in terms of

8    narrowing the focus of the trial.

9            And I think the elephant in the room here is the

10   employee/independent contractor dichotomy.  That's really,

11   for me, the most important component of this, and I think

12   that's really going to dictate a lot the direction the trial

13   is going to move.

14           This is an F.L.S.A. case.  We have destroyed

15   records and I need to make a determination on why and how

16   they were destroyed, but that creates certain presumptions in

17   favor of the plaintiff in this case.

18           So I would implore that both of you focus

19   aggressively on litigating what I consider is the most

20   important issue in front of the Court:  on the classification

21   of these nurses.  Are they independent contractors or are

22   they employees?

23           Because I think once that decision is made and it's

24   going to be part of your overall presentation, that's going

25   to pave the way for how the rest of the litigation is going

1    to go.  In my view, there's nothing more important than that

2    right now.

3          And even, hypothetically, if you were to receive a

4    lot of the remedies you're asking for on this Motion for

5    Sanctions, that's still the elephant in the room.  And if you

6    don't meet your burden there, they pretty much walk away.  If

7    you meet your burden there, then there are going to be a lot

8    of other challenges for the defendant to face at that point.

9          So I have the information I need.  Thank you for

10   the evidence.  To make sure, I've already read what the

11   government's exhibits are that have been admitted.

12         As we stand, there are only two exhibits that were

13   identified by the defendant:  One was Defense Exhibit 1 that

14   was not admitted into evidence; and Defense Exhibit 2, which

15   was a lawyer demand letter that was admitted when Ms. Reyes

16   was on the stand.

17         Is that your understanding of the evidence you

18   submitted, from the defense perspective?

19         MR. BRAND:  I believe so, Your Honor.  I believe

20   so.  I believe it was Number 2 that came in.  Number 1 did

21   not.

22         THE COURT:  All right.

23         Anything further from the plaintiff?

24         MS. CHASTAIN:  No, Your Honor.

25         THE COURT:  From the defense?

1          MR. BRAND:  Yes, Your Honor.  Over the course of

2    the last week, week and a half I found out the following as

3    it relates to a November trial date.  What the Court is --

4    what I'm about to tell the Court is Dr. Thomas is actually in

5    medical school and is trying to finish up the semester and

6    will have exams at the -- November, going into December.  And

7    I have had --

8          THE COURT:  You said he lives in Georgia.  What

9    medical school is he in?

10          MR. BRAND:  No, no.  That's -- that's Timothy

11    Thompson.

12          THE COURT:  Oh, I beg your pardon.  The doctor is

13    now pursuing her MD?

14          MR. BRAND:  Correct.

15          THE COURT:  I understand.

16          MR. BRAND:  Correct.  She's in medical school.

17          THE COURT:  All right.

18          MR. BRAND:  So she is asking if we could do it

19    on -- on break.

20          Also, I've had a number of witnesses, which are all

21    nurses, and then I've had my wife tell me that during that

22    time that we had scheduled, we had holiday plans, travel

23    plans as well, and everybody is like this with me.

24          THE COURT:  I'm in trial every week starting next

25    week until the third week of December, and I'm going to have

1    trials that are starting to get scheduled then.

2         I don't think -- we're shorthanded in the Middle

3    District.  This is a civil case and you're asking for two

4    weeks.  It would take a miracle for me to be able to open up

5    another two-week period.  And, quite frankly, I think I've

6    warned everyone that if I have a criminal case with a speedy

7    trial challenge, then you're going to get bumped anyway.

8         You're a priority civil case for me.  That's why

9    I've given you a firm trial date, but I just can't commit to

10   moving this again.

11        And there is one way that this could get moved, and

12   I think you've already acknowledged that you'd be willing to

13   consent, but the plaintiffs have not exhibited any

14   willingness to consent.  I'm not trying to browbeat you here,

15   but the only way you're going to get alternate dates at this

16   point is if you consent to the magistrate judge presiding

17   over the final judgment here.

18        Both of you have to agree, and if you're not

19   agreeing, this is pretty much in stone.  And unfortunately

20   for you, you could still get bumped by a criminal case.  I

21   have such a heavy criminal docket right now, but there's

22   nothing I can do about that.  And, obviously, you're aware of

23   the fact that the magistrate judges cannot preside over these

24   criminal cases.

25        So it is what it is.  I can't move it.  There are

1  other things you can do.  If you have final exams in medical

2  school, there's no need for every representative of the

3  business entity to be here sitting at the table throughout

4  the entire trial.  There are things that can be done to give

5  you some relief in that regard.

6          But if she's going to be called as a witness, she's

7  definitely going to have to be here when it's time to

8  testify.

9          So I can't help you with that.  I can tell you that

10  you are the -- you and one other civil case -- and the other

11  civil case is only a four-day case -- are the only two civil

12  cases on my docket that have firm trial dates at this point

13  for the rest of the year.  And I don't plan on giving any

14  other civil litigants any more trial time.  There's nothing I

15  can do.  So you're going to have to make do with that.

16          Again, if both of you decide that you've had enough

17  of me and you want to consent, that's the only other way I

18  can offer you another level of flexibility.

19          Either way, I will have an order out as soon as

20  humanly possible, but these are pretty much written in stone,

21  unless you get bumped for criminal.  There's nothing I can do

22  about that.

23          But thank you for bringing those concerns to my

24  attention.

25          MR. BRAND:  Thank you, Your Honor.

1          THE COURT:  All right.  All of you, have a good

2     rest of the day.  Thank you.

3          (Proceedings concluded at 5:30 p.m.)

4                - - - - - - - -

5               Reporter's Certification

6     I certify that the foregoing is a correct transcript from the

7     record of proceedings in the above-entitled matter.

8                              s/Diane Peede, RMR, CRR
                               Official Court Reporter
9                              United States District Court
      Date:  October 30, 2017  Middle District of Florida

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25