**1**

```
1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                   ORLANDO DIVISION

3
    - - - - - - - - - - - - - - - X
4   R. ALEXANDER ACOSTA,            :
    Secretary of Labor,             :
5   United States Department of     :  Case No.:
    Labor,                          :  6:15-cv-1824-Orl-41GJK
6                                   :
            Plaintiff,              :
7                                   :  Orlando, Florida
    vs.                             :  January 10, 2018
8                                   :  1:40 p.m.
    CARING FIRST, INC.; IVANAH      :
9   V. THOMAS, an individual;       :
    and TIMOTHY THOMPSON, an        :
10  individual,                     :
                                    :
11          Defendants.             :
                                    :
12  - - - - - - - - - - - - - - - X

13                   TRANSCRIPT OF
    TELEPHONIC HEARING ON RENEWED MOTION FOR SANCTIONS
14      BEFORE THE HONORABLE CARLOS E. MENDOZA
              UNITED STATES DISTRICT JUDGE
15

16  APPEARANCES:

17
     Counsel for Plaintiff:        Lydia Chastain
18                                 Melanie Paul

19   Counsel for Defendant:        Craig Brand

20
    Proceedings recorded by mechanical stenography.
21  Transcript produced by computer-aided transcription.

22
    Court Reporter:   Suzanne L. Trimble, CCR, CRR, RPR
23                    Federal Official Court Reporter
                      401 West Central Boulevard, Suite 4600
24                    Orlando, Florida 32801
                      e-mail: trimblecourtreporter@gmail.com
25
```

*2*

P R O C E E D I N G S

1

2       THE COURTROOM DEPUTY:  This is the case of Secretary

3   of Labor, United States Department of Labor v. Caring First

4   Inc., Ivanah V. Thomas and Timothy Thompson, Case

5   No. 6:15-cv-1824.

6       Will counsel please state their appearances for the

7   record?

8       MS. CHASTAIN:  Good afternoon, Your Honor.  This is

9   Lydia Chastain with Secretary of Labor.

10       MS. PAUL:  Melanie Paul for Secretary of Labor.

11       MS. CHASTAIN:  With us also on this call is Melanie

12   Stratney (phonetic spelling), Wildali DeJesus, and Liz

13   Podczaski.

14       MR. BRAND:  Craig Brand on behalf of the defendants,

15   Your Honor.

16       THE COURT:  All right.  We're gonna break this up

17   into three different parts.  The first part is the continuance

18   on the medical issue.  The second part will be the issue about

19   the subpoenas and when they were served.  And then we'll take

20   up whether or not this trial is gonna move forward as

21   scheduled.

22       So I'm in receipt from a Dr. Brown here in Orlando,

23   the business is called House Call, and it is what it is.

24   Mr. Brand, would you like to supplement your letter with any

25   further argument at this time on this continuance?

*3*

1        MR. BRAND:  All I can tell Your Honor is that I had

2    to move heaven and earth in order to just get what I was able

3    to get.  And I believe that the cardiovascular surgeon is

4    trying to fit Mr. Thompson in today or tomorrow.  And other

5    than that, I just know that he's got a 50 to 69 percent

6    blockage of his internal coronary artery and still is

7    complaining of left side numbness, weakness, and blurred

8    vision.  And other than that, I don't know anything else.  The

9    mother is running around trying to get him doctors'

10   appointments.

11        THE COURT:  All right.  Ms. Chastain, would you like

12   to make any comment on this?

13        MS. CHASTAIN:  Yes, Your Honor.  Thank you.  I would

14   note that the letter submitted by Mr. Brand is not admissible

15   evidence.  It is not an affidavit or a sworn statement.  It is

16   hearsay.  And we have no way of -- given the short time

17   period, Your Honor, we've had no way of confirming this is in

18   fact a true statement of Mr. Thompson's medical condition.

19   Also, this letter does not indicate if or when Mr. Thompson

20   will ever be available as a witness to appear in this case.

21   It seems that his illness is chronic, potentially stress

22   related.  Such an illness or the duration of illness is not

23   ascertainable.  It's improper, I think, under these

24   circumstances to postpone a trial.

25        And I have a case, Your Honor.  It's *United States*

**4**

1   *v. Amaya*, 533 F 2d. 188.  It's a Fifth Circuit case that

2   stands for the proposition that duration of an illness, when

3   it is long enough, is an improper reason for continuance.

4              THE COURT:  All right.

5              MS. CHASTAIN:  In addition, Your Honor, if I may --

6              THE COURT:  Yes.

7              MS. CHASTAIN:  If the Court does find this evidence

8   to be sufficient to find that Mr. Thompson is unavailable, the

9   Secretary argues that we can continue and proceed without

10  Mr. Thompson being present.  Due process does not require

11  Mr. Thompson to be present.  This is a civil matter, not a

12  criminal matter.  Mr. Thompson has been deposed, and under

13  Rule 804(a)(1) his deposition testimony can be admissible if

14  he is indeed found to be unavailable.

15             And finally, Your Honor, if that does not satisfy

16  the Court, as a last resort, the Secretary offers to sever

17  Mr. Thompson from this matter, to try his liability as a

18  treating employer at a -- at a different date and proceed on

19  Tuesday with the issue of liability as against Caring First

20  and Dr. Thomas.

21             THE COURT:  All right.  Thank you for your argument.

22  I will take that under advisement.  I will have a decision for

23  you within the next 24 hours.

24             All right.  So let's move on to issue number two.

25  And I'm reading one of the attachments that Ms. Chastain

1 submitted with her most recent motion. I'm not gonna read it

2 to you word for word, but it seems that there was a bit of

3 communication that went on between the parties on November

4 the 8th, and then this communication continued until November

5 the 13th, when Mr. Brand finally said, *Thanks. I'll be*

6 *sending them a subpoena.*

7         Let's start with the basic issue here. Mr. Brand,

8 you told me yesterday that you had filed two subpoenas. Are

9 you still standing behind that statement?

10         MR. BRAND: 100 percent.

11         THE COURT: So you served two subpoenas?

12         MR. BRAND: 100 percent.

13         THE COURT: All right. Where is the second

14 subpoena? The bank says they never got a second subpoena.

15 Where is it?

16         MR. BRAND: That's, that's why the second subpoena

17 was served. So if I may -- if I may explain, Your Honor.

18         THE COURT: What were the dates they were served?

19         MR. BRAND: The problem is I'm in Denver, Colorado,

20 now, and the only thing I have in Denver, Colorado, are

21 everything I needed to prepare for trial, which is my trial

22 notebooks --

23         THE COURT: So you don't have a copy of the subpoena

24 that you served in your working file?

25         MR. BRAND: I don't have my working file with me. I

1  don't even have the second subpoena with me.  I had the --

2  luckily, I had the scan of the certificate, the green card

3  that was scanned that I had in my computer, but I do not

4  have -- the working file is too large.  I don't travel -- I

5  couldn't travel with it.  So the only thing I have here in

6  Denver is my trial notebooks, everything I was reading to

7  prepare for trial.  Everything else is back in Orlando.

8       THE COURT:  What do you mean *back in Orlando*?  Do

9  you have an office here in Orlando?

10      MR. BRAND:  I do have an office.

11      THE COURT:  Is there anyone who works in that

12 office, other than you?

13      MR. BRAND:  No.  At this point, Your Honor, it's a

14 virtual office.  When I moved to Colorado.  I moved out to

15 Colorado to stop the practice of litigation and --

16      THE COURT:  Just listen.  I just want some questions

17 answered.  I don't need a long answer for each one.

18      You have a virtual office here in Orlando where you

19 have stored most of the materials that you need for this

20 trial.  Is that correct?

21      MR. BRAND:  Actually, the material that is stored --

22      THE COURT:  Is that correct, yes or no?

23      MR. BRAND:  No, not at that office.

24      THE COURT:  All right.  So where is the file that

25 contains the second subpoena or proof of it that you're

1  telling me of, if it's not in the virtual office?

2        MR. BRAND:  That is at a friend's house where I will

3  be staying during the trial next, next week.

4        THE COURT:  And the friend, you could not call the

5  friend and have them either e-mail it to you, .pdf it to you,

6  or fax it to you?

7        MR. BRAND:  I did call the friend and I did ask him

8  if he could go through the file, and he has no idea what he

9  was looking at, and the short answer is, Your Honor, he was

10  not able to find it, and he was not able to look for it and

11  had no idea what it would look like or where it would be in my

12  trial -- in, in those boxes.

13        THE COURT:  So I guess the question I have then is,

14  if you served two subpoenas on this bank, why does the bank

15  only have one subpoena that's ever been served on it by you,

16  your law firm, or your clients?

17        MR. BRAND:  And I have an answer.  My answer is I

18  did serve them with a first subpoena.  I gave them about ten

19  days.  I called up to find out what the status was with the

20  subpoena, when I could expect my records, make sure that they

21  would be electronically sent to me.  The bank said they had no

22  mailing whatsoever of it, that they do not have it.

23        I said, Okay, if we're gonna play that game, then

24  I'm gonna send you another one.  And I sent them another

25  subpoena, and that makes the second subpoena.

*8*

1      THE COURT:  How far apart were the two subpoenas

2  that you sent time-wise?

3      MR. BRAND:  Best guess, ten days to two weeks.

4      THE COURT:  Okay.  Let's for the sake of argument

5  say that it was two weeks then.  According to my records here,

6  the subpoena that you eventually sent -- my deadline was

7  November the 3rd, and the subpoena that you eventually sent

8  was -- help me, Steven.  What's the date?

9      LAW CLERK:  27th.

10      THE COURT:  The 27th.  So if I take 20 days off of

11  that, it's still untimely.  So I guess my question is, as of

12  November the 13th no subpoena had been sent, and I guess what

13  you're telling me is subsequent to the 13th -- and two weeks

14  before the date of the actual subpoena we have proof of would

15  have been around the 13th.  That's when you sent your first

16  subpoena?

17      MR. BRAND:  That is when I sent the first subpoena,

18  yes, Your Honor.

19      THE COURT:  All right.  I understand.  So both of

20  the subpoenas were, then, untimely.

21      MR. BRAND:  There were other things that were done

22  ahead of time that were -- that were not a subpoena, but there

23  were other things that were done ahead of time in good faith

24  to make sure that we had compliance with the Court's order.

25      THE COURT:  All right.  Ms. Chastain.

1          MR. BRAND:  If Your Honor would like, I can explain.

2          THE COURT:  Go on ahead, Mr. Brand, if you wanted --

3          MR. BRAND:  Thank you, Your Honor.  Your Honor,

4    immediately after the Court issued its order and the Court put

5    the burden upon us to go out and get the records, my client

6    went to the bank, met with the bank officers.  Tyler Huber, a

7    personal banker from Wells Fargo, put in the request, filled

8    out the paperwork.  I was told that she would be able to get

9    all of the copies of her checks, and in fact I did file the

10   October 30, 2017, letter that I did file this morning from

11   Wells Fargo confirming that Ivanah Thomas went to the bank and

12   made a request for all of those documents.

13          The letter then says due to the size of the request,

14   Wells Fargo cannot guarantee that we'll have copies to the

15   customer by Friday, November 3rd.  The documents are being

16   generated.

17          Now, I got on the phone after -- I personally got on

18   the phone after my client went there.  I spoke with Mr. Huber.

19   I spoke with somebody else at the bank.  They told us that

20   they will expedite this and that we will have our records and

21   that not only that, but they said that they would be able to

22   electronically provide them to us, which would speed up the

23   time so that they would not have to copy them.

24          I even called up Ms. Chastain.  I informed

25   Ms. Chastain.  I may even have an e-mail to her saying that

1   the bank has told me that they would be able to send us

2   electronic copies of these records.  They were happy.  It

3   seemed like everything was going absolutely great with the

4   bank.

5          Then what happened was the bank on its own, without

6   my knowledge at all, the bank sent another letter, which I

7   filed -- I'm looking for it right now -- stating that they

8   unilaterally decided on their own, without calling my client

9   or without calling me, to cancel the order because they were

10  gonna charge $34,000 per year to my client for the checks and

11  that my client did not have $34,000 in her bank account, and,

12  therefore, they were cancelling what they said that they would

13  do.

14         I got on the phone with Mr. Huber.  I got on the

15  phone with Mr. Huber's boss.  We had long conversations.  They

16  said that they were -- I pleaded with them.  They said that

17  they were gonna go ahead and bring it up to legal, and that

18  they would be able to give -- come back and give me an answer

19  as to that.  I did speak to somebody who called me in my car.

20  We did have a conversation as to, again, lowering the cost and

21  making this happen.

22         I did say, Why would you be charging me for copies

23  if I don't want copies.  Just please e-mail them, and I'll

24  take them on a rolling production.  Please make that happen.

25  I was affirmatively assured that that sounded reasonable, that

1    they will make that happen.

2           I received a letter which I filed, another letter

3    saying that the bank will not do that.  That was in, I think,

4    November -- oh, here it is -- no -- looking for this letter

5    right now, Your Honor.  I'm sorry.  My desk is a bit messy

6    right now -- from the bank saying that they are not going to

7    do that.  They were gonna stick with the $34,000.

8           I then was in contact and communication with

9    Ms. Chastain to find out if her subpoena was still ongoing.

10   She wrote back to me and said her subpoena was not still

11   ongoing.

12          Then I said, Okay, I'm gonna send out my own

13   subpoena, which I went ahead and did.  I then said, Okay, I'm

14   gonna send out my own subpoena.  Sent out my own subpoena.

15   Gave the bank enough time to get it and what I figured to

16   process it.

17          And the bank then told me, Oh, no, what subpoena?

18   What are you talking about?  We don't have anything from you.

19          I'm like, Okay, you're going to play this game.

20   Here you go again.  Sent them out another subpoena, and that

21   was the subpoena that even Ms. Chastain acknowledged happened.

22          By the way, Ms. Chastain in her motion, she even --

23   she even cited that in fact the bank told her that they did

24   have a subpoena from me.  That was my second subpoena.

25          But the names that she got and the calls that she

1   said she made to the bank, those were given -- and I have it

2   in an e-mail to her -- those were given by me because I was

3   the one that was in contact with the bank.  I was the one that

4   was leaving all kinds of messages to the bank.  I was the one

5   that was -- I mean, I got irate at many points on this and was

6   getting all kinds of phone calls back from it.  I even have

7   messages on my voicemail on my phone from the bank.  I did --

8   I was doing everything -- I was doing everything within my

9   power.

10          And the problem is, Your Honor, I was, for lack of a

11  better word, I was -- it's my fault.  I understand it's my

12  responsibility.  But I was a sucker.  And I had good faith to

13  believe that -- I mean, I was screaming at people to the point

14  where managers were calling me back and telling me, We will

15  take care of this, Mr. Brand.  We will get these in.

16          Twice they asked me for extensions in time.  Twice I

17  told them, You cannot have it.  I said, It's not about me.

18  There's a court order.  I have to have these.  They said they

19  understand.  They will comply.  They were telling me this,

20  Your Honor.

21          I mean, I kept speaking to different people and

22  different people -- and it's my stupidity.  And I really

23  acknowledge that now in hindsight.  It really was my stupidity

24  for being so gullible to believe that the people that were

25  telling me, they were managers of the departments, and it went

1    back and forth with several managers.

2          One of the managers even told me that they had a

3    shake up and that Wells Fargo subpoena department and the

4    other managers are no longer there. Now they're dealing with

5    me. And they're gonna be taking care of this, still on top of

6    it.

7          Even as of -- I had 14 hours of depositions

8    yesterday, and I'm still calling the bank screaming at them

9    and maybe the day before.

10         And I get a letter on January 9th which I filed from

11   the bank, now a Jamal Brown, who I didn't even talk to, saying

12   that, We're on this now, and we'll have these documents to you

13   within, I believe, two weeks' time.

14         So, Your Honor, I did -- I was acting in good faith,

15   in hindsight gullible. In hindsight I probably should have --

16   I probably should have filed a motion with the Court to compel

17   Wells Fargo. I just was believing what I was being told, and

18   I was speaking to people that I thought did have the authority

19   to make this happen.

20         And everybody understood I was not after

21   13,000 pages of copies. Nobody had a standard printer machine

22   to do it. But all they had to do was locate the records, put

23   them into an e-mail, and just hit send and do it.

24         And everybody I was speaking to was understanding

25   that, and they were like -- they were like, Okay, we get it.

1   It's not a problem.  We're going -- we're now the one in

2   charge of this.  We're going to make this happen.  And, again,

3   Your Honor, I apologize.  I was acting in good faith.  Again,

4   hindsight -- you know, yes, I should have done more.  Yes, I

5   believe that these people were going to do it.

6           And then even, even a letter that I received on the

7   9th from Wells Fargo from Jamal Brown -- who I've never even

8   spoke to, who is operation, her title is operation manager --

9   was because I was on the phone with a Leeds Young (phonetic

10  spelling) who was telling me they're the operations manager,

11  and they will make sure it's done immediately.  And I'm like,

12  I need it done today, and they're like, Today.

13          And then I get the letter on January 9th which I

14  filed saying that they're now getting to it.  Again, not even

15  going back to the whole process I was talking about.  So

16  apparently Wells Fargo doesn't seem to have their act together

17  again, and I'm not excusing myself for not doing more.  I can

18  tell Your Honor the only -- again, without beating a dead

19  horse, I really believed I was getting this stuff.

20          If you look at my e-mails to Ms. Chastain, my

21  responses were -- I mean, I was I was enlightened -- or,

22  delighted because I really did think that we were getting

23  this.  I had nothing to hide.  I didn't want to hide anything.

24  I wasn't trying to hide anything.  I wasn't trying to hide

25  anything.  My client went right away and requested the

1    records.  We thought we were getting the records.  And, again,

2    the bank unilaterally on us decided they're not gonna give it

3    to us.

4            And, Your Honor, you know, the fights I had with the

5    bank to overcome the $34,000 a year issue, I was on the phone

6    with the bank once, twice, three times every single day until

7    I believed I had that resolved.  And then after we finally got

8    that letter saying basically everything we talked about, it's

9    like it didn't happen.

10           So that's when I decided I was gonna send -- that's

11   when I called -- I spoke to Ms. Chastain, I think it was by

12   e-mail, found out their subpoenas weren't even around anymore,

13   and I sent out mine.  And all that happened right at that

14   time.  It's not like I wasted any time.  It's not like I let

15   any big time delay go by.

16           And if you look at that initial letter from the

17   bank, we were telling them that we have a November 3rd

18   deadline, and we need it.  And that was the deadline that I

19   was fighting for with the bank the whole time to get it done.

20           Ms. Chastain does have an e-mail to me very recently

21   that she filed, part of the exhibit filed this morning, that

22   says that they need one week to be able to review the bank's

23   record and come up with -- come up with a number.  And if that

24   is all the case that is needed, then I have an easy solution,

25   and the easy solution, I believe, would make a lot of lives

1    easier, which would be try the issue on liability.  If

2    liability is proved, then by then the banks should have its

3    numbers, and Ms. Chastain can add those numbers up, file an

4    affidavit as to what those numbers are, and that would be the

5    balance number.  If there is no liability and my -- and my

6    clients -- the people that were working with her are found to

7    be independent contractors, then this becomes a moot issue as

8    far as the damage amount.

9         But I apologize, Your Honor, to yourself.  I

10   apologize to Ms. Chastain.  I apologize to myself because I

11   really -- I feel bad and horrible to myself as well for being

12   so gullible, but really did believe that the bank was going to

13   Honor their own client's demands and requests and the

14   paperwork they filled out to make sure they would have their

15   client's checks in their client's hands after they make

16   Dr. Thomas fill out the paperwork and the telephone calls that

17   they had with me.

18        But I did send out that subpoena as soon as I

19   determined that there was a problem to be had and that in fact

20   it didn't seem that the bank cared that their own client

21   filled out the request to get copies of their own checks.  I

22   immediately sent out those subpoenas.  And, yes, I am speaking

23   100 percent to the fact that two subpoenas were sent out.  I

24   know for a fact two subpoenas were sent out.  The second one

25   was sent out immediately upon realizing that the bank is

1   playing games with me on this.

2         And I apologize.  I apologize to everybody.  But it

3   still goes back to -- and I'm not excusing it.  I'm not making

4   excuse.  But those checks I still claim are not best evidence

5   of the time or the hours here, but I'm not -- I'm not gonna

6   get into that argument, unless the Court wants me to.  But,

7   Your Honor, I do take responsibility, and I take

8   responsibility for, I guess, being stupid.  And I apologize.

9         THE COURT:  All right.  Ms. Chastain, would you like

10  to respond?

11        MS. CHASTAIN:  Your Honor, I think Mr. Brand's own

12  filing shows that a subpoena wasn't issued to the bank until

13  November 30th.  I know of no way you can request records from

14  a bank such as Wells Fargo less than a subpoena, particularly

15  the kind of volume we're seeking here.  The other steps taken

16  by his clients, I think, were woefully insufficient and in

17  were fact were woefully insufficient.

18        So the meaningful first step Mr. Brand took to

19  comply with the Court's order was not until November 30th, and

20  that was long after the Court's initial deadline.  We still

21  believe that sanctions along the lines proposed in our renewed

22  filing is appropriate.

23        MR. BRAND:  Your Honor, if I may just very briefly.

24  What Ms. Chastain said is absolutely incorrect.  You can

25  request your own bank records.  I mean, it's my client's bank

1    records.  My client went to the bank and requested those, her

2    records.  There is a record and a letter that I filed from the

3    bank even admitting to that fact.  So you do not need a

4    subpoena to go get your own records.

5         I mean, if I went to my bank right now and requested

6    my checks, I would hope in all sincerity that the bank is

7    going to give me my own checks.  And if not, then I guess

8    something else has to happen.

9         In this particular case I was absolutely under the

10   good faith belief that Dr. Thomas going to the bank and

11   requesting and filling out the forms for her to get her own

12   checks was in good faith and that was done immediately.  And,

13   again, there is a record that I -- there is a letter that I

14   filed this morning confirming that.

15        So I did not delay things.  I did not cause delays

16   in things.  The bank did.  And could I have maybe furthered

17   that along by filing other motions in it?  The answer is in

18   hindsight, yes, Your Honor.  And, again, I apologize for being

19   stupid.  I should have foreseen that.

20        But I really did.  I really was talking to so many

21   people that I was believing that the people I was talking to

22   got finally what I was saying, and it was just how -- I can't

23   imagine how hard it is to send me an electronic file of the

24   checks that I'm requesting.  I mean, it just doesn't seem in

25   my head something that should be so difficult.  And to this

1    day I'm still not getting it.

2            But the bank sent me a letter on the 9th, after I

3    called up and was screaming again at them and sending the

4    letter saying, Okay, we'll get on it.  We need two weeks.  I

5    don't know why they need two hours to do something that should

6    be able to done by an electronic search.

7            I mean, Wells Fargo should be just like Bank of

8    America, which I know their programs are in Relativity

9    software.  If it's Relativity software, then it should be

10   something that should be able to be done in two minutes.

11           Again, in hindsight, Your Honor, I apologize.  I

12   fully take the responsibility for being really that -- I guess

13   that dumb, but it wasn't the only thing that was going on in

14   my life, and it wasn't the only thing that I was paying

15   attention to or maybe not paying attention to, but I did not

16   do anything in bad faith.  I did not drop any ball in bad

17   faith.  I really trusted and believed people were going to

18   give me that stuff, and I still don't understand the

19   difficulty.  But it's not like -- I mean, there was no intent,

20   Your Honor, to say, Hey, I'm not gonna do this, and I'm just

21   gonna wait until sometime after the Court's deadlines to file

22   something.  I mean, that was never my intent.  And I've been

23   doing this a long time not to do -- I mean, I've gone a long

24   time in this process by not stepping on any shoes -- toes, and

25   certainly not defying any courts.  And I wasn't gonna make a

1   practice of starting that when I'm trying to finally get out

2   of the practice of law.

3        If nothing else, Your Honor -- I mean, I don't know

4   how many other ways to say it.  I'm really sorry.

5        THE COURT:  All right.  Based on the arguments of

6   counsel and my review of the documents that have been

7   submitted, I want to be clear that on October 20, 2017, as a

8   sanction for the Court's finding that the defendants woefully

9   violated orders by destroying evidence, I set a deadline for

10  November 3rd for matters to be turned over to the plaintiff in

11  this case.

12       Reviewing the record, nothing was done, and I heard

13  of nothing being done in terms of turning this discovery over

14  until there was a January 4th, 2018, notice of defendant's

15  noncompliance with court order, and as a result of that the

16  plaintiffs have filed a motion for sanctions, Secretary's

17  renewed motion for sanctions, and that's Document 129.

18       I'm going to instruct Ms. Darleen to enter an

19  endorsed order granting the motion, 129, of the plaintiffs.

20       I'm going to make a finding that the defendants have

21  engaged -- and this is a macro view of the case, from

22  beginning until now -- and I'm gonna tell you in my own words.

23  I've never seen anything like this before.  The defendants

24  have engaged in egregious misconduct, and liability is now

25  established, and I will be entering judgment in favor of the

1   plaintiffs in the amount of $976,652.98.  That's going to be

2   the endorsed order with a more specific written order to

3   follow in the next week or two.  But I will have that order

4   out before the trial was going to expire anyway.

5          That being the case, I've heard your arguments.  I

6   appreciate your arguments.  I don't need to hear any more

7   argument at this time.  Both of you, thank you for your

8   appearance today.  From the plaintiffs' --

9          MS. CHASTAIN:  Your Honor --

10          THE COURT:  Yes.  Go on ahead.

11          MS. CHASTAIN:  I'm sorry.  I wanted to be clear that

12   our $986,000 demand is back wages only.  The Secretary also

13   believes that liquidated damages in an equal amount are also

14   due, due to lack of good faith on the part of the defendants.

15          THE COURT:  All right.  Ms. Chastain, you're going

16   to have until the end of next week to submit that secondary

17   amount, and that's subject to the Court's approval.  And I

18   will consider that.

19          MS. CHASTAIN:  Absolutely, Your Honor.

20          THE COURT:  I'm not saying I'm gonna grant that

21   amount, but that's what the sanction was initially, and I will

22   consider that amount.  But you're gonna have to do whatever

23   you can because this information is apparently not going to be

24   coming to you any time soon.

25          MS. CHASTAIN:  I agree.

1    MR. BRAND:  Your Honor, would I be able to file a

2    response brief to the liquidated damages?

3    THE COURT:  The sanction specifically precludes you

4    from doing that.

5    MR. BRAND:  Okay.

6    THE COURT:  All right.  Thank you both.  Have a good

7    afternoon.

8    Ms. Chastain, I'm gonna be ready with that order

9    probably early next week.  So I think the timing is fine, but

10   absolutely by close of business, let's make it Thursday of

11   next week, I need that information because I would like to get

12   that order out on Friday of next week.

13   Thank you both.  Have a good afternoon.

14   MS. CHASTAIN:  Thank you, Your Honor.

15   MS. PAUL:  Thank you.

16   (WHEREUPON, this matter was concluded at 2:10 p.m.)

17

18                        *   *   *

19

20             CERTIFICATE OF REPORTER

21

     I certify that the foregoing is a correct transcript of the
22   record of proceedings in the above-entitled matter.

23

24   _/s/ Suzanne L. Trimble_____            3/27/18_
     Suzanne L. Trimble, CCR, CRR, RPR          Date
25   Official Court Reporter